## I.   INTRODUCTION[1]

1.      This is a shareholder securities fraud class action on behalf of the purchasers of publicly traded securities of Dell Inc. ("Dell" or the "Company") during the period from May 16, 2002 through September 8, 2006, inclusive (the "Class Period") against Dell, Michael S. Dell ("Michael Dell"), Dell's founder and Chairman, Kevin B. Rollins ("Rollins"), Dell's former President and Chief Executive Officer, James M. Schneider ("Schneider"), Dell's former Chief Financial Officer (collectively, Michael Dell, Rollins, and Schneider are hereinafter referred to as "Individual Defendants"), and Pricewaterhouse Coopers ("PwC"), Dell's outside auditor.[2] Lead Plaintiff alleges that Defendants made false statements to investors, engaged in accounting fraud, and made billions in profits on insider information in violation of §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and of the Securities and Exchange Commission ("SEC") Rule 10b-5.[3]

---

[1] Lead Plaintiff is mindful of the fact that the instant complaint is lengthy. However, Lead Plaintiff's extensive allegations provide a level of specificity and corroboration necessary to satisfy the strict requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and a plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]," 15 U.S.C. § 78u-4(b)(1) & (2) (emphasis added). Given this burden, the length of the Complaint, which details a complex fraud scheme involving multiple bad actors and more than four years of unlawful conduct, is unavoidable. Lead Plaintiff incorporates herein by reference Dell's Form 10-K dated October 30, 2007, in its entirety. Where feasible, Lead Plaintiff has quoted sparingly from this document in order to avoid unnecessary repetition.

[2] Dell, the Individual Defendants, and PwC collectively will be referred to as the "Defendants."

[3] Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff bases its belief upon information uncovered by its investigation, conducted by and through counsel, into the facts and circumstances alleged herein including, without limitation: (a) review and analysis of certain filings made by Dell with the SEC; (b) review and analysis of certain press releases, public statements, news articles, and other publications disseminated by or concerning the Defendants and related parties; (c) review and analysis of Dell press conferences, analyst conference calls and conferences, and Dell's corporate website; (d) review and analysis of securities analyst reports concerning Dell and its operations; (e) review and analysis of certain other information, documents and materials concerning Dell and the other Defendants, including newspaper and other articles; and (f) interviews with former Dell employees.

## II.    EXECUTIVE SUMMARY

2.      During the Class Period, the Defendants engaged in a broad and complex scheme to deceive investors into buying Dell common stock at inflated prices.  More specifically, the Defendants orchestrated and executed a host of fraudulent accounting manipulations that, *inter alia*, artificially enhanced Dell's financial results and concealed the fact that Dell's business model had become dysfunctional.  From shortly after its founding in the early 1990s, through the rise and fall of the "dot com boom," Dell had successfully positioned itself as a highly efficient, low-cost manufacturer of personal computers ("PCs") that could deliver a quality product direct-to-consumers with a cost structure that was far more efficient than its chief rivals.  Dell's superior inventory management and other management efficiencies provided it with strong operating margins that fueled its growth.  Between 1994 and 1998, its annual revenues grew from $2 billion to $16 billion, representing a 50 percent annual growth rate.  After 1998, Dell's revenues continued to grow at double-digit rates.

3.      Beginning in 2001, Dell's competitive advantage over its rivals withered.  Prices for PCs fell across the board, declining 16% between 2000 and 2001, and by 2002 Dell's profit margin, which had long been the best in the business, began to decline (falling to 5.8% for the 12 months ended in mid-2002, far below Dell's five year average of 6.7%).  Also by 2002, Hewlett-Packard had surpassed Dell as the global leader in PC sales.

4.      Any declines in Dell's growth would, of course, be devastating to the Company.  Dell needed year-over-year growth in order to maintain its stock price and to continue to pay the compensation its employees expected to receive.  For example, in an August 21, 2007 piece entitled "Change course or cook the books?  Dell chose latter," the *Houston Chronicle* stated:

> Like many companies trading at a high multiple, Dell needed to maintain its growth to keep its stock price rising.  That was important not just to investors but to employees and executives who got part of their compensation in stock options.

2

5.      However, rather than alter its business model or make necessary changes in the way it did business in order to return to its earlier dominance, Dell sought a quick fix:  the Defendants decided to "cook the books."  In order to do that, the Company incentivized its managers through enormous bonuses, which were tied to meeting financial benchmarks, and then engaged in a massive accounting fraud scheme to meet its revenue growth numbers.

6.      In 2002, Dell's Board recommended and the stockholders approved the "2002 Long Term Incentive Program" ("the 2002 Plan").  The 2002 Plan replaced the "Dell Computer Corporation Corporate Incentive Plan," approved in 1994 ("the 1994 Plan").  The 2002 Plan changed Dell's bonus structure in two significant ways.  First, under the 2002 Plan bonuses became directly linked to revenue-related figures.  Like the 1994 Plan, the 2002 Plan provided the Individual Defendants and other executives with "performance-based compensation."  Under the 2002 Plan, however, four new performance measures appeared:  revenue; operating income; operating margin; and return on investment capital.  Moreover, in 2003 the Compensation Committee introduced a new "performance-based" bonus opportunity for executives  called the "Long Term Cash Incentive Bonus Program" (the "Cash Incentive Plan").  The Cash Incentive Plan offered "jumbo bonuses" to top Dell executives rather than the more traditional stock options.  The Cash Incentive Plan offered executives up to 10 times more than their normal bonus.  The Cash Incentive Plan linked "jumbo bonuses" directly to "certain *revenue growth* and *profitability* metrics."  Dell 2003 Proxy Statement at 22 (emphasis added).  In short, at the start of the Class Period, Dell created a compensation structure for both its executives and its rank and file employees that rewarded them for hitting financial targets and punished them for missing them.

7.    The timing of the changes in Dell's long-term bonus structure was not coincidental.  In fiscal 2002, as noted above, Dell's business model had begun to suffer serious deficiencies and, as a result, Dell's earnings per share decreased for four straight quarters and year-over-year revenue growth decreased for three quarters.  As a result, the Individual Defendants' annual short-term bonuses suffered substantially.  In an attempt to reverse the decline, management implemented the 2002 Plan, *which began to link all long-term "performance-based" executive bonuses with revenue*.

8.    Under the new bonus plan, Dell management set unrealistic goals for employees. In fact, Michael Dell has acknowledged that Dell's bonus structure placed unrealistic pressure on Company employees.  In early 2007, Michael Dell circulated an email/memo explaining that the Company would now "set the annual bonus plan *against realistic targets*."  (emphasis added).

9.    Thus, Dell senior management was now incentivized to make the numbers, rather than to take the harder path of actually fixing the business.  The performance-based compensation structure, coupled with Dell's admittedly deficient controls, created a fertile breeding ground for fraud and generated a "culture of deception."  Indeed, Dell's restatement admitted that the Company's control environment failed to emphasize "strict adherence" to generally accepted accounting principles.  At the same time, Dell's sales people employed dishonest sales tactics and lied to customers.  Simply put, dishonesty was a Company-wide problem.  By way of example:

- The SEC has now charged three Dell employees with insider trading during the Class Period;

- Dell has settled a consumer protection lawsuit that uncovered a host of dishonest sales practices during the Class Period;

- The New York Attorney General has filed a consumer protection lawsuit highlighting numerous dishonest consumer-oriented practices at the Company; and

- Dell managers lied to their own employees, providing them with "fake" margins to encourage the sale of certain products.

10.     As a consequence of Dell's "by any means necessary" environment and the Company's culture of deception, beginning in 2002 the Defendants spun a web of deceit by disseminating false and misleading information to the public and by touting the Company's continued financial success as the result of its unique business model. In reality, however, Dell's "success" was based on accounting fraud. The Individual Defendants *knew* about the fraudulent practices implemented and executed under their watch. Numerous confidential sources confirm a simple truth: that these individuals were intimately involved in *everything* that was going on at Dell.

11.     Over the next four years, Dell's senior management engaged in wide-spread accounting fraud and manipulation using improper revenue recognition, "cookie-jar reserves," and other accounting chicanery so as to make it appear that Dell was performing as it had historically in order to justify managements' enormous bonuses. As Dell's fraud continued, the Company's stock price continued to climb.

12.     To capitalize on Dell's increasing stock price, the Individual Defendants, along with many other Dell insiders, cashed in on their Dell stock and stock option grants, selling many billions of dollars worth of stock at inflated prices. While insiders were dumping their holdings in the Company, the investing public was completely unaware that Dell's reported numbers were being fabricated to cover up the fact that the Company's business model was no longer performing as it had over most of the previous decade. The three Individual Defendants, *alone*, collectively sold almost *90 million shares* of their personal holdings of Dell stock, reaping proceeds of almost *$3 billion*. These Individual Defendants also collectively received $18

million in cash bonus compensation for fiscal years 2003 to 2006 based on "overall company and business performance, as well as . . . customer satisfaction."

13.    Public speculation that the Company was experiencing problems began as early as 2005, when Dell announced that it had missed revenue and earnings projections for the first time since 2002.  It was not, however, until August 17, 2006, while announcing a 51% drop in quarterly revenues, that Dell finally disclosed that it had been under investigation by the SEC for more than a year for accounting irregularities relating to "revenue recognition and other accounting and financial reporting matters for certain past fiscal years."  Just one month later, on September 11, 2006, Dell issued a press release stating that it would delay filing its Form 10-Q for the second quarter 2007, because the SEC investigation and a subsequently initiated independent investigation by its audit committee had raised serious questions about the accuracy of the Company's reported financial results.  Over the course of the next year, Dell would refuse to file any audited financials, thereby risking being delisted from the NASDAQ stock exchange.  Over that same period, numerous senior Dell executives, including Dell's CEO Rollins and CFO Schneider, either resigned or were fired because of their complicity in the accounting fraud scheme that was slowly being exposed.  Schneider unexpectedly "retired" as Dell's CFO effective January 1, 2007.  *See* Damon Darlin, "Dell's Financial Chief Resigns Unexpectedly," *The New York Times*, Dec. 20, 2006.  Shortly after Schneider left the Company, Dell announced that Rollins would "resign" as Dell's CEO and a board member effective January 31, 2007.  Following Schneider and Rollins, other Dell senior executives also resigned, retired, left or announced their intention to leave the Company, including: Joe Marengi, Dell's Senior Vice President, Americas; John Medica, Dell's Senior Vice President, Consumer Products; Senior Vice President John Hamlin, head of Dell's online operations worldwide; and Senior Vice

6

President Paul McKinnon, head of Dell's human resources department.  In August 2007, Dell's present CFO pointedly told investors that *"the one's that knew about it [the accounting fraud] are the ones that are gone."*  (emphasis added).

14.    Finally, on October 31, 2007, Dell filed restated financials for its fiscal years 2003, 2004, 2005, 2006, and the first quarter of 2007.  In a stunning report, Dell's Audit Committee revealed the results of the investigation, stating:

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that *certain adjustments appear to have been motivated by the objective of attaining financial targets*.  According to the investigation, these activities typically occurred in the days immediately following the end of a quarter, when the accounting books were being closed and the results of the quarter were being compiled.  *The investigation found evidence that, in that timeframe, account balances were reviewed, sometimes at the request or with the knowledge of senior executives, with the goal of seeking adjustments so that quarterly performance objectives could be met.*  The investigation concluded that a number of these adjustments were improper, including the creation and release of accruals and reserves that appear to have been made for the purpose of enhancing internal performance measures or reported results, as well as the transfer of excess accruals from one liability account to another and the use of the excess balances to offset unrelated expenses in later periods.

> \*   \*   \*

> [O]ur previously issued financial statements for Fiscal 2003, 2004, 2005 and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements.

DELL FY 2007 Form 10-K at 37 (emphasis added).

15.    Defendants also admitted that they had failed to maintain an adequate financial reporting system.  Specifically, "Management's Report on Internal Control Over Financial Reporting" states:

> *Control environment* — We did not maintain an effective control environment.  Specifically:

- We did not maintain a tone and control consciousness that consistently emphasized strict adherence to GAAP. *This control deficiency resulted in an environment in which accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls*, which in certain instances led to inappropriate accounting decisions and entries that appear to have been largely motivated to achieve desired accounting results and, in some instances, *involved management override of controls*. In a number of instances, information critical to an effective review of transactions and accounting entries was not disclosed to internal and external auditors.

- We did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience, and training in the application of GAAP commensurate with our financial reporting requirements and business environment.

- The control environment, which is the responsibility of senior management, sets the tone of the organization, influences the control consciousness of its people, and is the foundation for all other components of internal control over financial reporting. The control environment material weaknesses described above contributed to the material weaknesses related to our period-end financial reporting process described below.

- Period-end financial reporting process — *We did not maintain effective controls over the period-end reporting process, including controls with respect to the review, supervision, and monitoring of accounting operations*. Specifically:

  - Journal entries, both recurring and nonrecurring, were not always accompanied by sufficient supporting documentation and were not always adequately reviewed and approved for validity, completeness, and accuracy;

  - Account reconciliations over balance sheet accounts were not always properly and timely performed, and the reconciliations and their supporting documentation were not consistently reviewed for completeness, accuracy, and timely resolution of reconciling items; and

  - We did not design and maintain effective controls to ensure the completeness, accuracy, and timeliness of the recording of accrued liabilities, reserves, and operating expenses, primarily related to our accrued warranty obligations, goods and services received but not invoiced, customer rebates, and nonproduction operating expenses.

- These material weaknesses resulted in the restatement of our annual and interim financial statements for Fiscal 2003, 2004, 2005, and 2006 and the first quarter of Fiscal 2007, and resulted in adjustments, including audit adjustments, to our annual and other interim financial statements for Fiscal 2007. Additionally,

these material weaknesses could result in misstatements of substantially all of our financial statement accounts that would result in a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.

- Based on management's evaluation, because of the material weaknesses described above, management has concluded that our internal control over financial reporting was not effective as of February 2, 2007.

Dell FY 2007 Form 10-K at 112-113 ("Management's Report on Internal Control Over Financial Reporting").

16.     Defendants' motivation to engage in accounting fraud was clear and concrete and stemmed directly from the adoption in 2002 of the new executive compensation system. As noted in one recent press report, "In simple[] terms: Executives were cooking the books to hit performance targets that resulted in bigger payouts to them." Andrew Osterland, "SarbOx exec pay clawback could scratch Dell," *Financial Week*, Dec. 3, 2007.

17.     Ultimately, the Company admitted that the Defendants used fraudulent accounting to materially inflate Dell's reported revenues by approximately $463 million for fiscal years 2003 through 2006. Thus, during the Class Period, the Defendants knew, or recklessly disregarded, the following material adverse facts and intentionally concealed these facts from investors:

1)     The Dell direct business model was not operating successfully or creating the strong, often record, financial results and operating margins Dell was reporting; in fact, due to overly aggressive cost-cutting in Dell's customer support and service and manufacturing operations, Dell's business model was afflicted with significant customer dissatisfaction and complaints, as well as increasing product quality problems;

2)     For one year, beginning in August 2005, Defendants concealed that the SEC had notified Dell it was investigating Dell's prior financial reporting practices and SEC filings which Dell's top insiders knew would likely uncover numerous irregularities and fraudulent accounting practices;

9

3)     Dell's financial statements issued during the Class Period were artificially inflated and falsified and did not fairly represent Dell's results from operations, nor did they comply with GAAP;

4)     Dell's Sarbanes-Oxley representations were false, as Dell's internal financial and accounting and disclosure controls were deficient and an undisclosed material fraud was ongoing at Dell:  Dell's financial statements were being falsified, its disclosures and its SEC filings were false and misleading, and an ongoing fraudulent violation of the securities laws was occurring; and

5)     Dell's purported success in reducing its operating expenses as a percentage of net revenues and in increasing its net and gross operating profit margins to record high levels was only being achieved at the cost of the serious product quality and customer support and service problems outlined above, and which the Dell Defendants knew would require massive expenditures to fix, thereby harming Dell's profitability going forward.[4]

18.     Although Dell has sought to paint its admissions as nothing more than minor adjustments with little effect on the Company and its shareholders, the reality is that the Defendants' fraud was much grander and more calculated than simple accounting manipulations. Indeed, without the accounting fraud, Dell would have repeatedly missed analyst consensus estimates during the Class Period, which would hardly have been considered immaterial to the investing public.

19.     Despite all of the foregoing problems with Dell's accounting practices, Defendant PwC, Dell's longtime auditor, consistently rubberstamped Dell's financial statements as being prepared in accordance with Generally Accepted Accounting Practices ("GAAP") during the Class Period when, in fact, they were not.  PwC issued unqualified "clean audit" opinions for each and every one of the annual reports that Dell now admits was false.  While the massive accounting fraud was taking place at Dell, PwC received $36.5 million in compensation in connection with auditing Dell's annual financial statements, reviewing the Company's quarterly

---

[4] The term "Dell Defendants" refers collectively to the Company, Michael Dell, Rollins, and Schneider.

statements, and reviewing Dell's internal controls.  PwC was a knowing or reckless participant in the fraudulent scheme, violating 8 of the 10 standards of Generally Accepted Auditing Standards ("GAAS"), including lacking independence in performing Dell's auditing services.   Quite pointedly, on numerous other occasions, PwC has been accused of violating its own professional standards, including those relating to its independence, even after having been sanctioned by the SEC.  In fact, PwC's office in Austin, Texas, which is the office that had primary responsibility for Dell's audit, previously has been subject to legal action for its failure to comply with GAAS and standards of independence.  Indeed, Dell's failure to file financial statements for more than 18 months demonstrates that the financial records used by PwC as support for its audit opinions were totally unreliable and in complete disarray.  The fact that Dell had to spend almost $30 million per month in order to ascertain the Company's true financial condition raises a strong inference that PwC acted with reckless disregard when it issued clean audit opinions of Dell's Class Period financial statements.

20.     As a result of this scheme, and its revelation to the investing public, Dell's shareholders have been severely damaged.  As a direct result of the Defendants' fraudulent actions and false and misleading statements, the price of Dell's stock was bid up to a Class Period high of nearly $43 per share in 2004, only to fall to approximately $22 per share by the end of the Class Period.  The bulk of shareholders' losses were realized in the year between the (concealed) start of the SEC's investigation and Dell's ultimate admission that it was, indeed, the target of an SEC inquiry.  In fact, between August 2005, at the start of the SEC's investigation, and the end of the Class Period, Dell's shares fell from $40.52 (close as of August 1, 2005) to $21.65 (close as of September 8, 2006), eliminating more than $40 billion in market capitalization value.

21.     The impact of the Defendants' fraud continues to be felt by Dell's shareholders. As of January 2008, Dell's shares are hovering near $20 per share, approximately the same price at which the Company's shares closed on the last day of the Class Period.

## III.    JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to §§ 10(b), 20(a) and 20(A) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and §27 of the 1934 Act, 15 U.S.C. §78aa. Venue is proper pursuant to §27 of the 1934 Act and 28 U.S.C. § 1391(b).  Dell was headquartered in this District during the Class Period and many of the alleged false and misleading statements were made in and/or disseminated from this District.

## IV.    THE PARTIES

23.     Plaintiff Union Asset Management Holding AG ("Plaintiff"), one of Europe's largest investment fund management companies, purchased a total of 3,228,000 shares of Dell common stock at artificially inflated prices due to Defendants' fraud during the Class Period, suffering massive losses as a result. *See* Certification and Schedule A (the "Funds").[5]

24.     Defendant Dell is a Delaware corporation with its principal place of business at One Dell Way, Round Rock, Texas, 78682.  According to the Company's 2006 Form 10-K filed with the SEC on March 15, 2006, Dell is a provider of information technology products and services:

> Dell offers a broad range of product categories, including desktop computer systems, mobility products, software and peripherals, servers and networking products, enhanced services, and storage products. During calendar 2005, Dell

---

[5] Lead Plaintiff's original Certification, Schedule A (listing Plaintiff's trades), and a copy of its Supplemental Declaration discussing its commitment to this litigation is attached at Appendix 1 and incorporated herein.

was the number one supplier of personal computer systems worldwide as well as in the United States.

25.     Dell touts that its "business strategy combines its direct customer model with a highly efficient manufacturing and supply chain management organization and an emphasis on standards-based technologies."  According to the Company, the "key tenets" of this business strategy include:

- *A direct relationship is the most efficient path to the customer.*  A direct customer relationship, also referred to as Dell's "direct business model," eliminates wholesale and retail dealers that add unnecessary time and cost or diminish Dell's understanding of customer expectations.  As a result, Dell is able to offer customers superior value by avoiding expenditures associated with the retail channel such as higher inventory carrying costs, obsolescence associated with technology products, and retail mark-ups.

- *Customers can purchase custom-built products and custom-tailored services.*  Dell believes the direct business model is the most effective model for providing solutions that address customer needs.  In addition, Dell's flexible, build-to-order manufacturing process enables Dell to turn over inventory every five days on average, and reduce inventory levels.  This allows Dell to rapidly introduce the latest relevant technology more quickly than companies with slow-moving, indirect distribution channels, and to rapidly pass on component cost savings directly to customers.

- *Dell is a low-cost leader.*  Dell's highly efficient supply chain management and manufacturing organization, efficient direct business model, and concentration on standards-based technologies allow Dell to maintain one of the lowest cost structures among its major competitors and to pass those savings to its customers.  Dell's relentless focus on reducing its costs allows it to consistently provide customers with superior value.

26.     Dell also touts that its Board of Directors "expects each director, as well as each member of senior management, to lead by example in a ***culture that emphasizes trust, integrity, honesty, judgment, respect, managerial courage and responsibility***."  (emphasis added).  Investors have relied on this philosophy when evaluating Dell's financial statements and in deciding whether to buy Dell's securities.  Indeed, one of the key factors investors evaluate when

13

deciding to purchase a company's securities, along with a company's long-term earnings and growth prospects, is the credibility of the management making those projections.

27. To that end, the Dell Defendants projected an image of integrity and honesty to the marketplace. Dell has publicly claimed that its management operates at the "highest [ethical] standards when doing business" and that this is a key factor in delivering long-term shareholder value. For example, with respect to its Code of Conduct, Dell touts that:

> Dell's success is built on a foundation of personal and professional integrity. We hold ourselves to standards of ethical behavior that go ***well beyond legal minimums***. . . . We owe this to our . . . shareholders and other stakeholders. And we owe it to ourselves because ***success without integrity is essentially meaningless***. This culture of performance with integrity unites us as a company that understands and adheres to our company values and to the laws of the countries in which we do business. . . . ***[W]e want*** all members of our team, along with ***our shareholders***, customers, suppliers and other stakeholders, ***to understand that they can believe what we say and trust what we do***.

(emphasis added).

28. Defendant Michael Dell, Dell's founder, served as Dell's Chief Executive Officer and its Chairman during the Class Period. During the Class Period, Defendant Michael Dell was a signatory to Dell's Form 10-K for the periods ending 01/31/2003, 01/30/2004, 01/28/2005, and 02/03/2006. Defendant Michael Dell also certified Dell's financial condition and internal controls over financial reporting in Dell's Form 10-Ks for the periods ending 01/31/2003 and 01/30/2004, and Form 10-Qs for the periods ending 05/02/2003, 08/01/2003, 10/31/2003 and 04/30/2004.

29. Defendant Rollins served as Dell's President and Chief Operating Officer, Chief Executive Officer, and a director during the Class Period. During the Class Period, Defendant Rollins was a signatory to Dell's Form 10-K for the periods ending 01/28/2005 and 02/03/2006. Defendant Rollins also certified Dell's financial condition and internal controls over financial reporting in Dell's Form 10-K for the periods ending 01/28/2005 and 02/03/2006, and Form 10-

Q for the periods ending 07/30/2004, 10/29/2004, 04/29/2005, 07/29/2005, 10/28/2005, and 05/05/2006.

30.    Defendant Schneider served as Dell's Senior Vice President and Chief Financial Officer during the Class Period and until his December 19, 2006 resignation.  During the Class Period, Defendant Schneider was a signatory to Dell's 10-K for the periods ending 01/31/2003, 01/30/2004, 01/28/2005, and 02/03/2006.  Defendant Schneider also certified Dell's financial condition and internal controls over financial reporting in Dell's Form 10-Ks for the periods ending 01/31/2003, 01/30/2004, 01/28/2005 and 02/03/2006, and Form 10-Qs for the periods ending 05/02/2003, 08/01/2003, 10/31/2003, 04/30/2004, 07/30/2004, 10/29/2004, 04/29/2005, 07/29/2005, 10/28/2005 and 05/05/2006.

## V.    CONFIDENTIAL SOURCES

31.    Several former employees of Dell have provided Plaintiffs with information concerning the Defendants' fraudulent scheme and misrepresentations.  These witnesses gave information on a confidential basis, and each is designated as "CS__," as stated below.

32.    CS1 worked at Dell from 1998 to 2003, and his/her last position at Dell was as Senior Manager in Software Support.  CS1 was two reporting levels removed from Rollins, and provided Plaintiffs with information concerning Dell's effort to sell more units by cutting its prices.

33.    CS2 worked at Dell between 2000 and 2004, and last held the position of Vice President of Corporate Communications, reporting directly to Rollins.  CS2 provided information concerning Dell's inability to set proper forecasts, as well as its failure to make the necessary adjustments in its pricing and marketing strategies to stay competitive.  CS2 also reported that Dell pushed products at the end of reporting periods in order to meet sales numbers, stating "there was always a scramble at the end of the quarter to make their sales."

34.     CS3 worked at Dell from late-2002 to mid-2005.  CS3 joined the Company as a Sales Manager and was employed as a Project Manager immediately before his/her departure. CS3 revealed that Dell sold products at zero, if not negative, margins that sometimes caused the Company to fail to make any profits on its sales.  Specifically, CS3 reported that, between 2004 and 2005, the average Dell computer was sold at a negative $37 per computer margin.

35.     CS4 worked as a Senior Program Manager for Dell from 1997 through 2004, and provided information concerning Dell's warranty under accruals.

36.     CS5 worked as one of Dell's top Account Representatives from early 2004 through 2006.   CS5 provided information concerning Dell's compensation structure that emphasized revenue over margins, and reported that Dell made virtually "no margin" on sales of products in its "Enterprise" product line.

37.     CS6 was employed as a Financial Analyst by Dell between 2002 and late 2005. CS6 provided information concerning Dell's emphasis on shipping product at the end of reporting periods, and stated that Dell encouraged employees to "move ship dates in order to meet numbers" at the end of reporting periods.  CS6 explained that at Dell, senior management was "involved in everything."

38.     CS7 worked at Dell from 1999 to mid-2005, and before his/her departure was employed as an Operations Control Manager.  CS7 provided information concerning Dell's efforts to increase production at the end of reporting periods in order to meet Dell's internal projections.  CS7 also reported that he/she did not remember any quarter in which Dell did not meet its production numbers.  CS7 had regular calls with managers from other divisions to discuss shortages and other manufacturing issues.  Occasionally, but always at the end of a quarter, Michael Dell or Rollins would participate in these calls in an effort to motivate

performance.  CS7 described management as "hands off until the end of the quarter when they were all involved because they were trying to meet the numbers."

39.     CS8 worked at Dell from 1994 through mid-2005, and was employed as a Senior Account Executive before his/her departure from the Company.  CS8 provided information regarding Dell's financial reporting practices and explained that the Company's financial information was reported at least weekly, but at times, especially at the end of financial reporting periods, more frequently.  CS8 further stated that vice presidents had access to this information.

40.     CS9 held various positions at Dell from between 1991 and 2006.  CS9's final position with the Company was that of a Financial Controller.

41.     CS10 most recently worked as a Finance Advisor until his/her departure from Dell in late 2006.  CS10 began working at Dell in 2003 as an IT Programmer.

42.     CS11 worked at Dell from 1996 to mid-2006.  At the time of his/her departure, CS11 had been employed as a Finance Senior Consultant in Sales Compensation for Dell's Americas division.  CS11, along with CS9 and CS10, explained that there was a subgroup within the Corporate Finance department, the Reserve Policy Board, that laid out the reserve policies, including warranty reserves, for the Company.

43.     CS12 worked at Dell for approximately four years until 1999.  At the time of his/her departure,  CS12 was a Vice President of the Company and was two levels removed from Rollins.  CS12 provided information concerning Dell's reserve policies and practices which, according to this witness, were handled only by the most senior executives of the Company, including Michael Dell, Rollins, and Schneider.

44.     CS13 worked at Dell from 1995 to 2006.  In his/her last position at the Company, CS13 served as Dell's Controller of Financial Services.  CS13 was responsible for accounting for

revenue, including revenue from the sale of extended warranties, and provided information about Dell's warranty recognition practices.

45.     CS14 was employed in DHS (Dell Home Sales), which was part of Dell's Americas Consumer Division from mid-2004 to Spring 2006. CS14 provided information about Dell's use of "fake margins" to motivate its sales force to push products.

46.     CS15 worked at Dell from 1999 to 2005, and his/her final position at Dell was operations manager. CS15 provided information regarding Dell's use of "functional reserve[s]" to boost a division's numbers when the actual numbers were less than the projected numbers.

47.     CS16 worked at Dell from 1999 through 2005 and, before leaving Dell, worked as a senior sales compensation analyst. CS16 provided information regarding Dell's practices of enticing sales people to sell products at losses through the use of "fake" margins in order to meet projected revenue numbers.

48.     CS17 worked at Dell from 1999 to 2005 and, during the last year and a half of his/her tenure, was an Account Executive focusing on sales to schools in California. CS17 explained that pressure to sell increased around 2002 or 2003 when Joseph Marengi and Rosenda Para took over the Americas Division. Under these individuals, quotas and goals became less attainable, the pressure to "hit the numbers" rose, and it was clear that the consequence for not hitting the numbers was termination. CS17 also noted that Michael Dell was keenly aware of the computer business market, and that Rollins was "highly dialed in" and had a "laser focus" on everything.

49.     CS18 worked at Dell from 1998 to 2005 and, for most of his/her tenure with the Company, was a financial analyst. CS18 analyzed warranty and reserve data and made forecasts for management to ensure that Dell had enough reserves in the "bucket" for future warranty

liabilities. CS18 confirmed that, until 2002, the calculation of warranty reserves was based on a set formula. Traditionally, the Company recognized warranty revenue over a 10 year period, with most of the revenue being recognized by the third year. CS18 recounted that in 2002, however, Dell shortened its warranties and, more importantly, changed the way it calculated warranty reserves. CS18 recalled that on several occasions he/she would submit figures to Dell's corporate finance office and would in turn be told to make "adjustments" to account for overhead. Moreover, CS18 noted that at times warranty reserves were adjusted by as much as $2 million.

50.     CS19 worked at Dell from 2004 to 2006 as a Sales Manager who directed a group of business-to-business sales executives. CS19 described Dell's work environment as high pressured and noted that, to meet their requirements, Dell salespeople routinely tried to sell customers products they did not need. For example, salespeople often tried to "scare" a customer into buying unnecessary security software. CS19 stated that the "Dell Ethics Office wasn't very ethical."

51.     CS20 worked at Dell from 1993 until 2005, and his/her latest position was Senior Program Manager. CS20 recounted that Dell's environment changed in the early 2000s under Rollins's leadership. CS20 believed that the Company's numbers "were amiss," and that the numbers being reported were inconsistent with what he/she understood them to be. CS20 provided an example wherein another employee in the federal segment claimed to be making 300% of his quota, yet CS20 knew that the federal segment as a whole was not even close to making its numbers. CS20 also noted that the numbers that Dell disseminated publicly did not match the numbers fellow colleagues recounted to him/her. Throughout his/her career, CS20 heard constant rumors of improper revenue recognition within the Company.

52.    CS21 worked as an engineer at Dell from 1998 until 2005.  While at Dell, he/she reported directly to a Vice President who reported to Michael Dell, Rollins, and Schneider, as well as other senior executives.  CS21 explained that in 2001, Dell quit focusing on customers, and focus on Wall Street's expectations intensified.  CS21 received numerous complaints from educational institution customers regarding low quality and reported these frequently.  A well-known customer offered feedback and CS21 recounted that management simply ignored the complaint.  CS21, like other witnesses, confirmed that Rollins set unrealistic expectations and that lower-level employees recognized this as a "quarter by quarter" approach.  To satisfy these demands, CS21 noted that other employees often *fudged* numbers.  CS21 also explained that he/she got the impression that senior management had bonuses tied to the numbers and, thus, felt great pressure to meet them.

53.    CS22 worked as a financial analyst at Dell from 1998 until 2002.  CS22 was at one time only one level removed from Rollins in that his/her boss reported to Rollins.  CS22 explained that senior management, including Rollins, conducted monthly reviews of financial forecasts.  Like other confidential sources, CS22 confirmed that Rollins was a hands on manager.

54.    CS23 worked at Dell as a Brand Manager from 2001 until 2002.  CS23's position focused on forecasting revenue and margin goals for desktops in Dell's Small to Medium Businesses Division.  CS23 created forecasts four times a quarter and noted that Rollins reviewed the forecasts.  CS23 also explained that any Dell employee could view sales numbers (including revenues) through the Company's computers on an hourly basis.

55.    CS24 worked at Dell between May 1997 and January 2005 in a variety of positions.  CS24 noted that the Company over-positioned itself to the public.  He/she recounted that, during the late 1990s, Michael Dell and his team were representing that the Company was

doing more than $1 million of internet business daily.  CS24 explained that this was not true and that Michael Dell and everyone at the Company knew it.  In fact, Dell took the position that every time a customer admitted during a sales call to having seen Dell's website, that sale was to be logged as an online sale, even though it was not.  CS24 described Dell's corporate culture as willing to do anything to "*buff* things up."

56.    CS25 worked at Dell from 2000 to 2005 and was the Vice President of Asia-Pacific and Japan, an upper level executive position.  CS25 reported directly to Rollins.  CS25 indicated that the Company's numbers targets were unrealistic, stating "there was a bit of *stretch* in the system."  He/she also confirmed, like other employees, that top management was "clear. . . hands-on; they were in the details of the business."

57.    CS26 worked at Dell in sales from 1995 until 2005.  CS26 explained that beginning in 2002, there was "intense and unrealistic" pressure to meet quotas.  This was coupled with a "quarter by quarter" mentality.  CS26 explained that his/her group would come up with a realistic projection for quarterly sales after doing market research, only to have upper level management increase the forecast by millions of dollars without explanation.  CS26 noted that no one challenged the exaggerated forecasts because they feared for their jobs.  CS26 described these forecasts as part of a "pervasive culture" at Dell.  For example, although he/she knew from fellow colleagues in the Europe and Asia division that sales were poor, the numbers forecasts from management did not reflect that fact.  CS26 recounted that it was common practice to increase revenue numbers by booking as sales laptops that were given away for free as incentives, and that this practice was no secret.

58.    CS27 worked at Dell in a variety of positions between 1996 and 2003.  Prior to leaving the Company, he/she was the Vice President of Government Relations.  CS27 provided

information about the working relationship between and among Defendants Michael Dell, Rollins, and Schneider. Although CS27 did not report to Michael Dell, he/she saw him all the time. He/she also supplied quarterly operational reviews directly to Rollins. CS27 noted that Dell's product quality slipped, as did its customer service, and that this was in part due to Michael Dell's decision to outsource customer service to India. CS27 further explained that Dell was missing its sales numbers as early as 2002 and that this continued until his/her departure in 2003.

59.     CS28 worked at Dell between 2000 and 2005 in the Global Information Solutions Group. CS28 provided Lead Plaintiff with information regarding PwC's Sarbanes-Oxley compliance recommendations that management thought were "unnecessary."

## VI.     BACKGROUND ON DELL AND THE REVELATION OF SERIOUS ACCOUNTING FRAUD

### A.     Background

60.     Dell started as a small, *ad hoc* business in a college dorm room, where founder Michael Dell built computers from surplus parts and sold them cheaply and directly to fellow students. By 1994, Dell had decided to jump to the next level and compete with Hewlett-Packard and IBM. Dell radically reinvented its business process and instituted a new inventory management plan that focused on reducing carrying inventories. Dell trained its employees to "sell what you have," directing customers to products that were already in inventory, rather than to what the customers needed or wanted. In addition, Dell targeted long-term corporate relationship accounts, customers having predictable needs that were closely tied to their budget cycles, and customer-specific intranet sites to track client needs. Dell's management overhaul succeeded. Between 1994 and 1998, Dell's revenues grew from $2 billion to $16 billion, representing a 50% annual growth rate.

61.     While Dell's new business model allowed it to compete with top-tier computer manufacturers like IBM and Hewlett-Packard, Dell's growth was hamstrung because of a limited consumer market,   In addition, Dell's cost and pricing structures, margins and ultimate profitability were subject to the ever-increasing competition in (and commoditization of) the PC market.  Nonetheless, Dell avoided a potential plateau or reversal of fortune as the so-called "dot com boom" of the late 1990s provided an expanding market for Dell's direct-to-consumer approach.

62.     When the boom ended, however, it became apparent to Company insiders that Dell had exhausted its market.  Dell's cost-savings, compared to that of its competitors, had eroded, it faced stiff price competition in its core PC business, and it had matured substantially enough that it could no longer sustain its historical growth rate without moving to new business areas.   Faced with these new problems, Dell began taking drastic measures to maintain profitability and keep its position as the "market leader."

63.     For example, the Company slashed prices (at the cost of margin) to maintain competitiveness.  As one article recognized, "[t]hanks to intense discounting on all its products, the company's average selling price fell 16% from 2000 to 2001.  That dropped its gross profit margin to 17.6% from 21.3%.  And Dell expects to keep pricing aggressively until demand improves."  Andrew Park, "How Long Can Dell Defy Gravity?," *BusinessWeek*, Jan. 15, 2002.

64.     Dell's net profit margin was even worse.  As a 2002 article explained, "[e]ven though Dell's net profit margin of 5.8 percent over the past twelve months is tops in the industry, it is below the company's five-year average of 6.7 percent."  Paul R. La Monica, "Dude, Dell Is Not The Tech Sector," *CNN Money*, Oct. 2, 2002, available at http://money.cnn.com/2002/10/02/pf/investing/q_dell/index.htm.  As CS1, formerly a Senior Manager in Software Support,

confirmed, Dell started a "price war with its competitors to capture the marketplace. They sacrificed profit for market share. We were operating, but losing money every day."

65.    CS2, formerly a Vice President of Corporate Communications, explained that in 2002, at or about the beginning of the Class Period, Dell began to miss certain targets, mostly because Dell "got out of price position." CS2 noted that Dell used to lead the industry in gauging how many units, *e.g.* computers, could be sold at any given price point. This changed, however, and Dell increasingly found itself either priced too high relative to its competitors or too low to provide a healthy margin.

66.    Pricing problems multiplied under Rollins' leadership, both when he served as President and after he became Dell's CEO in 2004. According to CS2, Dell "just called the market wrong, and they started getting out-maneuvered, out-priced, out-bid, out-marketed, out-manufactured by HP. . . . Under Rollins' leadership, [Dell's] ability to make the tradeoff between revenue and margins got less accurate. It just fell off the rails." Under Rollins, pricing continued to drive Dell's business, as it had in the past, but the environment in which Dell was operating had changed. Dell's competitors were now using the same suppliers as Dell, thereby erasing Dell's prior supply-chain advantage. But, as CS2 explained, Rollins and "Dell [did] not know how to live in a world where low price doesn't win every time." Dell did not have any "hot" products like Apple did, with its titanium laptops and new iPod. Thus, when it could not compete on price, Dell could not compete at all.

67.    In late 2002, Dell stock fell as Hewlett-Packard reportedly surpassed the Company in global PC sales, raising questions about whether Dell could continue to compete in this new market. By mid-February 2003, a sharp drop in the Company's share price had wiped

24

out over $20 billion in Dell's stock market capitalization and over $1 billion in the value of Dell's top insiders' vested stock options.

68.     CS3, formerly a Sales and Project Manager in Dell's Home Sale Division, reported that by 2004 Dell was offering computers for $499 and $599.   These computers, according to CS3, had negative margins of between $25 and $100, and the margins on other projects were so razor thin, if not negative, that there was no way of making up this considerable shortfall.   As CS3 stated, "margins were cut so low we were bleeding money."   Between 2004 and 2005, CS3 reported that Dell's average computer was sold at a negative margin of $37 per computer.

69.     Dell's decreasing margins, which were all important to Dell's shareholders, placed the Company in a quandary.   Adam Adelman, an analyst with Philippe Investment Management, a money management firm based in New York, stated, "[t]he main reason to own Dell [shares] was because of their margins."   http://money.cnn.com/2002/10/02/pf/investing/ q_dell/index.htm.   As Mr. Adelman went on to explain, "at some point you have to wonder how much more Dell can squeeze on the expense side and how much of a growth story it can be." *Id.*

70.     These negative developments not only affected the Company's stock price but executive bonuses, as well.   In fiscal year 2002, the Individual Defendants each received bonuses that were well below what they had come to expect.   The reason they received lower bonuses was crystal clear, as the Company's proxy statement explained:  Michael Dell only received 25% of his target bonus because "the Company's revenue growth performance fell short of some of the aggressive internal goals established at the beginning of the year."   DELL FY 2003 Form 14A at 17.

**B.    The Fraud At Dell Is Revealed**

71.    To hide Dell's deteriorating business model and artificially inflate the Company's stock price, the Individual Defendants began their campaign of misinformation.  They repeatedly assured the investing public that Dell would continue to have consistent growth and revenue expansion.  They stressed that massive operating expense cuts, including large manufacturing and product warranty cost reductions, were being achieved without sacrificing Dell's quality control or impairing customer service and support.  They, along with PwC, also assured investors that Dell's SEC filings were supported by an adequate system of internal financial, accounting and disclosure controls as required by the Sarbanes-Oxley Act of 2002.

72.    The Defendants' statements that: (1) Dell's market share, sales revenue, and earnings were expanding in a predictable and stable manner; (2) the Company's gross profit margins were not diminishing; and (3) Dell's "unique" business model continued to be robust in that that its product quality and customer service were industry leaders, were false and misleading and were designed to, ***and did***, artificially inflate the Company's stock price.

73.    Even as the Company's model was showing significant problems internally and margins were virtually disappearing, the Dell Defendants continued to make false and misleading statements regarding its financials, such as:

- "[W]e made our guidance in each and every one of the last eight quarters – we have met or exceeded the guidance that we have given out.  It's a very strong, consistent performance.  We set records for . . . operating income, OPECs as a percent of revenue.

- "[W]e hit our targets again, making the twelfth consecutive quarter in which we have met or exceeded our guidance to investors.  And we generated record . . . operating income and (EPS)."

74.    Throughout the Class Period, Dell also consistently highlighted the integrity of its financial results saying, "[W]e're winning the right way, with a high level of integrity."

Moreover, PwC certified that each and every annual report Dell filed during the Class Period "present[ed] fairly, in all material respects, the financial position of Dell."

75.     Defendants' fraudulent scheme worked well and the Company's stock price soared from a low of $22.59 per share in mid-February 2003 to a Class Period high of $42.57 per share in December 2004, a 90% price increase that substantially outstripped the stock performance of other publicly-traded computer equipment sellers.

76.     By mid-2005, the Defendants' fraud caught up with them as the systemic deficiencies in Dell's business model became increasingly apparent: poor product quality was widespread, customer sales were down, and customer support was experiencing major problems. Then, in August 2005, unbeknownst to investors, the SEC began to investigate the Company's accounting practices, and Defendants were no longer able to utilize accounting fraud to smooth Dell's financial results. Quickly pulling their hands out of the "cookie jar," the Defendants began to condition the market for bad news by slowly leaking out the truth with quarterly reductions in Dell's revenue and earnings projections. As a result of a series of announcements of missed revenue and earnings targets from August 2005 through the beginning of August 2006, Dell's stock price declined precipitously from approximately $40.00 per share to $22.00 per share, without the Defendants ever having to expose the true nature of the fraud they had been committing for years.

77.     On August 17, 2006, in the context of announcing another quarter of disappointing financial results (in which profits had fallen nearly 51% from the same financial quarter a year prior and the Company had missed its earnings projections by $.10 per share, or nearly 30%), Dell confessed to the investing public for the first time that the SEC was conducting an ongoing investigation into the Company's accounting practices and, further, that it

had being doing so for more than a year. Incredibly, Defendant Rollins told investors that there "was really no reason" to disclose the investigation earlier. Dell's stock price immediately declined another 9%, to a low of $20.65 on August 18, 2006. It was at this point that investors first began to realize that the true reason for Dell's prior poor financial results and diminished future prospects was due to more serious, but deliberately undisclosed, problems at the Company.

78.  Even with the cat half out of the bag, Dell delayed coming clean to investors about these critical matters until September 11, 2006. At that time, the Company announced that the U.S. Attorney's Office for the Southern District of New York had served a subpoena requesting documents concerning Dell's "accounting and financial reporting between 2002 and 2006." Dell further stated that the Company would not be able to file its second quarter 2006 financial report because of questions raised in connection with the SEC's investigation.

79.  On November 15, 2006, Dell announced that the SEC had upgraded its investigation into the Company's revenue and other accounting practices to "formal" status and, therefore, Dell was delaying disclosure of its preliminary financial results for the third fiscal quarter of 2006 due to "the level of complexity the company is facing in the preparation of" those results. Dell explained that the "complexity arises out of the ongoing investigations by the Securities and Exchange Commission (SEC) and the company's Audit Committee into certain accounting and financial reporting matters, and the fact the company has not filed its Form 10-Q for the second fiscal quarter."

80.  A *BusinessWeek* news article published on November 19, 2006, characterized Dell's November 15, 2006 announcement as a "double-barrel surprise" to Wall Street. The article noted that:

[T]he SEC's decision to upgrade its probe of Dell's books to a formal investigation suggests the agency may be unsatisfied with the level of disclosure from the company. Often, the SEC declares a formal investigation because this gives it the right to issue subpoenas.

81.     Although the details of the SEC and Dell investigations were not yet public, securities analysts began to opine that Dell was engaging in earnings smoothing, *i.e.*, deliberate manipulation of financial results through improper accounting techniques across different financial reporting periods. Smoothing creates the facade of steady financial metrics, consistent with analysts' expectations. This, in turn, fuels investor confidence in management's predictions, and investors are, therefore, willing to pay a higher, inflated price for the company's stock. This is precisely what happened at Dell. Through its accounting manipulations, the Company was able to meet or exceed earnings guidance for every single quarter during the Class Period, in stark contrast to the now restated financials.

82.     As the scrutiny on Dell's deteriorating business model and improper accounting practices intensified, the Company announced a series of resignations. Defendant Schneider, Dell's Senior Vice President and Chief Financial Officer, announced his "retirement" from the Company on December 19, 2006. In the next three months, other Dell senior executives also resigned, retired, left, or announced their intention to leave the Company, including Joe Marengi, Dell's Senior Vice President, Americas; John Medica, Dell's Senior Vice President, Consumer Products; Senior Vice President John Hamlin, head of Dell's online operations worldwide; and Senior Vice President Paul McKinnon, head of Dell's human resources department.

83.     On January 25, 2007, with Dell still not having filed any financial reports, the Company announced that NASDAQ's Listing Qualifications Panel would continue to list Dell's stock on that exchange if the Company provided the panel "with certain information regarding the previously announced Audit Committee investigation by March 1, 2007, and file[d] its

delinquent periodic reports, along with any required restatements of prior financial statements, by March 14, 2007." Although Dell stated that it would be "able to provide NASDAQ with the requested information by the March 1 deadline," the Company did not expect that it would be able to "file the delinquent [quarterly and restated financial] reports with the SEC" by March 14.

84.     Less than a week later, on January 31, 2007, Dell announced that, "effective immediately," Defendant Rollins "ha[d] resigned from his position as CEO and as a member of the Board of Directors." However, just four months earlier, in September 2006, when asked whether Defendant Rollins would be keeping his job in the wake of the Company's deteriorating financial performance, Defendant Michael Dell had responded, "I think Kevin Rollins is an outstanding executive."

85.     The extent and complexity of Company's Class Period accounting and financial reporting irregularities are reflected in part by the Company's March 1, 2007 disclosure that the fourth quarter 2007 "costs associated with the ongoing investigations into certain accounting and financial reporting matters reduced operating income and earnings per share by $89 million and $0.03, respectively." In other words, Dell spent $89 million in the fourth fiscal quarter of 2007 alone, roughly *$30 million per month*, in connection with its internal investigation activities and efforts to restate its financials.

86.     On August 16, 2007, Dell confessed that it had, in fact, cooked its books. In its press release, the Company announced that: (a) it had completed its internal investigation of various accounting and financial reporting issues; (b) the investigation revealed a variety of accounting errors and irregularities; and (c) Dell would restate results for fiscal years 2003, 2004, 2005 and 2006, and the first quarter of fiscal year 2007.

87.     Dell stated that its investigation had uncovered, *inter alia*, "numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts" and, further, that such adjustments had deliberately been made for the purpose of meeting Dell's quarterly financial objectives.   In this regard, the Company's August 16, 2007 press release stated:

> *The investigation identified evidence that certain adjustments appear to have been motivated by the objective of attaining financial targets. According to the investigation, these activities typically occurred at the close of a quarter.*  The investigation found evidence that, in that timeframe, account balances were reviewed, *sometimes at the request or with the knowledge of senior executives*, with the goal of seeking adjustments so that quarterly performance objectives could be met.  *The investigation concluded that a number of these adjustments were improper, including the creation and release of accruals and reserves that appear to have been made for the purpose of enhancing internal performance measures or reported results*, as well as the transfer of excess accruals from one liability account to another and the use of the excess balances to offset unrelated expenses in later periods.

(emphasis added).

88.     In its August 16, 2007 press release, the Company also conceded that Dell suffered from a lack of internal controls during the relevant time period:

> As a result of the investigation issues, as well as other issues separately identified by management, *current management has concluded the company did not maintain an effective control environment, including a tone and control consciousness that consistently emphasized strict adherence to Generally Accepted Accounting Principles (GAAP).*  In addition, current management has concluded that the company did not maintain effective controls over the period-end reporting process, including controls with respect to the review, supervision and monitoring of accounting operations.
>
> Management expects to conclude that these control deficiencies constituted material weaknesses in the company's internal control over financial reporting.

(emphasis added).

89.     Finally, on October 30, 2007, as described in detail below, Dell issued the restatement in which it acknowledged its fraudulent scheme.

## VII.   DELL'S FRAUDULENT SCHEME / ACCOUNTING VIOLATIONS

### A.   Dell Confesses That It Was Cooking Its Books and Announces That It Will Restate More Than Four Years of Results

90.    As set forth above, *supra* ¶¶ 3-10, the Company's failing business model caused Dell to create a compensation program that paid bonuses that hinged upon hitting financial targets.  This failing-business environment coupled with deficient internal controls caused and indeed motivated and encouraged Dell's employees to knowingly and intentionally misrepresent the Company's financial results during the Class Period – exactly as the Company recently admitted in its Form 10-K dated October 30, 2007:

> *accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls*, which in certain instances led to inappropriate accounting decisions and entries that appear to have been largely motivated to achieve desired accounting results and, in some instances, involved management override of controls.

Dell FY 2007 Form 10-K at 112 ("Management's Report on Internal Control Over Financial Reporting") (emphasis added).

91.    In Dell's Form 10-K, filed on October 30, 2007, management identified the following control deficiencies as of February 2, 2007 that constituted "material weaknesses"[6]:

- We did not maintain a tone and control consciousness that consistently emphasized strict adherence to GAAP. . . .

- We did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience, and training in the application of GAAP commensurate with our financial requirements and business environment. . . .

---

[6] Dell's Form 10-K filed on October 30, 2007 concedes that a "material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."  Dell FY 2007 Form 10-K at 112.

- We did not maintain effective controls over the period-end reporting process, including controls with respect to the review, supervision, and monitoring of accounting operations. Specifically:

  - Journal entries, both recurring and nonrecurring, were not always accompanied by sufficient supporting documentation and were not always adequately reviewed and approved for validity, completeness, and accuracy;

  - Account reconciliations over balance sheet accounts were not always properly and timely performed, and the reconciliations and their supporting documentation were not consistently reviewed for completeness, accuracy, and timely resolution of reconciling items; and

  - We did not design and maintain effective controls to ensure the completeness, accuracy, and timeliness of the recording of accrued liabilities, reserves, and operating expenses, primarily related to our accrued warranty obligations, goods and services received but not invoiced, customer rebates, and nonproduction operating expenses.

- These material weaknesses resulted in the restatement of our annual and interim financial statements for Fiscal 2003, 2004, 2005, and 2006 and the first quarter of Fiscal 2007, and resulted in adjustments, including audit adjustments, to our annual and other interim financial statements for Fiscal 2007.

Dell FY 2007 Form 10-K at 112-113 ("Control Environment").

92.     Dell attempted to spin the impact of the restatement by maintaining that its cumulative quantitative impact would be small, and thus immaterial. In an August 16, 2007 conference call with Dell investors to discuss the completion of Dell's internal investigation of accounting misconduct and Dell's impending restatement, Dell's new CFO Don Carty ("Carty") publicly stated:

Net revenue for each annual period, as I said, is expected to be reduced by an amount that's less than 1% of the amount previously reported for that annual period. The adjustments to net revenue for the quarterly periods will vary. The largest changes in quarterly net revenue are expected to be in the fourth quarter of fiscal 2003 and the second quarter of fiscal 2004. *Each of those with expected reductions of 2% or less.  All the other quarterly revenue changes are expected to be less than 1%.*

Turning to net income, *changes to net income for the annual periods are expected to range from approximately 0.5% to 5% of the amounts that were*

*previously reported*. The cumulative change for the entire restatement period is expected to be a reduction of between $50 and $150 million compared to previously reported cumulative net income for that same restatement period of $12 billion.

(emphasis added).

93.     However, Carty's spin on the impact of the restatement is specious, especially in light of the Company's own press release of August 16, 2007, in which the Company admitted that its accounting chicanery *vis-à-vis* accruals and reserves was material to Dell's shareholders:

The restatement will correct the accounting errors and irregularities that have been identified through the Audit Committee investigation and by management as a result of its additional reviews. *The accounting errors and irregularities that will be corrected are significant because of the combination of the number of issues identified, the qualitative nature of many of the issues, and in some cases, the dollar amounts involved*.

(emphasis added).

94.     This attempt to downplay the quantitative significance of the gimmicks used by Dell to prepare its financial statements was also met with great skepticism by many experienced analysts in the business press. For example, in an August 21, 2007 piece entitled "Change course or cook the books? Dell chose latter," the Houston Chronicle stated:

The problems that spawned [Dell's] accounting *improprieties* run deep, to the core of the culture that grew around Dell as it transformed the personal computer industry.

Back in 2003, the first year covered in the investigation, Dell was the undisputed King of PC Land. Hewlett-Packard Co. was struggling with what appeared to be a wrongheaded purchase of Compaq, and Dell, even with $35.4 billion in revenue at the time, continued to grow.

*Like many companies trading at a high multiple, Dell needed to maintain its growth to keep its stock price rising. That was important not just to investors but to employees and executives who got part of their compensation in stock options.*

Founder Michael Dell, for example, sold more than $2.8 billion worth of Dell stock from 2003 to 2006, SEC filings show.

After a stellar run during the 1990s in which it was the best-performing stock on the Nasdaq, the PC market began to move away from Dell and its direct sales strategy.

Businesses no longer needed to replace PCs every couple of years. Most now had enough memory to handle software upgrades for years to come.

Consumers, meanwhile, had become so accustomed to the PC as a commodity — a concept that Dell itself created — that custom-building a machine online no longer seemed essential. Why wait even three days for a custom build when you could find one with everything you needed right on the store shelf?

Faced with weakening demand, Dell cut back on expenses so it could continue to show improving numbers to investors. In the process, Dell's once-sterling customer service began to suffer. It alienated consumers at a time when consumer sales were becoming increasingly important to PC makers.

*"Dell has serious business issues they just flat-out weren't addressing," said Lynn Turner, a former chief accountant with the Securities and Exchange Commission. "Rather than really managing the business and fixing the problems, they started managing the numbers."*

\* \* \*

*No one, it seemed, wanted to admit that one of the greatest success stories in American business had become a numbers game.*

*The desperation emanating from the finance department and the reliance on seemingly "acceptable devices" to shore up the books even failed to catch the attention of the directors on Dell's audit committee.*

Only after the SEC contacted the company about its own investigation did the directors act.

*"The directors, not unlike Enron, were totally asleep at the wheel," Turner said.*

\* \* \*

*Even now, with the SEC conducting its own investigation, Dell seems to have trouble understanding that the true cost isn't measured in dollars per share. In an SEC filing last week, it downplayed the tweaking of its finances.*

"Often, these adjustments were several hundred thousand or several million dollars, in the context of a company with annual revenue of between $35 billion and $56 billion," it said.

*The dollar amounts may have been relatively small, but it doesn't matter whether the books were simmered or boiled. The damage is in the cooking.*

(available   at   http://www.chron.com/disp/story.mpl/business/steffy/5073469.html)   (emphasis

added).

95.     Along these same lines, on August 20, 2007, Jack Ciesielski wrote as follows on

the web site Seeking Alpha:

> After reviewing thousands of transactions, the forensic team "identified evidence
> that accounting adjustments were viewed at times as an acceptable device to
> compensate for earnings shortfalls that could not be closed through operational
> means.   Often, these adjustments were several hundred thousand or several
> million dollars, in the context of a company with annual revenue of between $35
> billion and $56 billion and annual net income of between $2.1 billion and $3.6
> billion for the periods in question."
>
> **So, materiality for adjustments that were known to be improper - "an acceptable
> device to compensate for earnings shortfalls" - apparently was justified by
> putting them into the wrong context of materiality.  Instead of evaluating the
> adjustments for what they meant qualitatively to investors, they were probably
> rationalized as immaterial strictly on a quantitative basis.**
>
> *  *  *
>
> You're probably thinking, "Peanuts, quantitatively.  What's the big deal?"  Read
> on:  back to the [Dell] 8-K.
>
>> Most of these reductions relate to the timing of net income that
>> would or will be recognized in periods before and after the
>> Restatement Period.  Net income and EPS for three of the four
>> annual periods are expected to be reduced by amounts ranging
>> from approximately 0.5% to 5% of the amounts previously
>> reported, while net income and EPS for the remaining annual
>> period (fiscal 2006) are expected to be increased by approximately
>> 1%.  The changes to net income and EPS for the quarterly periods
>> will vary, with the adjustments expected to increase net income
>> and EPS in some quarters and reduce net income and EPS in
>> others. The largest percentage changes in quarterly net income and
>> EPS expected to be in the first quarter of fiscal 2003 and the
>> second quarter of fiscal 2004, each with expected reductions of
>> between 10% and 13%; the fourth quarter of fiscal 2005, with an
>> expected reduction of approximately 7%; and the second quarter of
>> fiscal 2005 and the third and fourth quarters of fiscal 2006, each
>> with an expected increase ranging from approximately 5% to 7%.
>> Net income and EPS for each of the other quarters are expected to
>> change by 5% or less.

36

> *Those are some very wide intra-year earnings swings that would have occurred without the "acceptable device[s] to compensate for earnings shortfalls."*

(available at http://seekingalpha.com/article/45090-dell-its-all-over-but-the-shoutin) (emphasis added).

**B.      The Dell Defendants Committed Fraud By Knowingly and Intentionally Violating GAAP**

96.     Generally Accepted Accounting Principles, or GAAP, are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  Those principles are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established:  the Committee on Accounting Procedure, the Accounting Principles Board ("APB"), and the Financial Accounting Standards Board ("FASB").

97.     As set forth in SEC 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."   17 C.F.R.  § 210.4-01(a)(1).   Throughout the Class Period, Defendants knew that they were responsible for preparing financial statements that conform to GAAP. As noted by AICPA professional standards:

> Financial statements are management's responsibility. . . .  [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management. . . .   Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

AICPA Statements on Auditing Standards, AU §110.03, *Distinction Between Responsibilities of Auditor and Management.*

37

98.     Despite their responsibility to ensure that the Company prepared accurate financial statements conforming to GAAP, Michael Dell, Rollins, and Schneider throughout the Class Period knowingly and intentionally presented a false picture of Dell's true financial condition and future prospects by, among other things, concealing the deterioration in the Company's business model in order to inflate or maintain the Company's stock price. Defendants concealed Dell's true financial condition, smoothing the Company's reported operating results by falsely inflating Dell's reported revenue, net income and earnings per share in Dell's earnings press releases and Form 8-K's during the Class Period. To accomplish this, the Dell Defendants engaged in accounting fraud, violated GAAP, created the appearance of revenue and earnings, and manipulated Dell's accruals and reserves for the purpose of enhancing reported financial results. These Defendants also made materially false and misleading statements about other matters related to these critical financial metrics, as described in detail below.

99.     More specifically, as the Company admitted in its Form 10-K filed on October 30, 2007, in the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations – Audit Committee Independent Investigation and Restatement":

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that certain adjustments appear to have been motivated by the objective of attaining financial targets. According to the investigation, these activities typically occurred in the days immediately following the end of a quarter, when the accounting books were being closed and the results of the quarter were being compiled. The investigation found evidence that, in that timeframe, account balances were reviewed, sometimes at the request or with the knowledge of senior executives, with the goal of seeking adjustments so that quarterly performance objectives could be met. ***The investigation concluded that a number of these adjustments were improper, including the creation and release of accruals and reserves that appear to have been made for the purpose of enhancing internal performance measures or reported results, as well as the transfer of excess accruals from one liability account to another and the use of***

*the excess balances to offset unrelated expenses in later periods.*

\* \* \*

**The investigation identified evidence that accounting adjustments were viewed at times as an acceptable device to compensate for earnings shortfalls that could not be closed through operational means.**

\* \* \*

[O]ur previously issued financial statements for Fiscal 2003, 2004, 2005 and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements.

Dell FY 2007 Form 10-K at 37 (emphasis added).

100.   The following chart shows the effect the restatements had in periods in which net income in Dell's originally filed Consolidated Statements of Income was overstated.

| Effect of Restatement on Net Income | | | | | | |
|---|---|---|---|---|---|---|
| (in millions) | Q/E 7/29/05 | Q/E 4/29/05 | Q/E 1/28/05 | Q/E 8/1/03 | Q/E 1/31/03 | Q/E 5/3/02 |
| Decrease in reported net income | $38 | $26 | $42 | $63 | $24 | $56 |
| Originally reported net income | $1,020 | $934 | $667 | $621 | $603 | $457 |
| Restated net income | $982 | $908 | $625 | $558 | $579 | $401 |
| % originally reported EPS was overstated | 3.7% | 2.8% | 6.3% | 10.1% | 4.0% | 12.3% |

**C.   The Dell Defendants Committed Multiple Fraudulent Accounting Practices During the Class Period, Including By Fraudulently Accelerating Revenues**

101.   During the Class Period, Dell, with the knowledge and at the direction of the Individual Defendants, materially inflated the Company's reported revenues by approximately $463 million for fiscal years ended 2003 through 2006, by improperly accounting for or accelerating revenues. As explained in detail below and as confirmed by Dell's recent Form 10-K, the Company's fraudulent accounting practices included, but were not limited to: (i)

improperly accelerating revenue on high volume software products despite the fact that vendor

specific objective evidence ("VSOE") had not been appropriately established; (ii) improperly

overstating revenue by including sales of software where the Company was not the principal in

the transaction; (iii) manipulating revenues by improperly recognizing revenue in the incorrect

periods or recognizing the incorrect amount of revenue on certain transactions; (iv) improperly

recognizing revenue on certain transactions when delivery had not occurred; (v) improperly

deferring revenue on certain sales in order to stockpile revenue that could be released in future

quarters in order to improve Dell's consolidated financial results; and (vi) improperly

accelerating revenues in connection with extended warranties and enhanced service level

agreements.

102.    It is important to note that Dell engaged in these fraudulent practices during the

Class Period while at the same time, in its financial statements, the Company represented to the

investors that:

> Revenue Recognition — Net revenue includes sales of hardware, software and
> peripherals, and services (including extended service contracts and professional
> services).  These products and services are sold either separately or as part of a
> multiple-element arrangement.  Dell allocates revenue from multiple-element
> arrangements to the elements based on the relative fair value of each element,
> which is generally based on the relative sales price of each element when sold
> separately.   The allocation of fair value for a multiple-element software
> arrangement is based on vendor specific objective evidence ("VSOE") or in
> absence of VSOE for delivered elements, the residual method.  In the absence of
> VSOE for undelivered elements, revenue is deferred and subsequently recognized
> over the term of the arrangement.   For sales of extended warranties with a
> separate contract price, Dell defers revenue equal to the separately stated price.
> Revenue associated with undelivered elements is deferred and recorded when
> delivery occurs.  Product revenue is recognized, net of an allowance for estimated
> returns, when both title and risk of loss transfer to the customer, provided that no
> significant obligations remain.  Revenue from extended warranty and service
> contracts, for which Dell is obligated to perform, is recorded as deferred revenue
> and subsequently recognized over the term of the contract or when the service is
> completed.  Revenue from sales of third-party extended warranty and service
> contracts, for which Dell is not obligated to perform, is recognized on a net basis

at the time of sale.

Dell defers the cost of shipped products awaiting revenue recognition until the goods are delivered and revenue is recognized. In-transit product shipments to customers totaled $420 million and $430 million as of February 3, 2006 and January 28, 2005, respectively, and are included in other current assets on Dell's consolidated statement of financial position.

Dell FY 2005 Form 10-K ("Critical Accounting Policies – Revenue Recognition").

### 1.    Improper Acceleration of Revenue on High Volume Software Products Where VSOE Had Not Been Appropriately Established

103.    In one facet of their fraud, the Defendants caused Dell to improperly recognize revenue from the sale of certain software products.

104.    The Dell Defendants well knew that GAAP permits the recognition of revenue from the sale of software products only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectability of revenue is probable. Statement of Position 97-2 ("SOP 97-2"), Software Revenue Recognition.

105.    Moreover, in order for revenue to be recognized, it must be earned and realized or realizable. Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶ 83. Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Concepts Statement No. 5 ¶ 83. If collectability is not reasonably assured, then revenues should be recognized on the basis of cash received. Concepts Statement No. 5 ¶ 84g; *see also* Accounting Research Bulletin ("ARB") No. 43, (June 1943) Ch. 1A ¶ 1; Accounting Principles Board Opinion No. 10, Omnibus Opinion-1966 (Dec. 1966) ¶ 12. If payment is subject to a significant contingency, then revenue recognition is improper.

Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies (Mar. 1975).

106.   Similarly, the SEC's Staff Accounting Bulletin ("SAB") No. 101, which sets forth the SEC Staff's views in applying GAAP to revenue recognition in financial statements, imposes the same prerequisites to the recognition of revenues as does SOP 97-2.

107.   SOP 97-2 contains specific guidance on whether a company may recognize revenue from a software license sale at the time of the sale (that is, "immediately" or "upfront") or whether revenue must be deferred.  Typically, arrangements with software companies consist of a number of elements, only one of which is the delivery of the actual software.  Upgrades and enhancements of the software or Post Contract Support ("PCS") to customers' satisfaction are common additional elements of such arrangements.  For these multiple element arrangements, SOP 97-2 generally requires that the vendor have vendor specific objective evidence of fair value, or VSOE, for each of the delivered elements in order to recognize any upfront revenue. VSOE is the specific price that a given vendor charges for each of the delivered elements when sold separately.  If the elements to be delivered as part of a multiple element arrangement are not sold separately, even if VSOE is known for all elements including the services or PCS, no upfront revenue can be recognized.  This is based on a fundamental accounting concept that, until the customer receives the essential value purchased, the vendor has not completed the earnings process.

108.   Contrary to the guidance provided by SOP 97-2, the Dell Defendants knowingly, intentionally, and improperly accelerated revenue on high volume software products despite the fact that "VSOE ha[d] not been appropriately established."  Dell recently admitted in its Form 10-K filed on October 30, 2007, that this improper acceleration of revenue recognition of high

volume software products overstated revenues for fiscal years ended 2003 through the First

Quarter of 2007:

> Revenue Recognition Adjustments
>
> Software Sales — The largest revenue recognition adjustment relates to correcting
> the timing and amount of revenue recognized on the sale of certain software
> products. Dell is a reseller of a broad array of third-party developed software.
> Individually significant categories of software are analyzed for application of the
> appropriate accounting under American Institute of Certified Public Accountants
> ("AICPA") Statement of Position No. 97-2, Software Revenue Recognition
> ("SOP 97-2"). However, the allocation of software sales revenue between the
> software license (recognized at point of sale) and ***post-contract support (deferred
> and recognized over time)*** for other high volume, lower dollar value software
> products has historically been assessed as a group and the post-contract support
> revenue was deferred based on an estimate of average "Vendor Specific Objective
> Evidence" ("VSOE"). During the course of its internal reviews, Dell determined
> that its application of SOP 97-2 for these high volume software products was not
> correct. ***Dell has determined that the most appropriate application of SOP 97-2
> is to defer all of the revenue from these "other software" offerings and amortize
> the revenue over the post-contract support period as VSOE has not been
> appropriately established.***

Dell FY 2007 Form 10-K at 74 ("Revenue Recognition Adjustments – Software Sales")

(emphasis added).

### 2.   Improper Overstatement of Revenue on Software Sales When the Company Was Not the Principal in the Transaction

109.   Moreover, the Dell Defendants knowingly, intentionally, and improperly

overstated revenue by including sales of software offerings when the Company was not the

principal in the transaction. Although this particular improper reporting of revenue did not

inflate net income, it was nonetheless materially misleading because the Dell Defendants knew

that the revenue trends reported by the Company were closely watched by analysts and investors.

110.   Under GAAP, "[i]f a supplier (and not the company) is responsible for

fulfillment, including the acceptability of the product . . . ordered or purchased by a customer,

that fact may indicate that the company does not have risks and rewards as principal in the

transaction and that it should record revenue net based on the amount retained (that is, the amount billed to the customer less the amount paid to a supplier)." FASB Emerging Issues Task Force ("EITF") Issue 99-19, Reporting Revenue Gross as a Principal vs. Net as an Agent ¶ 15. In assessing whether revenue should be as reported on a gross revenue basis, with a separate display of cost of sales to arrive at gross profit, or on a net basis, the SEC considers whether the company "acts as an agent or broker (including performing services, in substance, as an agent or broker) with compensation on a commission or fee basis." EITF Issue 99-19 ¶ 3. *Under this accounting guidance, because Dell was not the principal in the sale to the customer, Dell was required to report revenues on a net basis*. Yet during the Class Period, the Dell Defendants knowingly and intentionally failed to report revenues on a net basis. Specifically, in the Company's Form 10-K filed on October 30, 2007, Dell conceded that:

> [D]uring the course of its reviews, Dell identified certain software offerings where it had previously recognized the gross amount of revenue from the sale but where it functions more as a selling agent as opposed to the principal in the sale to the customer. In those cases Dell should have recognized the revenue *net* of the related cost pursuant to EITF Issue No. 99-19, *Reporting Revenue Gross as a Principal vs. Net as an Agent*.

Dell FY 2007 Form 10-K at 75 ("Revenue Recognition Adjustments – Software Sales").

### 3.    Improper Recognition of Revenue in Incorrect Periods

111.    The Dell Defendants also manipulated revenues by improperly recognizing revenue in the incorrect periods or recognizing the incorrect amount of revenue on certain transactions. Moreover, in some instances, the Company improperly allocated revenue among the individual elements of the sale.

112.    Confidential Sources have confirmed that Dell actively encouraged its employees to improperly recognize revenue. According to CS6, the Company encouraged employees to "move ship dates in order to meet numbers" at the end of reporting periods. The protocol of

pushing for sales at the end of a quarter in which there was a revenue shortfall allowed the Company to book revenue for that quarter, but did not allow sufficient time to reverse the entry should a product be returned, including cases in which there were double or otherwise unwanted shipments. As CS6 explained, it generally took four or five days for a Dell computer to be assembled and shipped. At the end of the quarter, however, production was stepped up so that the time was reduced to one or two days. Revenue was booked at the time the product was shipped. This was superficially beneficial in that reporting period, but triggered a pervasive problem on the back end in that, by recklessly expediting the manufacturing process in order to ship the product to "meet the numbers," the Dell Defendants knowingly caused serious quality control problems, which in turn caused massive warranty costs in future periods.

113.    According to CS6, because of the quick turnaround encouraged by the Dell Defendants at the end of each quarter, the quality of the products being shipped out suffered, and orders were shipped even if they were wrong or the equipment did not work properly. By the time these defective products were returned, Dell would be in its next fiscal quarter and the return would be booked at that time. CS6 was even aware of sales representatives putting in entirely phony orders at the end of the quarter.

4.    **Improper Recognition of Revenue Where Delivery Had Not Occurred**

114.    The Company also improperly recognized revenue on certain transactions when delivery had not even occurred and the risk of loss had not passed from Dell to a third party. According to SAB No. 104, "delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site . . . ." Despite that clear principle, Dell was forced to admit in its Form 10-K filed on October 30, 2007 that:

45

- SAB 104 Deferrals — Instances were identified where Dell prematurely recognized revenue prior to finalization of the terms of sale with the customer, or prior to title and/or risk of loss having been passed to the customer. Sometimes these situations involved warehousing arrangements.

Dell FY 2007 Form 10-K at 75 ("Revenue Recognition Adjustments – Other").

5.    **Improper Deferral of Revenue to Stockpile Revenue**

115.    The Dell Defendants also improperly deferred revenue on certain sales in order to stockpile revenue that could then be released in future quarters in order to improve Dell's consolidated financial results. GAAP normally reflects application of the "all-inclusive" income statement concept. This concept recognizes all income and expenses, even irregularly occurring losses or costs, in the results of operations in the period incurred, unless GAAP provides otherwise. This all-inclusive concept is intended, among other things, to avoid discretionary omissions of losses or gains from income, thereby avoiding a presentation of a more (or less) favorable report of performance than is justified. Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises ¶ 35. However, as disclosed in Dell's Fiscal 2007 10-K, "[t]here were situations where revenue was incorrectly deferred to later periods despite title and/or risk of loss having passed to the end customer. Under SAB 104, there were also cases where the in-transit deferral calculation for the period end was not appropriately calculated or was based on incorrect assumptions." Dell FY 2007 Form 10-K at 75 ("Revenue Recognition Adjustments – Other").

6.    **Improper Acceleration of Revenues Related to Extended Warranties**

116.    Additionally, the Dell Defendants improperly accelerated revenues in connection with extended warranties and enhanced service level agreements. Pursuant to FASB Technical Bulletin No. 90-1, Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts, "[r]evenue from separately priced extended warranty and product

46

maintenance contracts should be deferred and recognized in income on a straight-line basis over the contract period. . . ." However, the Company's Fiscal 2007 10-K belatedly admits that "[i]n some instances Dell's accounting estimates of the agreement durations were not correct, resulting in revenue being recognized over a shorter time period than the actual contract durations. Additionally, an error was identified in the amount of deferred revenue recognized and amortized during the restatement period." Dell FY 2007 Form 10-K at 75 ("Revenue Recognition Adjustments – Other").

117. In fact, CS4, formerly a Senior Program Manager for Dell's Enterprise Product Group, confirms that Dell intentionally, systemically, and improperly recognized warranty revenue over a shorter period than the actual contract agreements. CS4 confirms that this deceptive warranty revenue recognition practice was "standard operating procedure" at Dell and not the result of an inadvertent error. Throughout the Class Period, Dell's standard operating procedure of recognizing warranty revenue over a shorter period than that of the actual contract agreements was knowingly, intentionally and deliberately implemented by the Individual Defendants in order to fraudulently accelerate revenues.

118. CS4 estimates that up to 40% of Dell's product lines recognized warranty revenue in an accelerated manner.

119. CS4 confirms that Rollins and Schneider were in a position to knowingly and intentionally implement Dell's standard operating procedure of recognizing warranty revenue over a shorter period than the actual contract agreements. Throughout the Class Period, there were monthly meetings where the profitability of product lines was reviewed and decisions were made about adjustments of warranty revenue recognition. CS4 attended some of these meetings and confirmed that Rollins and Schneider did, as well.

**D.**     **The Dell Defendants Knowingly Manipulated Accruals And Reserves**

120.     Dell's financial results also were materially false and misleading during the Class Period because the Dell Defendants knowingly and intentionally engaged in the improper creation and release of accruals and reserves made for the sole purpose of inflating financial results.  The Dell Defendants further manipulated the Company's financial results through the transfer of excess accruals from one liability account to another and through the use of the excess balances to offset unrelated expenses in later periods.

**1.**     **GAAP Requirements and "Cookie Jar" Reserves**

121.     GAAP requires the establishment and accrual of reserves for expenses, losses and liabilities, even though payment of the expense, or realization of the loss, may be contingent upon future events.  More specifically, GAAP states that:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
>> Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . [and]
>
>> The amount of loss can be reasonably estimated.

Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies* ¶ 8 (March 1975) (footnotes omitted).

122.     If there is at least a reasonable possibility that an additional loss has been incurred beyond the amount accrued, disclosure of the nature of the contingency and an estimate of the possible loss or range of loss must be made.  SFAS No. 5, ¶ 10. Pursuant to SFAS No. 5, companies may establish reserves for identifiable, probable and estimable risks.  In the past, some enterprises have accrued so-called "reserves for general contingencies."  However, general or unspecified business risks do not meet the conditions for accrual in paragraph 8 and GAAP