515.    Rollins and Schneider also filed certifications pursuant to 18 U.S.C. §1350, "that (a) Dell's Quarterly Report on Form 10-Q for the quarter ended July 29, 2005, as filed with the Securities and Exchange Commission, fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and (b) information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Dell."

516.    Rollins and Schneider knew, or recklessly disregarded, that the statements contained in their signed certifications filed with the Q2 2006 10-Q were materially false and misleading when made because, as admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls."  In its restatement, Dell also admitted that its control deficiencies led to:  a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a failure by the Company to maintain effective controls over period-ending reporting.  Additionally, Rollins and Schneider's Section 1350 certifications were false because Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."  The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

P.    **Third Quarter 2006 (For The Quarter Ended October 28, 2005)**

1.    **Dell Announces That Its Results for the Quarter Would Be Lower Than Expected**

517.    On October 31, 2005, Dell issued a press release, which was also filed with the SEC on From 8-K, announcing that the Company:

expects to achieve earnings per share of $0.39 on a non-GAAP basis, which is at the low end of the range of its previous guidance for fiscal 2006 third quarter, and expects revenue to be approximately $13.9 billion versus its original guidance of $14.1 to $14.5 billion. The shortfall in revenue versus previous guidance was driven in part by the company's U.S. consumer and U.K. businesses, which fell short of expectations. The company continues to refocus on higher value products and services while optimizing profitability.

518.   This statement was materially false and misleading because Dell's lower than expected revenue was the result of the Defendants being forced to unwind their scheme in order to avoid detection by the SEC, which had begun its investigation into the Company by this time.

## 2.   Third Quarter 2006 Earnings Release

519.   On November 10, 2005, Dell issued an earnings release announcing its financial results for the quarter ended October 28, 2005 (the "Q3 2006 Earnings Release"). The Q3 2006 Earnings Release, which was also filed as an exhibit to Form 8-K, contained the following false and misleading financial information relating to the Company's third quarter results:

|  | In Millions of Dollars (except per share data) |
|---|---|
| Net Revenue | $13,911 |
| Non-GAAP Operating Income | $1,196 |
| GAAP Operating Income | $754 |
| Non-GAAP Net Income | $944 |
| GAAP Net Income | $606 |
| Non-GAAP Earnings per Share | $.39 |
| GAAP Earnings per Share | $.25 |
| Non-GAAP Gross Margin | $2,589 |
| Gross Margin | $2,251 |
| Stockholders' Equity | $4,821 |
| Total Liabilities | $18,053 |

520.   Commenting on Dell's reported results, the Q3 2006 Earnings Release stated:

Continued successful application of Dell's unique direct business model and solid sales increases in enterprise products and services led the company to record revenue and units in fiscal third quarter 2006.

*   *   *

201

Company revenue for the period ended Oct. 28 was $13.9 billion, a company record and up 11 percent year-over-year. Dell's earnings per share was 39 cents on a non-GAAP basis, up 18 percent from a year ago. Reported GAAP third-quarter earnings was 25 cents per share, reflecting a previously announced one-time charge of $442 million.

521.     The Q3 2006 Earnings Release also included the following comments from Defendant Rollins, "Our operating performance was again exceptional by any comparable measure. . . . However, we hold ourselves to higher standards."

522.     The Q3 2006 Earnings Release also stated: "The company expects fourth quarter revenue of $14.6 to $15.0 billion and earnings per share of $0.40 to $0.42."

523.     Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income, earnings per share and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means." As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated. Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements." The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

524.     In terms of Dell's operations in Japan, the Q3 2006 10-Q stated, "Asia Pacific and Japan had significant growth year-over-year in Dell's most strategic product categories."

525.     Defendants also knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted

material information about Dell's use of fictitious transactions with its Japanese business. As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators. The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

### 3.      Third Quarter 2006 Earnings Conference Call

526.    On November 10, 2005, Dell held a conference call to discuss third quarter FY 2006 earnings ("Q3 2006 Earnings Call"). On the Q3 2006 Earnings Call, a Dell representative stated: "While we are disappointed we didn't reach our revenue target for the quarter we are very pleased with our ability to deliver industry-leading profitability, consistent growth in earnings, and a balanced P&L."

527.    This statement was materially false and misleading because Dell's lower-than-expected revenue was the result of the Defendants being forced to unwind their scheme in order to avoid detection by the SEC, which had begun its investigation into the Company by this time.

### 4.      Third Quarter 2006 10-Q

528.    On November 28, 2005, Dell filed its Form 10-Q for the quarter ended October 28, 2005 ("Q3 2006 10-Q"). The Q3 2006 10-Q repeated the following false and misleading financial information set forth in the Company's Q3 2006 Earnings Release:

|  | In Millions of Dollars (except per share data) |
|---|---|
| Revenue | $13,911 |
| Operating Income | $754 |
| Net Income | $606 |
| Earnings per Share | $.25 |
| Gross Margin | $2,251 |
| Total Stockholders' Equity | $4,821 |
| Total Liabilities | $18,053 |

529.    Commenting on Dell's reported results, the Q3 2006 10-Q stated:

In both the three and nine month periods ended October 28, 2005, we grew revenue across all regions and product categories over the prior year periods, other than Desktop PCs, which declined 2% in the third quarter of fiscal 2006 compared to the prior year.   The decline in Desktop PC revenue reflects continuing reductions in average selling prices and an industry-wide shift to mobility products.  Revenue outside the U.S. comprised 40% of consolidated revenue for the third quarter of fiscal 2006 compared to 37% for the same period last year.  For the nine months ended October 28, 2005, revenue outside the U.S. represented 40% of the consolidated revenue compared to 38% in the prior year nine month period.  Internationally, we produced 20% and 21% year-over-year revenue growth for the third quarter and first nine months of fiscal 2006, respectively.

530.    Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income, earnings per share and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."  As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated.  Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."  The foregoing

statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

531.   The Q3 2006 10-Q stated the following about Dell's adherence to GAAP:

The accompanying unaudited condensed consolidated financial statements of Dell Inc. ("Dell") should be read in conjunction with the consolidated financial statements and accompanying notes filed with the U.S. Securities and Exchange Commission ("SEC") in Dell's Annual Report on Form 10-K for the fiscal year ended January 28, 2005.  The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").  In the opinion of management, the accompanying unaudited condensed consolidated financial statements reflect all adjustments of a normal recurring nature considered necessary to fairly state the financial position of Dell and its consolidated subsidiaries as of October 28, 2005 and January 28, 2005.

532.   Defendants knew, or recklessly disregarded, that the Company's statements concerning Dell's adherence to GAAP and its purported revenue recognition practices were false and misleading when made because, as described above, Dell failed to adhere to its stated revenue recognition policies and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."  Moreover, Dell's restatement admits that the Company did not follow GAAP when reporting its financial results during the Class Period.

533.   The Q3 2006 10-Q stated the following about Dell's revenue and warranty liability:

**NOTE 5 — AGGREGATE DEFERRED REVENUE AND WARRANTY LIABILITY**

Dell records warranty liabilities at the time of sale for the estimated costs that may be incurred under its basic limited warranty. Revenue from extended warranty and service contracts, for which Dell is obligated to perform, is recorded as deferred revenue and subsequently recognized over the term of the contract or when the service is completed. Changes in Dell's aggregate deferred revenue and warranty liability are presented in the following table:

|  | Nine Months Ended | |
|---|---|---|
|  | October 28, 2005 | October 29, 2004 |
|  | (In millions) | |
| Aggregate deferred revenue and warranty liability at beginning of period | $ 3,594 | $ 2,694 |
| Revenue deferred and costs accrued for new warranties(a) | 3,318 | 2,420 |
| Service obligations honored | (1,191) | (846) |
| Amortization of deferred revenue | (1,408) | (946) |
| Aggregate deferred revenue and warranty liability at end of period | $ 4,313 | $ 3,322 |

(a) During the quarter, Dell recognized a product charge of $307 million for estimated warranty costs of servicing or replacing certain OptiPlex ™ systems that include a vendor part that failed to perform to Dell's specifications. At October 28, 2005, $274 million of the accrued warranty obligation remains outstanding for servicing or replacing additional OptiPlex ™ systems.

534.    Defendants knew, or recklessly disregarded, that these statements were false and misleading when made because, as described above, Dell accelerated the recognition of at least some deferred revenue from extended warranties and under-accrued costs associated with basic warranties in violation of GAAP.

535.    In discussing Dell's operations in Japan, the Q3 2006 10-Q stated, "APJ — Year-over-year net revenue growth during the third quarter and first nine months of fiscal 2006 was 20% and 21%, respectively."

536.    Defendants also knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted material information about Dell's use of fictitious transactions with its Japanese business.  As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators.  The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

537.    Under the heading "Legal Proceedings," the Q3 2006 10-Q stated: "Dell is subject to various legal proceedings and claims arising in the ordinary course of business.  Dell's

management does not expect that the outcome in any of these legal proceedings, individually or collectively, will have a material adverse effect on Dell's financial condition, results of operations, or cash flows."

538.    Defendants knew, or recklessly disregarded, that the statements concerning legal proceedings were false and misleading because Defendants knew at that time that Dell was being investigated by the SEC and that a civil or criminal action, or a settlement that involved a restatement, was likely.

539.    Dell also stated the following about the Company's controls:

> Dell's Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of Dell's disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Exchange Act) as of the end of the period covered by this report, have concluded that, based on the evaluation of these controls and procedures, Dell's disclosure controls and procedures were effective.

540.    The Defendants knew, or recklessly disregarded, that the foregoing statements regarding the effectiveness of Dell's controls were materially false and misleading when made. As admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls." In its restatement, Dell also admitted that its control deficiencies led to: a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a failure by the Company to maintain effective controls over period-ending reporting.

541.    The Q3 2006 10-Q also included signed certifications from Rollins and Schneider stating:

> 1.    I have reviewed this Quarterly Report on Form 10-Q of Dell Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

542. Rollins and Schneider also filed certifications pursuant to 18 U.S.C. §1350, "that (a) Dell's Quarterly Report on Form 10-Q for the quarter ended October 28, 2005, as filed with the Securities and Exchange Commission, fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and (b) information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Dell."

543. Rollins and Schneider knew, or recklessly disregarded, that the statements contained in their signed certifications filed with the Q3 2006 10-Q were materially false and misleading when made because, as admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls." In its restatement, Dell also admitted that its control deficiencies led to: a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a failure by the Company to maintain effective controls over period-ending reporting. Additionally, Rollins and Schneider's Section 1350 certifications were false because Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements." The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

Q.      **Fourth Quarter 2006 (For The Quarter Ended February 3, 2006)**

1.      **Fourth Quarter 2006 Earnings Release**

544.    On February 16, 2006, Dell issued an earnings release announcing its financial

results for the quarter ended February 3, 2006 (the "Q4 2006 Earnings Release").  The Q4 2006

Earnings Release, which was filed as an exhibit to a Form 8-K, contained the following false and

misleading financial information relating to the Company's fourth quarter results:

|  | In Millions of Dollars (except per share data) |
|---|---|
| Net Revenue | $15,183 |
| Operating Income | $1,246 |
| Net Income | $1,012 |
| Earnings Per Share (Diluted) | $.43 |
| Gross Margin | $2,709 |
| Stockholders' Equity | $4,129 |
| Total Liabilities | $18,980 |

545.    Commenting on Dell's reported results, the Q4 2006 Earnings Release stated:

Dell (NASDAQ:DELL) achieved record revenue of $15.2 billion and earnings of
43 cents per share driven by growth in enterprise products and services and sales
outside the United States in the fiscal fourth-quarter 2006.

*   *   *

Dell's fourth quarter revenue of $15.2 billion was a 13 percent year-over-year
increase. Earnings per share was 43 cents, a year-over-year increase of 65 percent
and 16 percent on a Non-GAAP basis.  Revenue and EPS exceeded expectations.
Revenue was up due in part to a stronger than expected impact of the extra week
of sales in the quarter.  EPS reflected an adjustment to a lower tax rate for the year
because of a larger mix of profits from outside the U.S.

Revenue for the fiscal year was $56 billion, a 14 percent increase. EPS for the
fiscal year was $1.46, a 24 percent increase.  Non-GAAP EPS, which excludes
certain charges and an income tax benefit that occurred during fiscal 2006 and an
income tax charge in the fourth quarter of fiscal 2005, increased 21 percent to
$1.56.

546.    The Q4 2006 Earnings Release also included the following comments from

Rollins:

We drove a better balance across all price points of our products and greater operational efficiencies this quarter, and performed at the high level of execution we expect for ourselves. . . . Our success in countries such as China and Germany shows the Dell direct business model is preferred by customers in all regions and provides us with a unique advantage and opportunity for continued growth.

547.    The Q4 2006 Earnings Release further stated:

Cash flow from operations was $1.6 billion for the quarter and $4.8 billion for the fiscal year.

*   *   *

The company expects first quarter fiscal year 2007 revenue of $14.2 to $14.6 billion and earnings per share of 39 cents to 41 cents, excluding an estimated three cents of stock compensation. Dell begins reporting earnings including stock compensation expense in the first quarter of fiscal 2007.

548.    Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income, earnings per share and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."  As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated.  Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."  The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

549.    Commenting on Dell's international performance, the Q4 2006 Earnings Release stated:

Strong Growth in All Regions of the World

Sales outside the U.S. were an all-time high of 43 percent of the company's overall revenue for the fourth quarter, up from 40 percent in the previous quarter. The company gained share in every region during the year.

Asia Pacific and Japan (APJ) increased revenue in the quarter by 21 percent and units by 27 percent year-over-year.

550.    Defendants also knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted material information about Dell's use of fictitious transactions with its Japanese business.  As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators.  The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

### 2.    Fourth Quarter 2006 Earnings Conference Call

551.    On February 16, 2006, Dell held a conference call to discuss fourth quarter FY 2006 earnings ("Q4 2006 Earnings Call").  On the Q4 2006 Earnings Call, Defendant Schneider stated: "[W]e have a pretty tough compare with the year ago quarter when you see some of the guidance.  That was probably on a relative basis one of the better quarters we had in the half-dozen past quarters.  You had op[erating] income . . . that was the highest it was in the past few years."

552.    On the Q4 2006 Earnings Call, in response to a question concerning the adequacy of accruals the company took to cover future costs, Defendant Schneider stated: "On the accruals that we took in the prior quarter we've been spending against those.  We analyzed it here at the

end of the year, and we feel like what we booked is appropriate.  So I don't really expect that there would be any additional charges coming out of that."

553.    Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income, earnings per share and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."  As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated.  Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."  The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

554.    Schneider's statements about Dell's accruals were false and misleading because, as admitted by Dell's restatement, the Company improperly accounted for certain accruals.

### 3.    10-K for the Year Ended February 3, 2006

555.    On March 15, 2006, Dell filed it Form 10-K for the year ended February 3, 2006 (the "2006 10-K").  The 2006 10-K, which was signed by, *inter alia*, Michael Dell, Rollins, and Schneider, contained the following false and misleading financial information for the 2006 fiscal year:

|  | In Millions of Dollars (except per share data) |
| --- | --- |
| Net Revenue | $55,908 |
| Operating Income | $4,347 |
| Net Income | $3,572 |
| Earning per Share (diluted) | $1.46 |
| Gross Margin | $9,950 |
| Total Stockholder Equity | $4,129 |
| Total Liabilities | $18,980 |

556.     The 2006 10-K also stated:

In fiscal 2006, we grew revenue across all regions and product categories over the prior year periods, other than Desktop PCs in the Americas' region, which declined 2% in fiscal 2006 compared to the prior year. . . .  In fiscal 2006, consolidated net revenue increased 14% to $55.9 billion, which included an extra week of operations. . . .  International performance was also an important driver of this growth.    Revenue outside the U.S. represented 41% of fiscal 2006 consolidated revenue compared to 38% in the prior year.  Outside the U.S., we produced 21% year-over-year revenue growth for fiscal 2006.

557.     In terms of Dell's reported gross margin, the 2006 10-K stated:

In fiscal 2005, gross margin as a percentage of net revenue improved slightly to 18.3% compared to 18.2% for fiscal 2004.  This year-over-year improvement was primarily driven by our continued cost savings initiatives.

558.     The 2006 10-K also falsely and misleadingly stated: "Our focus on balancing growth and profitability resulted in record operating and net income of $4.3 billion and $3.6 billion for fiscal 2006, respectively.  Operating and net income for fiscal 2005 were $4.3 billion and $3.0 billion, respectively."

559.     Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income, earnings per share and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."  As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities

214

figures were also misstated.  Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."  The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

560.   Dell stated the following about its adherence to GAAP:

We prepare our financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP").  The preparation of GAAP financial statements requires certain estimates, assumptions, and judgments to be made that may affect our consolidated statement of financial position and results of operations.  We believe our most critical accounting policies relate to revenue recognition, warranty accruals, and income taxes.

561.   Defendants knew, or recklessly disregarded, that the Company's statements concerning Dell's adherence to GAAP were false and misleading when made because, as described above, Dell failed to adhere to its stated revenue recognition policies and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."  Moreover, Dell's restatement admits that the Company did not follow GAAP when reporting its financial results during the Class Period.

562.   Dell stated the following about its operations in Asia (including Japan), "Asia Pacific-Japan -- In fiscal 2006, year-over-year net revenue growth was 21% on unit growth of 30% in fiscal 2006 compared to 26% revenue growth on 29% unit growth in fiscal 2005."

563.   Defendants knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted material information about Dell's use of fictitious transactions with its Japanese business.  As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions

of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators. The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

564.     The 2006 10-K stated: "Dell is subject to various legal proceedings and claims arising in the ordinary course of business. Dell's management does not expect that the results in any of these legal proceedings will have a material adverse effect on Dell's financial condition, results of operations, or cash flows."

565.     Defendants knew, or recklessly disregarded, that the statements concerning legal proceedings were false and misleading because Defendants knew at that time that Dell was being investigated by the SEC and that a civil or criminal action, or a settlement that involved a restatement, was likely.

566.     In describing the Company's warranty liability recognition practices, the 2006 10-K stated:

> Dell frequently enters into sales arrangements with customers that contain multiple elements or deliverables such as hardware, software, peripherals, and services. Judgments and estimates are critical to ensure compliance with GAAP. These judgments relate to the allocation of the proceeds received from an arrangement to the multiple elements, the determination of whether any undelivered elements are essential to the functionality of the delivered elements, and the appropriate timing of revenue recognition. *Dell offers extended warranty and service contracts to customers that extend and/or enhance the technical support, parts, and labor coverage offered as part of the base warranty included with the product. Revenue from extended warranty and service contracts, for which Dell is obligated to perform, is recorded as deferred revenue and subsequently recognized over the term of the contract or when the service is completed.* Revenue from sales of third-party extended warranty and service contracts, for which Dell is not obligated to perform, is recognized on a net basis at the time of sale.

\* \* \*

216

We record warranty liabilities at the time of sale for the estimated costs that may be incurred under its limited warranty. The specific warranty terms and conditions vary depending upon the product sold and country in which Dell does business, but generally includes technical support, parts, and labor over a period ranging from 90 days to three years. Factors that affect our warranty liability include the number of installed units currently under warranty, historical and anticipated rates of warranty claims on those units, and cost per claim to satisfy our warranty obligation. The anticipated rate of warranty claims is the primary factor impacting our estimated warranty obligation. The other factors are less significant due to the fact that the average remaining aggregate warranty period of the covered installed base is approximately 20 months, repair parts are generally already in stock or available at pre-determined prices, and labor rates are generally arranged at pre-established amounts with service providers. Warranty claims are relatively predictable based on historical experience of failure rates. *If actual results differ from our estimates, we revised our estimated warranty liability to reflect such changes. Each quarter, we reevaluate our estimates to assess the adequacy of the recorded warranty liabilities and adjust the amounts as necessary.*

(emphasis added).

567. Defendants knew, or recklessly disregarded, that these statements were false and misleading when made because, as described above, Dell under-accrued costs associated with basic warranties in violation of GAAP.

568. The 2006 10-K also stated:

**NOTE 7 — Deferred Revenue and Warranty Liability**
Revenue from extended warranty and service contracts, for which Dell is obligated to perform, is recorded as deferred revenue and subsequently recognized over the term of the contract or when the service is completed. Dell records warranty liabilities at the time of sale for the estimated costs that may be incurred under its limited warranty. Changes in Dell's aggregate deferred revenue and warranty liability (basic and extended warranties), which are included in other current and non-current liabilities on Dell's consolidated statement of financial position, are presented in the following table:

| | Fiscal Year Ended | |
|---|---|---|
| | February 3, 2006 | January 28, 2005 |
| | (In millions) | |
| Aggregate deferred revenue and warranty liability at beginning of period | $ 3,594 | $ 2,694 |
| Revenue deferred and costs accrued for new warranties(a) | 4,603 | 3,435 |
| Service obligations honored | (1,651) | (1,176) |
| Amortization of deferred revenue | (1,974) | (1,359) |
| Aggregate deferred revenue and warranty liability at end of period | $ 4,572 | $ 3,594 |
| Current portion | $ 2,478 | $ 1,893 |
| Non-current portion | 2,094 | 1,701 |
| Aggregate deferred revenue and warranty liability at end of period | $ 4,572 | $ 3,594 |

(a)   During the third quarter of fiscal 2006, Dell recognized a product charge of $307 million for estimated costs of servicing or replacing certain OptiPlex ™ systems that include a vendor part that failed to perform to Dell's specifications. At February 3, 2006, $197 million of the accrued warranty obligation remains for servicing or replacing additional OptiPlex™ systems.

569.     Defendants knew, or recklessly disregarded, that these statements were false and misleading when made because, as described above, Dell accelerated the recognition of at least some deferred revenue from extended warranties and under-accrued costs associated with basic warranties in violation of GAAP.

570.     In commenting on Dell's controls, the 2006 10-K stated:

Evaluation of Disclosure Controls and Procedures — Dell's Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of Dell's disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Exchange Act) as of the end of the period covered by this report, have concluded that, based on the evaluation of these controls and procedures, Dell's disclosure controls and procedures were effective.

Management's Report on Internal Control Over Financial Reporting — Dell's management, under the supervision of Dell's Chief Executive Officer and Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act). Management evaluated the effectiveness of Dell's internal control over financial reporting based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, management has concluded that Dell's internal control over financial reporting was effective as of February 3, 2006.

Management's assessment of the effectiveness of Dell's internal control over financial reporting as of February 3, 2006 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their Report of Independent Registered Public Accounting Firm included in "Item 8 — Financial Statements and Supplementary Data."

571.     The Defendants knew, or recklessly disregarded, that the foregoing statement regarding Dell's controls was materially false and misleading when made. As admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls." In its restatement, Dell also admitted that its control deficiencies led to: a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with

appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a

failure by the Company to maintain effective controls over period-ending reporting.

572.    The 2006 10-K also included signed certifications from Rollins and Schneider

which stated:

1.      I have reviewed this Annual Report on Form 10-K of Dell Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined in
Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the
registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such
    disclosure controls and procedures to be designed under our supervision,
    to ensure that material information relating to the registrant, including its
    consolidated subsidiaries, is made known to us by others within those
    entities, particularly during the period in which this report is being
    prepared;

    (b)     Designed such internal control over financial reporting, or caused
    such internal control over financial reporting to be designed under our
    supervision, to provide reasonable assurance regarding the reliability of
    financial reporting and the preparation of financial statements for external
    purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls
    and procedures and presented in this report our conclusions about the
    effectiveness of the disclosure controls and procedures, as of the end of
    the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal
    control over financial reporting that occurred during the registrant's most
    recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an

annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

573.    The 2006 10-K also included signed certifications from Rollins and Schneider pursuant to 18 U.S.C. §1350 which certified: "that (a) Dell's Annual Report on Form 10-K for the fiscal year ended February 3, 2006, as filed with the Securities and Exchange Commission, fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and (b) information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Dell."

574.    Rollins and Schneider knew, or recklessly disregarded, that the statements contained in their signed certifications filed with the 2006 10-K were materially false and misleading when made because, as admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls."  In its restatement, Dell also admitted that its control deficiencies led to:  a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a failure by the Company to maintain effective controls over period-ending reporting.  Additionally, Rollins and Schneider's Section

220

1350 certifications were false because Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements." The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

575.    The 2006 10-K also included a "clean audit" opinion from PwC certifying that:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Dell Inc. and its subsidiaries at February 3, 2006 and January 28, 2005, and the results of their operations and their cash flows for each of the three years in the period ended February 3, 2006 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. . . .  We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal Control Over Financial Reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A — Controls and Procedures, that the Company maintained effective internal control over financial reporting as of February 3, 2006, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of February 3, 2006, based on criteria established in Internal Control — Integrated Framework issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal

221

control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

576.   PwC knew, or recklessly disregarded, that its statements in the 2006 10-K were materially false and misleading. As evidenced by Dell's restatement, the financial reports covered by PwC's foregoing "clean audit" opinion were materially false, required restating and, as cautioned by Dell, "should no longer be relied upon because of certain accounting errors and irregularities in those financial statements." Moreover, as explained *infra* at Section X, PwC's audit of Dell failed to comply with GAAS, and its certification of the effectiveness of Dell's controls was false and misleading.

**R.   First Quarter 2007 (For The Quarter Ended May 5, 2006)**

**1.   First Quarter 2007 Earnings Release**

577.   On May 18, 2006, Dell issued an earnings release announcing its financial results for the quarter ended May 5, 2006 (the "Q1 2007 Earnings Release"). The Q1 2007 Earnings Release, which was also filed as an exhibit to Form 8-K, contained the following false and misleading financial information relating to the Company's first quarter results:

|  | In Millions of Dollars (except per share data) |
|---|---|
| Revenue | $14,216 |
| Operating Income | $949 |
| Net Income | $762 |
| Gross Margin | $2,472 |
| Stockholders' Equity | $3,374 |
| Total Liabilities | $19,497 |

578.    Commenting on the results, the Q1 2007 Earnings Release stated:

Dell's (NASDAQ:DELL) expansion of business outside the United States and its sales of servers, storage and enhanced services drove revenue of $14.2 billion and earnings of 33 cents per share in the fiscal first-quarter 2007.

*   *   *

Revenue outside the United States grew 12 percent and was 44 percent of Dell's overall revenue.

Dell had operating income of $949 million, or 6.7 percent of revenue, in the quarter, which reflected investments in customer experience as well as pricing decisions the company believes will drive future growth.

579.    Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."   As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated. Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."   The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

580.    In the Q1 2007 Earnings Release, Defendant Rollins gave the following false and misleading rationale for Dell's poorer-than-expected performance:  "The competitive environment has been more intense than we had planned for or understood."

581.    This statement is false and misleading because Defendants knew at the time it was made that Dell's disappointing performance was due to the unwinding of Defendants' fraudulent

scheme, which was prompted by the SEC's inquiry into the Company, and not solely due to external conditions.

582.    In terms of Dell's performance in, *inter alia*, Japan, the Q1 2007 Earnings Release stated, "Asia Pacific and Japan (APJ) increased revenue in the quarter by 17 percent and units by 30 percent year-over-year or roughly twice the growth of the industry."

583.    Defendants knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted material information about Dell's use of fictitious transactions with its Japanese business.  As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators.  The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

### 2.    First Quarter 2007 Earnings Conference Call

584.    On May 18, 2006, Dell held a conference call to discuss first quarter 2007 earnings ("Q1 2007 Earnings Call").  On the Q1 2007 Earnings Call, Defendant Rollins stated:

> Tony, just our history in the industry and our experience over the past 20 years or so suggests that when we started to stall, something was going on.  We think we clearly had some service and support issues, but that was fairly localized segments here in the U.S.  The greater issue was where we were price competitive and reacting to some of our competitors' improvements in their overall efficiencies.  We let it go on too long.  But our history tells us, and we have even seen the examples now in markets and positions where we have moved back into price position, that it will accelerate growth.

> It does come in a margin bump, and so we're prepared to take that move to sustain the business longer-term.  As we mentioned, it is not a one quarter pop.  We're going to have to stay at this for awhile [sic], and we believe that we will see sustained growth that will allow us then to work back into better levels of profitability over time.  Our goal is to run the Company for the strategic success of the Company for the long run, not for one quarter, not for one month.

585.    This statement is false and misleading because Defendants knew at the time it was made that Dell's disappointing performance was due to the unwinding of Defendants' fraudulent scheme, which was prompted by the SEC's inquiry into the Company, and not solely due to external conditions.

### 3.    The 2007 Proxy

586.    On June 5, 2006, Dell filed its proxy statement for 2007 with the SEC ("2007 Proxy"), in which the Company stated:

> Corporate Governance Principles — The Board of Directors believes that adherence to sound corporate governance policies and practices is important in ensuring that Dell is governed and managed with the highest standards of responsibility, ethics and integrity and in the best interests of its stockholders. The Board maintains a set of Corporate Governance Principles intended to reflect a set of core values that provide the foundation for Dell's governance and management systems and its interactions with others.

587.    Also, in two statements opposing different shareholder proposals, Dell stated:

> The Board of Directors and management of Dell are committed to the belief that a business has many responsibilities — to its customers, *investors*, partners and employees and to the communities in which it operates. *Dell already has many programs and policies in place to effectively support these global responsibilities.*

*   *   *

> Enhancing the return on investment for Dell stockholders is of the utmost importance to Dell's Board of Directors and management.

588.    Defendants knew, or recklessly disregarded, that the above statements concerning Dell's purported adherence to sound corporate governance policies and practices and Dell's management's commitment to provide investors with the highest return on investment were false and misleading when made because, as described above, Dell manipulated its accounting to compensate for earning shortfalls.  Moreover, these accounting manipulations were carried out

by Dell to hide the true state of the Company from investors and so the Company's "quarterly

performance adjustments could be met."

### 4.   First Quarter 2007 10-Q

589.   On June 7, 2006, Dell filed Form 10-Q for the quarter ended May 5, 2006 ("Q1

2007 10-Q").   The Q1 2007 10-Q repeated the following false and misleading financial

information set forth in the Company's Q1 2007 Earnings Release:

|  | In Millions of Dollars (except per share data) |
|---|---|
| Revenue | $14,216 |
| Operating Income | $949 |
| Net Income | $762 |
| Gross Margin | $2,472 |
| Total Stockholders' Equity | $3,374 |
| Total Liabilities | $19,497 |

590.   The Q1 2007 10-Q also stated:

In the three month period ended May 5, 2006, we grew revenue across all regions
and product categories over the prior year periods, other than Desktop PCs, which
declined 3% in the first quarter of fiscal 2007 compared to the prior year.   The
decline in Desktop PC revenue reflects continuing reductions in average selling
prices and an industry-wide shift to mobility products.   Revenue outside the U.S.
comprised 44% of consolidated revenue for the first quarter of fiscal 2007
compared to 42% for the same period last year.   Internationally, we produced
12% year-over-year revenue growth for the first quarter of fiscal 2007.

591.   The Q1 2007 10-Q stated the following about Dell's reported gross margins:

Our margins declined for the first quarter of fiscal 2007 as compared to the same
period in the prior year as pricing declined more rapidly than offsetting
component price improvements.

592.   Defendants knew, or recklessly disregarded, that Dell's reported net revenue,

operating income, net income and gross margin figures were misstated because, as admitted by

Dell's restatement, the Company improperly recognized revenue throughout the Class Period and

used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed

through operational means."   As a result of the Company's fraudulent revenue recognition

practices, its reported stockholders' equity and total liabilities figures were also misstated. Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements." The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon. Moreover, Dell's statements concerning the reasons for the decline in its reported margins were materially false when made because the Defendants knew at the time the statement was made that Dell's disappointing performance was due to the unwinding of Defendants' fraudulent scheme, which was prompted by the SEC's inquiry into the Company, and not solely due to external factors.

593.   The Q1 2007 10-Q stated the following about Dell's adherence to GAAP:

> The accompanying condensed consolidated financial statements of Dell Inc. ("Dell") should be read in conjunction with the consolidated financial statements and accompanying notes filed with the U.S. Securities and Exchange Commission ("SEC") in Dell's Annual Report on Form 10-K for the fiscal year ended February 3, 2006.   The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").   In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments of a normal recurring nature considered necessary to fairly state the financial position of Dell and its consolidated subsidiaries as of May 5, 2006 and February 3, 2006.

594.   Defendants knew, or recklessly disregarded, that the Company's statements concerning Dell's adherence to GAAP were false and misleading when made because, as described above, Dell failed to adhere to its stated revenue recognition policies and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means." Moreover, Dell's restatement admits that the Company did not follow GAAP when reporting its financial results during the Class Period.

595.    With respect to Dell's operations in Japan, the Q1 2007 10-Q stated, "APJ revenue grew 17% on unit growth of 30% for the first quarter of fiscal 2007."

596.    Defendants also knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted material information about Dell's use of fictitious transactions with its Japanese business.  As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators.  The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

597.    The Q1 2007 10-Q further stated:

**NOTE 7 — AGGREGATE DEFERRED REVENUE AND WARRANTY LIABILITY**
Revenue from extended warranty and service contracts, for which Dell is obligated to perform, is recorded as deferred revenue and subsequently recognized over the term of the contract or when the service is completed. Dell records warranty liabilities at the time of sale for the estimated costs that may be incurred under its limited warranty. Changes in Dell's aggregate deferred revenue and warranty liability (basic and extended warranties), which are included in other current and non-current liabilities on Dell's consolidated statement of financial position, are presented in the following table:

|  | Three Months Ended | |
|---|---|---|
|  | May 5, 2006 | April 29, 2005 |
|  | (in millions) | |
| Aggregate deferred revenue and warranty liability at beginning of period | $ 4,572 | $ 3,594 |
| Revenue deferred and costs accrued for new warranties | 1,238 | 933 |
| Service obligations honored | (438) | (339) |
| Amortization of deferred revenue | (612) | (427) |
| Aggregate deferred revenue and warranty liability at end of period | $ 4,760 | $ 3,761 |

598.    Defendants knew, or recklessly disregarded, that these statements were false and misleading when made because, as described above, Dell accelerated the recognition of at least some deferred revenue from extended warranties and under-accrued costs associated with basic warranties in violation of GAAP.

599.    The Q1 2007 10-Q falsely and misleadingly stated: "Dell is subject to various legal proceedings and claims arising in the ordinary course of business. Dell's management does

not expect that the outcome in any of these legal proceedings, individually or collectively, will have a material adverse effect on Dell's financial condition, results of operations, or cash flows."

600.    Defendants knew, or recklessly disregarded, that the statements concerning legal proceedings were false and misleading because Defendants knew at that time that Dell was being investigated by the SEC and that a civil or criminal action, or a settlement that involved a restatement, was likely.

601.    Dell also stated the following about the Company's controls:

Evaluation of Disclosure Controls and Procedures — Dell's Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of Dell's disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Exchange Act) as of the end of the period covered by this report, have concluded that, based on the evaluation of these controls and procedures, Dell's disclosure controls and procedures were effective.

602.    The Defendants knew, or recklessly disregarded, that the foregoing statements regarding the effectiveness of Dell's controls were materially false and misleading when made. As admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls."  In its restatement, Dell also admitted that its control deficiencies led to: a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a failure by the Company to maintain effective controls over period-ending reporting.

603.    The Q1 2007 10-Q also included signed certifications from Rollins and Schneider stating:

1.    I have reviewed this Quarterly Report on Form 10-Q of Dell Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

229

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

      (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

604.    Rollins and Schneider also filed certifications pursuant to 18 U.S.C. §1350 stating, "that (a) Dell's Quarterly Report on Form 10-Q for the quarter ended May 5, 2006, as filed with the Securities and Exchange Commission, fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and (b) information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Dell."

605.    Rollins and Schneider knew, or recklessly disregarded, that the statements contained in their signed certifications filed with the Q1 2007 10-Q were materially false and misleading when made because, as admitted by Dell in its restatement, the Company failed to maintain effective controls which led to, *inter alia*, Dell employees using accounting "adjustments" in order "to compensate for operational shortfalls."  In its restatement, Dell also admitted that its control deficiencies led to:  a failure by the Company to consistently adhere to GAAP; a failure by the Company to employ persons with appropriate accounting knowledge given the complexity of Dell's reporting requirements; and a failure by the Company to maintain effective controls over period-ending reporting.  Additionally, Rollins and Schneider's Section 1350 certifications were false because Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."  The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

5.    **Dell Attempts to Condition the Market**

606.    On July 21, 2006, Dell issued an earnings release projecting "second quarter fiscal 2007 revenue to be approximately $14 billion with EPS of approximately 21 to 23 cents."

231

According to the press release, "[t]hese estimates primarily reflect aggressive pricing in a slowing commercial market worldwide."  In the July 21, 2006 press release, Defendant Rollins stated "All of our initiatives are focused on providing the best value, experience and products to customers every day, which will *maximize shareholder value over the long-term.*"  (emphasis added).

607.    Defendants knew, or recklessly disregarded, that the above statements concerning Dell's projected performance for the second quarter of fiscal 2007 were false when made because, as described above, Dell's lower EPS numbers were the result of the Defendants being forced to unwind their scheme in order to avoid detection by the SEC, which had begun its investigation into the Company by this time.

**6.      Second Quarter 2007 Earnings Release**

608.    On August 17, 2006, Dell issued an earnings release announcing its financial results for the quarter ended August 4, 2006 (the "Q2 2007 Earnings Release").  The Q2 2007 Earnings Release, which was filed with the SEC as an exhibit to Form 8-K, contained the following false and misleading financial information relating to the Company's second quarter results:

|  | In Millions of Dollars (except per share data) |
| --- | --- |
| Net Revenue | $14,094 |
| Operating Income | $605 |
| Net Income | $502 |
| Earnings Per Share (Diluted) | $.22 |
| Gross Margin | $2,190 |
| Stockholders' Equity | $3,125 |
| Total Liabilities | $20,023 |

609.    The Q2 2007 Earnings Release stated the following about the Company's performance for the quarter:

Dell (NASDAQ:DELL) reported revenue of $14.1 billion for the second quarter of fiscal year 2007, an increase of 5 percent year-over-year. Operating income was $605 million, or 4.3 percent of revenue, which includes $119 million of stock-based compensation. The company priced aggressively in a slower market resulting in operating income which was lower than its May expectations on similar revenue. As a result, EPS for the quarter finished at 22 cents.

610.    Defendants knew, or recklessly disregarded, that Dell's reported net revenue, operating income, net income, earnings per share and gross margin figures were misstated because, as admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means." As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated. Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements." The foregoing statements are included in the periods Dell now admits are inaccurate and should no longer be relied upon.

611.    Further, in the Q2 2007 Earnings Release, Defendant Rollins stated: "While we are disappointed with the results for the quarter, we are taking the necessary actions to correct missteps and improve our results for the long-term. . . . Key actions include accelerating cost initiatives, increasing investments in service and support, and better pricing management."

612.    These statements were materially false and misleading. In point of fact, Dell did not meet expectations in this reporting period because Defendants were forced to begin unwinding their scheme to avoid detection by the SEC, which had begun its investigation by this time.

613.    In discussing Dell's operations in Japan, the Q2 2007 Earnings Release stated:

In the Asia-Pacific and Japan region, Dell had unit growth of 27 percent; almost triple the rate of the industry, excluding Dell.  This allowed the company to move into the No. 2 position in the region with 11.1 percent share, up 1 percentage point year-over-year.  In Japan, Dell also moved to the No. 2 position with 16.1 percent share.

614.    Defendants also knew, or recklessly disregarded, that the above statements concerning Dell's operations in Japan were materially false and misleading and/or omitted material information about Dell's use of fictitious transactions with its Japanese business.  As admitted in Dell's restatement, "[Dell's internal] investigation determined that almost all of the transactions of the Japan services business involving the systems integrator likely were fabricated, as were certain additional smaller transactions involving two other Japanese systems integrators.  The impact of the adjustments reduced net revenue and cost of revenue to eliminate the effect of the fictitious transactions."

**7.    Dell Downplays the Gravity of the SEC's Investigation**

615.    On August 17, 2006, the *Dow Jones News Service* reported the following about the SEC's inquiry into Dell and Dell's response to the investigation:

AUSTIN, Texas (Dow Jones)--Dell Inc. (DELL) *executives downplayed the significance of a year-long informal SEC investigation* that the company disclosed Thursday, saying nothing illegal has been alleged.

Chief Financial Officer Jim Schneider told the news media during a conference call Thursday that Dell received a letter from the Securities and Exchange Commission in August 2005 and has been answering "mainly general questions on some practices" since then.

The letter was "one of hundreds I think that they send out each year," Dell Chief Executive Kevin Rollins said.

Both Rollins and Schneider said the questions related to "revenue recognition" and some other accounting practices but declined to elaborate.

They said they opted to make the inquiry public now - instead of a year ago - because Dell has decided internally to delve deeper into some issues that the

company discovered in the course of responding to the SEC's questions.

Because more internal resources are being devoted to the issue, the company decided to make it public "really at the first appropriate opportunity, which was now," Schneider said.

Still, he and Rollins maintained that they expect nothing financially material to come of either the internal effort or the SEC inquiry.

"This [SEC inquiry] has gone on for about a year without anything really being alleged," Schneider said.

(emphasis added).

616.    Defendants knew, or recklessly disregarded, that the above statements downplaying the significance of the SEC's investigation into Dell were false and misleading when made because Dell had a practice of misstating net revenue, operating income, net income, earnings per share and gross margin figures in its SEC filings and public statements.   As admitted by Dell's restatement, the Company improperly recognized revenue throughout the Class Period and used "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means."   As a result of the Company's fraudulent revenue recognition practices, its reported stockholders' equity and total liabilities figures were also misstated.  Moreover, as Dell has itself declared, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements."   Furthermore, Dell's financial statements failed to comply with GAAP when they were filed with the SEC.

IX.    SCIENTER/FRAUDULENT INTENT

A.    The Individual Defendants' Knowing And/Or Reckless Participation In The Fraud

617.    As Dell's most senior executives, the Individual Defendants were active, culpable, and primary participants in the fraud as evidenced by their knowing issuance and

control over Dell's materially false and misleading statements.  The following evidence further

bolsters the already strong inference of scienter:

- The Individual Defendants each signed SEC filings and made statements that contained materially false and misleading facts and/or omitted material facts;

- The Individual Defendants had unfettered access to all financial information and were intimately involved in the day-to-day management of the Company;

- The Individual Defendants had direct oversight of and actively managed accounting functions, including accounting for warranties and the commensurate accruals and reserves;

- The Individual Defendants were aware of and implemented policies that encouraged the fraud and knowingly ignored dishonest behavior within the Company;

- The Individual Defendants reaped the benefit of their fraud by engaging in massive insider trading during the Class Period; and

- The Individual Defendants Schneider and Rollins "left" the Company at suspicious times.

Quite pointedly, the Individual Defendants knew of and directed or recklessly disregarded the

materially false and misleading nature of the information they disseminated to the investing

public, and these actions constituted a fraud and deceit upon Lead Plaintiff and the members of

the Class.

**B.    The Individual Defendants Each Signed SEC Filings And Made Other Public Statements That Contained Materially False And Misleading Statements And/Or Omitted Material Facts**

618.    During the Class Period, Defendant Michael Dell was the Chairman of the Board

and CEO and, as discussed *supra* ¶ 28 and Section VIII, he signed a number of Dell's fraudulent

SEC filings, and made statements during conference calls and interviews that were false and

misleading.  Moreover, Michael Dell also certified Dell's financial condition and internal

controls over financial reporting in certain of the Company's Forms 10-K and 10-Q disseminated during the Class Period.

619.    During the Class Period, Defendant Rollins was Dell's COO, a Board Member and CEO, and, as discussed *supra* ¶ 29 and Section VIII, he signed a number of Dell's fraudulent SEC filings and made statements during conference calls and interviews that were false and misleading.  Moreover, Rollins signed certifications pursuant to SEC Rule 13a-14(a) and 18 U.S.C. § 1350 and assumed responsibility for the accuracy of the statements in the Company's annual and quarterly reports.

620.    During the Class Period, Defendant Schneider was a Senior Vice President and Dell's CFO, and, as discussed *supra* ¶ 30 and Section VIII, he signed a number of Dell's fraudulent SEC filings and made statements during conference calls and interviews that were false and misleading.  Moreover, Schneider signed certifications pursuant to SEC Rule 13a-14(a) and 18 U.S.C. § 1350 for every quarterly and annual report after August 29, 2002, and thus assumed responsibility for the accuracy of the statements therein.

621.    The certification requirements of Sarbanes-Oxley were expressly designed to prevent top executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch.   The SEC has expressly warned corporate officers that "a false certification potentially could be subject to . . . both Commission and private actions for violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."  Sec. Act Release No. 8124, Pt. II. B.6, 2002 WL 31720215 (Aug. 29, 2002).  As one commentator explained:

> The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge or specific intent by relying on failures in the PSLRA's proof of scienter requirement to avoid liability for having signed off on deficient reports. In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of section 302, which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under

10b-5.

*See* Kourtney T. Cowart, "The Sarbanes-Oxley Act: How A Current Model in the Law of Unintended Consequences May Affect Securities Litigation," 42 Duq. L. Rev. 293, 310-11 (2004). If Michael Dell, Rollins, and Schneider had truly evaluated the effectiveness of Dell's controls, as they claimed in their Sarbanes-Oxley certifications, then Dell senior management could not have engaged in the blatant and pervasive accounting chicanery which has since been revealed. Thus, the inference of scienter is strong.

**C.     The Individual Defendants Had Unfettered Access To All Of Dell's Financial Information And Were Intimately Involved In The Day-To-Day Management Of The Company**

622.     Each of the Individual Defendants was involved in Dell's daily operations, had unfettered access to all of the Company's financial information, and was ultimately responsible for making and/or approving all high-level financial decisions. Thus, the inference is strong that each one knew of, or recklessly disregarded, the ongoing fraud at the Company.

623.     CS27 observed that the leadership of Dell was "very hands on" and aware of "everything." For example, CS27 noted that it was Michael Dell who made the decision to outsource customer service to India, which led to the major customer support problems at Dell during the Class Period.

624.     CS27 also indicated that, even after Rollins took over, Michael Dell was still involved in the daily business of the company. Even though Michael Dell gave up the CEO title to Defendant Rollins in 2004, the Company stated that he would still be "deeply involved" in the day-to-day business of the Company. Michael Dell himself stated that he would "continue to be actively full-time engaged and involved in all the company's affairs. We're running the company together, and it continues a partnership that we've had for the last decade." Ron Insana, "Dell Knows His Niche and He'll Stick With It," *USA Today*, Apr. 4, 2004. In 2006,

238

Michael Dell stated that he "couldn't step back in any more than I already have because I never stepped out. . . . At Dell, Kevin [Rollins] and I have operated together for most of the last 10 years. . . . *He and I are intimately involved in running every aspect of the company together.*" "Michael Dell: Still Betting on the Future of Online Commerce and Supply Chain Efficiencies," Knowledge@Wharton (online business journal of the Wharton School) Sept. 29, 2006, publicly available at  http://knowledge.wharton.upenn.edu/article.cfm?articleid=1543 (emphasis added).

625.   On September 12, 2006, Defendant Michael Dell admitted his responsibility for the problems at Dell when he and Rollins met with a small group of hand-picked reporters to discuss the Company's business strategy going forward.  During that meeting, Michael Dell accepted responsibility for and admitted his personal involvement in the Company's day-to-day affairs: "Characterizations of the company's challenges being only of Kevin's doing are inaccurate. *Kevin and I run the business together.  If you want to blame somebody, you can blame me, too.*"  (emphasis added).  Michael Dell's "mea culpa," is consistent with Rollins's characterization of their relationship that same year:  "I don't think there's an ounce of light between us. . . .  Michael and I make every decision together. *We don't do anything in the company that he and I are not fully locked in to.*"  (emphasis added).

626.   CS27 supplied quarterly operational reviews directly to Rollins and, as a 2003 press report noted, "all of Dell's business units and staff functions report to Rollins on a daily basis."  William J. Holstein, "Dell: One Company, Two CEO's: Michael Dell Knew He Couldn't Manage Alone.  So He's Struck a Partnership with Kevin Rollins," *The Chief Executive*, Nov. 2003, publicly available at  http://findarticles.com/p/articles/mi_m4070/is_193/ai_110811913. CS17 described Rollins as "highly dialed in," with "laser focus" on everything.

239

627.    CS4, a former senior manager for the Company, explained that Dell held a monthly meeting on the profitability review of product lines and both Rollins and Schneider participated in those meetings.  The meetings generally took place once a month, but occurred more frequently at the end of the fiscal year or if a quarter was "tight."  One of the topics addressed at these meetings was whether to adjust warranty revenue recognition.

628.    CS6 corroborated CS27's description of the Company and explained that senior management, including the Individual Defendants, was "involved in everything."  According to CS6, analysts from each segment of the Company would prepare daily and weekly reports for senior management so that they had a real-time picture of the company, down to the operational level.

629.    CS8, a Senior Account Executive during the Class Period, further explained that financial information was reported at least weekly, but at times, especially at the end of financial reporting periods, more frequently.  CS8 further stated that vice presidents had access to this information which was on a form that was provided to the operating division "from the top."

630.    The Individual Defendants shared this information among themselves, and what one knew, the others knew.  As Defendant Michael Dell stated in an interview with *The Harvard Business Review*, "*[o]ur organization is flat so that information can flow freely and quickly.*" "Execution without Excuses: An Interview with Michael Dell and Kevin Rollins," Harv. Bus. Rev., Mar. 2005 (emphasis added).  Defendant Rollins echoed this view: "*[e]verybody sees everybody else's numbers* and gets to help with suggestions about their business. . . . Openness and sharing are part of success at Dell." *Id.* (emphasis added).

631.    Defendants Rollins and Dell "had an unusually close partnership, sharing an office separated by a glass door that was rarely closed.  'I don't think there's an ounce of light

between us' Rollins said last year." Dan Zehr & Kirk Ladendorf, "CEO Rollins Resigns Amid Dell Shakeup; Michael Dell Retakes Top Office," *Austin American-Statesman*, Feb. 1, 2007. CS9 confirmed that Rollins and Dell worked very closely together, consistent with Dell's "two in a box" policy, whereby two executives co-managed the same role. The same was true of Defendant Schneider. CS27 stated that Rollins and Michael Dell "were in constant contact with each other" and that Rollins worked directly and "closely" with Defendant Schneider, the Company's CFO.

**D.    The Individual Defendants Oversaw And Actually Directed Dell's Manipulative Accounting Practices**

632.    As President and CEO, and Senior Vice President and CFO, the Individual Defendants each (a) were involved in the decisions concerning accounting issues, including warranty and other accruals, made at the Company; (b) directly knew or learned of through the supervisory nature of their positions, or recklessly disregarded, the accounting fraud within the Company; and (c) made false and misleading statements omitting these material facts.

633.    The Individual Defendants had complete information about and control over the accrual process and warranty accounting. CS4 described how Dell planned and accounted for warranties. Each quarter, the Program Managers would meet with their Vice Presidents. In anticipation of these meetings, financial analysts working for the Program Managers compiled detailed reports with extensive information on the warranty costs and claims by product line since the warranty accruals were supposed to be made based on the historical costs. These reports were so detailed that they even tracked costs and claims to the individual product serial number. Then, according to CS4, the Vice Presidents would meet to discuss warranty claims, warranty accruals, revenues, margins, and other financial and operational information. CS2 confirmed that the Individual Defendants attended these meetings, along with Joe Marengi (head

241

of Americas), Ron Parra (head of Americas), Paul Bell (head of Europe), Bill Amelio (head of Asia), Jeff Clarke (head of Product Group), Tom Green (General Counsel), Mike George (head of Marketing), John Hamlin (head of Consumer Business), Paul McKinnan (head of Human Resources), Elizabeth Allen (Vice President of Corporate Communications), and Lynn Tyson (head of Investor Relations and Communications). These meetings took place once a quarter for an entire week and, according to CS2, they were closed, closely-guarded, and only involved high level people (*i.e.*, only people who needed to be there). In addition to these week-long quarterly meetings, CS2 stated that there were often discussions among senior management, including the Individual Defendants, about reserves.

634.    All policy, accounting and reporting decisions were ultimately made at the highest level of the Company. CS9 (Financial Controller), CS10 (Finance Advisor), and CS11 (Finance Senior Consultant) each indicated that the Corporate Finance Department, headed by Schneider, controlled the accounting and finance functions at the Company. CS11 explained that a subgroup of the Corporate Finance Department, "the Reserve Policy Board," dictated reserve policies, including warranty reserves.

635.    CS12, formerly a Vice President, likewise explained that reserves were not handled in the business units. Rather, reserve policy and accounting were managed only at the most senior levels, including by Michael Dell, Rollins, and Schneider. As did CS2, CS12 explained that reserve accounting was a closed process and that the Corporate Finance department and senior management would lock the doors and work on consolidating the numbers at the close of each financial period. According to CS12, the Individual Defendants were involved in this process, and only executives one or two levels down from Schneider were allowed to participate.

636.   In short, the Individual Defendants controlled the accounting and reporting decisions at the heart of the fraud.   They were the only ones with complete information from the operational level up, they were aware of the increasing warranty costs, and they made the ultimate decisions on how much to accrue for such estimated future expenses.   Thus, they knowingly or recklessly made the false and misleading statements alleged herein.

**E.   The Individual Defendants Were Aware Of And Implemented Policies That Encouraged Fraud And Knowingly Ignored Dishonest Behavior Within The Company**

**1.   Dell's Executive Compensation and Jumbo Bonus Scheme Encouraged Fraud**

637.   Michael Dell, Rollins, and Schneider earned substantial compensation during the Class Period through their bonuses, which were tied directly to the revenue-related numbers.   In 2002, as the Individual Defendants began their fraudulent scheme, Dell changed its long-term equity bonus plans, directly linking bonuses to revenues and offering new "jumbo bonuses" if executives achieved financial targets for an extended period.   This new revenue-focused structure provided the Individual Defendants with the motive to engage in and exploit the fraud. Moreover, the convergence of these compensation changes with the fraud at Dell gives rise to a strong inference of scienter.   *Financial Week* succinctly reached the same conclusion a month ago:   ***"In simple[ ] terms:  Executives were cooking the books to hit performance targets that resulted in bigger incentive payouts for them."***[7]·

638.   Dell's audit committee admitted as much when it stated that it had "identified evidence that certain adjustments appear to have been motivated by the objective of ***attaining***

———————————————

[7] This article, incorporated herein by reference, is publicly available at http://www.financialweek.com/apps/pbcs. dll/article?AID=/20071203/REG/71202005/1004/COMPLIANCEGOVERNANCE&template=printart.

*financial targets*," and that manipulations "appear to have been made for the purpose of enhancing *internal performance measures*." *See* Dell Form 10-K dated October 30, 2007 at 37 (emphasis added). It was these financial targets and performance measures that were the very factors upon which executive bonuses depended.

639. Executive compensation at Dell had three components during the Class Period: base salary, short-term bonuses, and long-term bonuses. Base salary and short-term bonuses each accounted for only 10% of executive compensation. (Notably, Individual Defendant Michael Dell's base salary as CEO, and later that of Individual Defendant Rollins, was below the base median salary of executives in similar companies.) The other 80% of executive compensation was long-term "at-risk" and/or equity-based, such as stock options. The Compensation Committee confirmed that the pay for the Company CEO (which included Rollins and Dell during the Class Period), focused on "performance-based elements . . . and plac[ed] less emphasis on fixed base pay." *See* Dell 2006 Proxy Statement at 23, 18. Thus, during the Class Period, the lion's share of each of the Individual Defendants' compensation, as much as 90%, depended upon Dell "making its numbers." As long as it did, the Individual Defendants and other executives made hefty cash bonuses and received "in the money" options.

640. The Individual Defendants and other Dell executives received short-term bonuses under the "Executive Annual Incentive Plan" (the "Short-Term Plan"). Both before and during the Class Period, executive bonuses were consistently linked to, among other things, *"business segment revenue growth, operating profit margin [and] operating income."* In 2007, Dell's Compensation Committee confirmed that the executive annual bonuses were tied to two key numbers: *revenue growth* and *operating income margin.* Dell 2007 Proxy Statement at 29. Both of these numbers were fraudulently manipulated throughout the Class Period.

641.   The Individual Defendants received tremendous bonuses under the Short-Term Plan throughout the Class Period.  The following chart summarizes the Individual Defendants' short-term bonus compensation:

| Defendant | Fiscal Year | Salary | Bonus | Salary + Bonus |
|---|---|---|---|---|
| Michael Dell | 2003 | $950,000 | $2,479,500 | $3,429,500 |
| | 2004 | $950,000 | $2,052,000 | $3,002,000 |
| | 2005 | $950,000 | $2,280,000 | $3,230,000 |
| | 2006 | $950,000 | $1,805,000 | $2,755,000 |
| | Total: | $3,800,000 | $8,616,500 | $12,416,500 |
| Rollins | 2003 | $770,962 | $2,012,210 | $2,783,172 |
| | 2004 | $797,115 | $1,721,768 | $2,518,883 |
| | 2005 | $869,231 | $2,086,154 | $2,955,385 |
| | 2006 | $944,231 | $1,794,039 | $2,738,270 |
| | Total: | $3,381,539 | $7,614,171 | $10,995,710 |
| Schneider | 2003 | $417,692 | $643,507 | $1,061,199 |
| | 2004 | $500,000 | $720,000 | $1,220,000 |
| | 2005 | $535,385 | $822,351 | $1,357,736 |
| | 2006 | $566,539 | $538,211 | $1,104,750 |
| | Total: | $2,019,616 | $2,724,069 | $4,743,685 |

642.   Before the Class Period, the 1994 Plan had governed long-term bonuses for the Individual Defendants and all other Dell employees.  Among other things, the 1994 Plan awarded stock or cash bonuses that depended on attaining "performance standards," which included the following:

- Total stockholder return;
- Net income;
- Earnings per share;
- Return on sales;
- Return on equity;
- Return on assets;
- Increase in the market price of stock or other securities; and
- Performance of the corporation as compared to other similar companies.

245

The 1994 Plan required that performance-based compensation for executives be based on one of the foregoing standards.[8]

643.   In 2002, just as the fraud was beginning at Dell, the Board recommended, and the stockholders approved, the 2002 Plan. The 2002 Plan replaced the 1994 Plan.

644.   The 2002 Plan changed Dell's bonus structure in two significant ways.   First, bonuses became linked directly to revenue-related figures.   Like the 1994 Plan, the 2002 Plan provided the Individual Defendants and other executives with "performance-based compensation."   Under the 2002 Plan, however, four new performance measures appeared:

- Revenue;
- Operating income;
- Operating margin; and
- Return on investment capital.

*The three revenue-related measures are the precise numbers that the Individual Defendants, as Dell's "senior executives," fraudulently manipulated for four years, beginning in 2003.*

645.   Second, in 2003 the Compensation Committee introduced a new "performance-based" bonus opportunity for executives (other than Michael Dell and Rollins) called the "Long Term Cash Incentive Bonus Program" (the "Cash Incentive Plan"). The Cash Incentive Plan was a sub-part of the 2002 Plan. As CFO.com contemporaneously reported, the Cash Incentive Plan offered "jumbo bonuses" to top Dell executives instead of more traditional stock options. The

---

[8] For the CEO and the four highest paid officers, 26 U.S.C. § 162(m) provides that a company may not deduct remuneration exceeding $1 million from its taxes. Section 162(m)(4)(C) excepts from this rule "performance-based compensation" that, subject to specified conditions, is "payable solely on account of the attainment of one or more performance goals." The statute itself does not dictate what those performance goals should be.