Michael Dell circulated an email/memo explaining that the Company would now "set the annual bonus plan *against realistic targets*."[13]

655.   One confidential source, CS17, explained that pressure increased substantially when non-defendant executives Rosendo Para and Joseph Marengi took over the Vice President positions in the Americas Division.  The numbers and quotas were raised, making them even less attainable.  According to CS17, the policy under Para and Marengi was "execute or be fired."  Notably, just as they were turning up the pressure on their employees around 2002 or 2003, Para and Marengi became two of the first three executives eligible for "jumbo bonuses" under the Cash Incentive Plan.

656.   The Individual Defendants were aware of the "jumbo bonuses" the Company was offering employees.  According to CS6, Dell's senior management was "involved in everything."  CS4 confirmed that his/her compensation was tied directly to the profitability of his/her product lines.  He/she stated that monthly meetings were held during which senior management reviewed the profitability of various product lines and that Defendants Schneider and Rollins participated in some of these meetings.  During these meetings, senior management, among other things, would often raise the compensation or bonus goals for sales people, thereby making it harder for them to attain their quotas.  CS17 described Defendant Rollins as having "laser focus" on every aspect of the business and being "highly dialed in."

---

[13] (emphasis added).  An online article addressing this subject, incorporated herein by reference, is publicly available at  http://news.zdnet.co.uk/itmanagement/0,1000000308,39285781,00.htm.   A copy of the email/memo itself, incorporated herein by reference, is publicly available at  http://www.translucence.org/archives/2007/02/no_bonus_for_yo.htmland.

657.    In sum, the Individual Defendants were aware of, helped implement, or designed the changes in Dell's bonus structure.  The bonus payments constituted a large majority of their own personal compensation and gave them the motive to commit fraud.

## 2.    Dell Had a "Culture of Deception"

658.    In September 2007, further evidence of scienter emerged when the SEC filed a civil insider trading complaint against three senior finance employees within Dell's Americas Business Unit ("ABU").[14]  Two of the defendants, Salvador Chavarria ("Chavarria") and John Nieto ("Nieto"), have entered into settlements with the SEC.  The third defendant, Glenn Leftwich ("Leftwich"), has not.

659.    Nieto and Leftwich worked in the Planning Division of Finance, which was responsible for comparing Dell's projected quarterly revenues and margins with its actual results. Thus, these individuals were in a position to know whether Dell's earnings guidance for their unit matched its actual performance.  They audaciously took advantage of this inside information just as the SEC was beginning its investigation of accounting practices at the Company.  After realizing that ABU was no longer going to meet its revenue projections, they began to purchase put options, essentially betting that Dell's stock would fall.  And fall it did.  This fraudulent behavior illustrates that the Individual Defendants, as Dell's most senior managers, failed to create sufficient internal controls and condoned a culture of misrepresentation and deception.

660.    This culture of deception permeated the Company.  Indeed, during the Class Period, the Company intentionally and/or recklessly deceived the consuming public about its products and services.  In May 2007, the New York Attorney General filed suit against Dell and

_____

[14] A copy of the SEC's complaint is attached hereto as Appendix 2.

Dell Financial Services ("DFS") for violation of a variety of state and federal consumer protection laws.[15]   The New York Attorney General alleged, among other things, that Dell and DFS:

- Deceived consumers into believing they were receiving 0% financing when, in fact, the financing they received was at rates as high as 20%;

- Charged customers for products they never received;

- Falsely claimed to offer effective technical support; and

- Promised rebates that it never delivered.

Although that lawsuit still is pending, the Attorney General has supported its Petition with numerous customer affidavits that outline the ways in which Dell's marketing techniques misled the public at large.

661.   In October 2006, Dell and DFS settled another class action lawsuit based on allegations similar to those made by the New York Attorney General.   As part of that settlement,[16] Dell and DFS agreed to refrain from:

- Deceiving customers into believing that they could obtain 0% financing when they could not; and

- "Rolling in" components to a computer in order to increase the price even when the customer did not want the components.

Those concessions are only the tip of the iceberg as Dell and DFS also agreed to a list of other reforms in conjunction with the settlement.  The complaints in the action read like a laundry list of misleading and deceptive bad acts that responsible companies do not indulge in.  Dell wades

---

[15] A copy of the complaint in *People of the State of New York v. Dell*, Index No. 003778/2007 (N.Y. S. Ct. Albany County) is publicly available through the New York Unified Court System's website.

[16] A copy of this settlement agreement is publicly available with the United States District Court for the Western District of Washington, *Brenda Watson, et al. v. Dell, Inc., et al.*, No. C-05-5200-RBL.

in fraud.

662.    Remarkably, Dell's management, including vice presidents, even misled their own employees.  CS16 explained that Dell managers lied to salespeople, giving them "fake" higher margins for products in order to encourage them to sell the product.  CS16's superiors were well aware of this practice.  In conjunction with the Washington class action, Dell agreed to clarify to its salespeople that they would not be penalized for selling items with low or negative margins.  In fact, one manager directed CS16's superiors to keep using the false numbers even though they objected to the practice.  This manager reported directly to Defendant Rollins, had bi-weekly phone calls with Rollins, prepared reports for Rollins detailing the Wall Street "numbers," and, at times, attended meetings with Defendant Schneider where that fraudulent practice was discussed.

663.    Apart from the foregoing, on August 14, 2006, Dell announced the largest-ever electronics recall, involving a total of 4.2 million Dell-branded lithium-ion batteries included with the Company's notebook computers sold between April 1, 2004, and July 18, 2006.  The recall was expected to cost Dell between $200 and $400 million.  According to a U.S. Consumer Product Safety Commission press release issued the same day, "Dell ha[d] received six reports of [these] batteries overheating, resulting in property damage to furniture and personal effects." *In fact, it has been reported in the press that Dell was aware of the problem with the batteries as far back as 2003-2004*.  As noted in one such report:

> [A] former Dell technician says Dell has known about the [battery] problem for more than two years.
>
> *Robert Day, Dell's lead acoustic technician from 1997-2005, said the computer company received hundreds of laptops that were charred or melted as a result of the defective battery, which Dell is now recalling.*
>
> Day shared hundreds of photos of laptops with ConsumerAffairs.com that he downloaded prior to leaving the company in January 2005.  His lab was next to

the Product Safety Investigations lab (PSI).

Day says Dell tried to hide the problem from the public for years. ***"They didn't want anyone to know how serious of a problem it was,"*** Day said.

The photos are from one of PSI's technician's archives. By 2005 there were 14 technicians in that lab.

***The findings of each lab, including the PSI, were submitted monthly to executives, so Day said there is no way many of the senior executives at Dell have not known about this problem for years.***

Joseph S. Enoch, "Insider: Dell Knew of Battery Problem for Years," *ConsumerAffairs.com*, Aug. 15, 2006 (emphasis added).

664.    CS28 also reported that in 2004 Defendant PwC prepared a list of suggestions for the Company in order to help it comply with Sarbanes-Oxley. However, management thought some of the suggestions were "unnecessary," evidencing a reckless disregard for their fiduciary responsibilities to shareholders. As addressed in detail elsewhere in this Complaint, *supra* ¶¶ 152-155, Dell has admitted that effective internal controls were virtually non-existent during the Class Period. Therefore, this utter failure to maintain effective internal controls demonstrates an intent to deceive investors or a high degree of recklessness on the part of the Individual Defendants, each of whom was responsible for ensuring that Dell's internal controls were adequate with respect to its financial reporting activities and practices.

665.    In sum, while the Company may have preached honesty and fair dealing, Dell did not practice those values during the Class Period. Instead, misrepresentations were "standard operating procedure" at Dell. The Individual Defendants cannot seriously claim that they were "shocked, shocked" to learn about the deceitful conduct that permeated major parts of the organization.

**F.      The Individual Defendants Reaped The Benefits Of Their Fraud By Engaging In Massive Insider Trading**

666.      The Individual Defendants' fraudulent scheme artificially inflated Dell's stock price and allowed them, as well as other Dell senior officers and directors, to cash in on their personal stock holdings.   The Individual Defendants reaped tremendous personal, financial benefit through insider trading:

| Defendant | Class Period Shares Sold | Proceeds | % of Holdings Sold |
|---|---|---|---|
| Michael Dell | 95,138,000 | $3,119,068,560 | 29.61% |
| Rollins | 2,163,000 | $74,190,052 | 13.65% |
| Schneider | 1,966,000 | $66,064,898 | 49.33% |
| **Total** | **99,267,000** | **$3,259,323,510** | |

Further, during the Class Period, non-defendant insider officers and directors also sold a total of *11.5 million shares* of Dell stock for combined proceeds of *$412.1 million*.[17]   Moreover, as noted *supra*, the SEC has already commenced formal legal proceedings against, and entered into settlements with, certain Dell employees for violation of insider trading laws.

667.      The Individual Defendants' insider trades are suspicious and unusual because:

● the Individual Defendants' trades all followed fraudulent earnings announcements;

● during the "peak" of the fraud, all three Individual Defendants traded consistently and in the same quarters, including the quarter in which the Company's stock price reached its highest point in the Class Period; and

● all three Individual Defendants stopped selling stock before the SEC investigation began in August 2005.

_____

[17] Appendix 3, attached hereto, contains a list of all insider trades made by Dell officers and directors during the Class Period, as reported to the SEC.

668.   As Dell has admitted, "senior executives" directed accounting manipulations "in the days immediately following the end of a quarter," before the Company had reported its quarterly earnings to the market.[18]  Dell Form 10-K dated October 30, 2007 at 37.  This scheme ensured both an inflated Dell stock price and that the Individual Defendants' stock options would remain "in-the-money," enabling the Individual Defendants to exploit the fraud.  The Individual Defendants and other insiders benefitted by trading after fraudulent earnings announcements.

669.   This fraudulent scheme continued every quarter for an astounding *sixteen straight fiscal quarters* (fiscal years 2003 to 2006).  Insiders traded during each and every quarter.  The Individual Defendants' insider trading continued until shortly before the SEC initiated its investigation of the Company, in or about August 2005.

670.   The following paragraphs detail the Individual Defendants' pattern of trading *after* fraudulent earnings announcements:

a.   **After Third Quarter 2003**

- November 1, 2002 – quarter ends.

- November 14, 2002 – Dell releases fraudulent numbers to the market, understating its revenues by $40 million.

- ***Michael Dell and Schneider Trade:***  Between November 21 and 22, 2002, Michael Dell sells 10,000,000 shares for proceeds of almost $290 million.  Schneider sells 280,000 shares for proceeds of $8.2 million.

b.   **After Fourth Quarter 2003**

- January 31, 2003 – quarter ends.

- February 13, 2003 – Dell releases fraudulent numbers to the market, overstating its Fourth Quarter 2003 revenue by $150 million dollars (the largest overstatement during the Class Period).

---

[18] Dell typically issued a press release of quarterly financial information to the market thirteen to fourteen days after the close of each fiscal quarter.

- ***All Three Individual Defendants Trade:***  On February 28, 2003, Rollins sells 270,000 shares for proceeds of $7.2 million.  Between March 13 and 21, 2003, Michael Dell sells 12,000,000 shares for proceeds of $323 million and Schneider sells 200,000 shares for proceeds of $5.5 million.

c.    **After First Quarter 2004**

- May 2, 2003 – quarter ends.

- May 15, 2003 – Dell once again releases fraudulent numbers to the market, overstating its revenue by $11 million.

- ***All Three Individual Defendants Trade:***  Between May 22 and May 30, 2003, Michael Dell sells 11,000,000 shares for proceeds of $328 million and Rollins sells 650,000 shares for proceeds of $7.6 million. Between May 28 and June 16, 2003, Schneider sells 396,000 shares for proceeds of $5.5 million.

d.    **After Second Quarter 2004**

- August 1, 2003 – quarter ends

- August 14, 2003 – Dells once again releases fraudulent numbers to the market, overstating its revenue by $98 million (the second largest overstatement during the Class Period).

- ***All Three Individual Defendants Trade:***  Between August 19 and September 18, 2003, Michael Dell sells 11,000,000 shares for proceeds of $359 million; Rollins sells 650,000 shares for proceeds of $22 million; and Schneider sells 396,000 shares for proceeds of $13.3 million.

e.    **After Third Quarter 2004**

- October 31, 2003 – quarter ends.

- November 13, 2003 – Dell once again releases fraudulent numbers to the market, this time understating its revenue by $7 million.

- ***Michael Dell and Schneider Trade:***  Between December 12 and 19, 2003,  Michael Dell sells 19,138,000 shares for proceeds of $638.8 million.  On January 5, 2004, Schneider sells 140,000 shares for proceeds of $4.9 million.

f.    **After First Quarter 2005**

- April 30, 2004 – quarter ends.

- May 13, 2004 – Dell once again releases fraudulent numbers to the market, understating its revenues by $44 million.

257

- ***All Three Individual Defendants Trade:*** By June 21, 2004, Michael Dell has sold 10,000,000 shares for proceeds of $351 million, Rollins has sold 250,000 shares for proceeds of $8.8 million, and Schneider has sold 100,000 shares for proceeds of $3.5 million.

g.   **After Second Quarter 2005**

- July 30, 2004 – quarter ends.

- August 12, 2004 – Dell once again releases fraudulent numbers to the market, overstating revenues by $56 million.

- ***All Three Individual Defendants Trade:*** Between August 17 and August 23, 2004, Michael Dell sells more than 11 million shares for proceeds of $384.4 million and Rollins sells 345,000 shares for proceeds of $11.9 million. On October 1, 2004, Schneider sells 50,000 shares for proceeds of $1.8 million.

h.   **After Third Quarter 2005**

- October 29, 2004 – quarter ends.

- November 11, 2004 – Dell once again releases fraudulent numbers to the market, this time understating its revenue by $11 million.

- December 9, 2004 – Dell stock reaches is highest point during the Class Period at $42.57.

- ***All Three Individual Defendants Trade:*** Between November 15 and December 9, 2004, Michael Dell sells 11 million shares for proceeds of $444 million; Rollins sells 398,000 shares for proceeds of $16.4 million, and Schneider sells 240,000 shares for proceeds of $9.7 million.

i.   **After Fourth Quarter 2005**

- January 28, 2005 – quarter ends.

- February 10, 2005 – Dell once again releases fraudulent numbers to the market, overstating revenues by $83 million.

- ***Schneider Trades:*** On March 1, 2005, Schneider sells 20,000 shares for proceeds of $809,000.

j.   **After First Quarter 2006**

- April 29, 2005 – quarter ends.

- May 12, 2005 – Dell once again releases fraudulent numbers to the market, overstating revenues by $86 million.

- ***Schneider Trades:*** Between May 23 and May 25, 2005, Schneider sells 140,000 shares for proceeds of $5.6 million.

**k.** **Second Quarter 2006 (August 2005) - The SEC launches its investigation.**

- The Individual Defendants Stop Selling Stock.

671. The following graph illustrates that, as the fraudulent numbers steadily inflated Dell's stock price, the Individual Defendants consistently profited on a quarterly basis through insider trades, until the stock and the fraud "peaked":



672. *Notably, the last quarter in which all three Individual Defendants traded Dell stock, the third quarter of 2005, was also the quarter in which Dell stock reached its highest point during the Class Period.* On December 9, 2004, Dell stock traded for $42.57, a price to which the stock has not yet returned. On this same day, Defendant Rollins sold $16.4 million dollars worth of stock at a price of $42. Moreover, all three Individual Defendants traded following the two quarters in which Dell overstated its revenues by the largest amounts ($150 and $98 million respectively), as well as the quarter following the Company's largest understatement ($44 million).

259

673.    The Individual Defendants' insider trading is inextricably intertwined with their fraudulent scheme to artificially inflate Dell's stock price.  As the fraudulent scheme progressed, the Individual Defendants traded consistently and reaped massive profits during the Class Period, giving rise to a strong inference that the Individual Defendants acted with scienter.

G.    **Individual Defendants Rollins And Schneider "Left" The Company At Suspicious Times**

674.    Following the announcement of the SEC's investigation into the Company's accounting practices, numerous members of the Company's senior management team, including Schneider and Rollins, either resigned or were forced out of the Company.  Dell admitted in its Form 10-K dated October 30, 2007 that "senior executives," and not lower level employees, directed the accounting fraud.  In August 2007, Carty, who replaced Schneider as the Company's CFO, refused to identify which Dell "senior executives" were responsible for the fraudulent scheme, but his response was telling:  *the ones that knew about it are the ones that are gone*." Matt Slagle, "Dell to Cut Prior Earnings Up to $150M," *Associated Press*, Aug. 17, 2007 (emphasis added).  In other words, all of the Dell senior executives that left after the SEC investigation was disclosed publicly, including Schneider and Rollins, were responsible for and knowledgeable regarding the fraud at Dell and that is precisely why they were forced out. Against the background of Dell's long-running accounting fraud scheme, this admission by Dell's current management further strengthens the inference of scienter.

X.    **PWC's KNOWING AND/OR RECKLESS PARTICIPATION IN THE FRAUD**

675.    The "independent auditor" serves an invaluable role in this nation's economy. The accuracy and reliability of a company's public financial disclosures are necessary to ensure that investors are provided with truthful information on which they can base investment decisions.  In this regard, the independent auditor serves the very public function of ensuring the

integrity of the securities market, and owes ultimate allegiance to the shareholders and creditors

of the reporting corporation, and to the investing public as a whole.  The United States Supreme

Court has observed that these obligations require the independent auditor to maintain "total

independence" from the company whose financial statements it audits, and to exhibit "complete

fidelity to the public trust":

> By certifying the public reports that collectively depict a corporation's financial
> status, *the independent auditor assumes a public responsibility transcending
> any employment relationship with the client.*  The independent public accountant
> performing this special function owes ultimate allegiance to the corporation's
> creditors and stockholders, as well as to the investing public.  This "public
> watchdog" function demands that the accountant maintain total independence
> from the client at all times and requires complete fidelity to the public trust.

*United States v. Arthur Young & Company.*, 465 U.S. 805, 817-18 (1984) (emphasis added in

part).

676.  PwC is a certified public accountant, auditor and consultant which provides a

variety of accounting, auditing, and consulting services.  PwC served as Dell's independent

auditor and principal accounting firm both before and during the Class Period.  PwC acted in this

capacity pursuant to the terms of contracts it had with Dell that, among other things, required

PwC to audit Dell's financial statements in accordance with GAAS, and to report the results of

those audits (and quarterly reviews) to Dell, its Board of Directors, its Audit Committee, and the

members of the investing public, including Lead Plaintiff and the members of the Class.

677.  PwC was engaged by Dell to provide independent accounting and auditing

services to Dell.  As such, PwC gave Dell accounting advice and provided consultation regarding

Dell's annual and quarterly reports that were filed with the SEC and publicly distributed.  By

virtue of its position as independent accountant and auditor of Dell, Defendant PwC had access

to the files and key employees of the Company at all relevant times.  Similarly, as a result of the

auditing and other services it provided to Dell, PwC personnel were frequently present at Dell's

corporate headquarters throughout each year. Therefore, PwC had continual access to and knowledge of Dell's confidential internal corporate, financial, operating, and business information. They also had the opportunity to observe and review the Company's business and accounting practices; and had the ability to test the Company's internal accounting information and publicly reported financial statements, as well as the Company's internal controls and structures.

678.   As Dell's auditor and principal accounting firm during the Class Period, PwC was required to review Dell's quarterly financial statements, as well as the text that accompanied those statements. It also was required to audit the annual financial statements and the accompanying text in the Company's Form 10-K's, and assure the Company's investors that Dell's financial reports fairly reflected the financial state of the Company.

679.   PwC was also responsible for, among other things, examining the Company's system of internal controls to identify any material weaknesses or reportable conditions that might affect the accuracy or reliability of the Company's financial statements.

680.   For Dell's fiscal years 2003 and 2004, PwC was required to perform its audit services according to Generally Accepted Auditing Standards ("GAAS"), which include Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants, or AICPA.[19] As such, PwC was required to issue an unqualified opinion *only* if the Company's financial statements were fairly presented in accordance with GAAP.

---

[19] GAAS, as approved and adopted by AICPA, relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as "AU § __") are recognized by the AICPA as the interpretation of GAAS.

681.    Beginning in Dell's fiscal year 2005, the Sarbanes-Oxley Act of 2002 authorized the Public Company Accounting Oversight Board ("PCAOB") to establish required auditing and related professional practice standards to be used by registered public accounting firms.  For Dell's fiscal years 2004 and 2005, PwC was required to perform its audit services according to PCAOB Standards. The PCAOB adopted as interim standards (on an initial, transitional basis) the generally accepted auditing standards described in SAS No. 95, Generally Accepted Auditing Standards, in existence on April 16, 2003.  When initially established, the PCAOB standards were the same as existing standards previously required under GAAS.

682.    PwC was responsible for reporting the audit results to Dell (including its Board of Directors and the Audit Committee), and to stand behind its unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly issued financial statements distributed to members of the investing public, including Lead Plaintiff and other members of the Class.  *See supra* ¶¶ 156-159 and Section X (identifying PwC's "clean audit" opinions). However, either knowingly or recklessly, PwC certified each and every materially false and misleading financial statement Dell issued throughout the Class Period through its Form 10-K's by issuing unqualified "clean audit" opinions.  Without these materially false and misleading unqualified "clean audit" opinions, Dell's fraudulent accounting scheme could not have been perpetrated.

683.    As the Company has now admitted, each of the reports PwC certified as being free from material misrepresentations was in fact replete with misstatements and omissions. Specifically, as Dell has itself acknowledged, "our previously issued financial statements for Fiscal 2003, 2004, 2005, and 2006 (including the interim periods within those years), and the first quarter of Fiscal 2007, ***should no longer be relied upon because of certain accounting***

*errors and irregularities in those financial statements*." (emphasis added).  Furthermore, Dell

now admits that its internal investigation:

> raised questions relating to numerous accounting issues, most of which involved
> adjustments to various reserve and accrued liability accounts, and identified
> evidence that certain adjustments appear to have been motivated by the objective
> of attaining financial targets. According to the investigation, these activities
> typically occurred in the days immediately following the end of a quarter, when
> the accounting books were being closed and the results of the quarter were being
> compiled. The investigation found evidence that, in that timeframe, account
> balances were reviewed, sometimes at the request or with the knowledge of senior
> executives, with the goal of seeking adjustments so that quarterly performance
> objectives could be met. The investigation concluded that a number of these
> adjustments were improper, including the creation and release of accruals and
> reserves that appear to have been made for the purpose of enhancing internal
> performance measures or reported results, as well as the transfer of excess
> accruals from one liability account to another and the use of the excess balances
> to offset unrelated expenses in later periods.

> \*   \*   \*

> The investigation identified evidence that accounting adjustments were viewed at
> times as an acceptable device to compensate for earnings shortfalls that could not
> be closed through operational means.

> \*   \*   \*

> The errors and irregularities identified in the course of the investigation revealed
> deficiencies in our accounting and financial control environment, some of which
> were determined to be material weaknesses, that require corrective and remedial
> actions.

Dell FY 2007 Form 10-K at 37.

684.    PwC issued unqualified "clean audit" opinions for each of the annual reports that

Dell's restatement now cautions investors not to rely upon.

685.    As set forth below, PwC ignored several "red flags" during its audits of Dell.  Red

flags include any facts giving a reasonable auditor pause to suspect that the financial statements

of the company it is auditing contain material misstatements or omissions.  Given the frequency

and magnitude of these glaring violations at Dell throughout the Class Period (which evidence

PwC's willful refusal to see obvious red flags) and PwC's interest in reaping the significant rewards it received from rubberstamping Dell's financial statements, it is clear that PwC knowingly issued (or issued with extreme recklessness) false and misleading "clean audit" opinions throughout the Class Period.

## A.   PwC Was Not Independent

686.   PwC's issuance of unqualified opinions was motivated, in part, by the substantial payments it received from Dell.  If PwC ceased rubberstamping Dell's financial statements, the lucrative revenue stream PwC received from Dell year after year would likewise cease. According to Dell's Proxy statements, during fiscal years 2003 through 2007, PwC earned approximately $51 million from its engagement with Dell.  Of this amount, $36.4 million related to services performed by PwC in connection with auditing Dell's annual financial statements, reviewing its quarterly statements, and reviewing Dell's internal controls.  PwC earned an additional $14.3 million for performing other services for Dell between FY2003 and FY2007. According to Dell's proxy filed with the SEC on May 3, 2003, PwC's audit fee "[i]ncludes fees paid for professional services rendered in connection with the audit of the annual financial statements, for the review of the quarterly financial statements and for the statutory audits of international subsidiaries."  Dell's proxy filed with the SEC on June 5, 2006 states that PwC's audit fees include "fees incurred for professional services rendered in connection with the audit of the annual financial statements, for the audit of internal controls under Section 404 of the Sarbanes-Oxley Act, for the review of the quarterly financial statements and for the statutory audits of international subsidiaries."  The following chart, which is derived from Dell's proxy statements, illustrates the allocation between audit and non-audit fees earned by PwC between FY2003 and FY2007:

| | Fees paid to PwC for auditing Dell's annual reports, reviewing Dell's quarterly reports and auditing Dell's controls | Other fees paid to PwC |
|---|---|---|
| | (in millions of dollars) | |
| FY2003 | 3.5 | 3.9 |
| FY2004 | 3.9 | 3.1 |
| FY2005 | 8.4 | 2.5 |
| FY2006 | 8.7 | 2.6 |
| FY2007 | 11.9 | 2.5 |
| | | |
| **TOTAL** | **36.4** | **14.6** |

687.    In violation of AU § 220.01, PwC knowingly or recklessly failed to maintain an independent mental attitude in all matters relating to services provided to Dell.

688.    Dell has been a long-time and significant client of PwC and a major source of income for PwC's Austin office.  In fact, during fiscal years 2003 through 2007, the fees paid by Dell to PwC were approximately $51 million.  Of this amount, approximately one-third related to fees for services other than the audit of Dell's financial statements.  The significant fees paid to PwC were peculiarly important to PwC's partners' because their incomes were dependent on continued business from Dell.  These pressures directly led to a conflict of interest for the auditors on the Dell engagement, and were a significant factor that led to PwC abandoning its independence, objectivity, and integrity on the audits and reviews of Dell's financial statements.

689.    PwC's independence also was compromised by its incestuous relationship to key decision-makers at Dell.  Specifically, before joining Dell, Defendant Schneider was associated with PwC for nineteen years, including ten years as a partner.

690.    Moreover, PwC did not rotate the partners responsible for conducting Dell's audits.  CS13 directly observed that, with regard to the Dell account, PwC did not have a practice of changing partners every few years.

**B.  PwC Had Full And Complete Access To Dell's Information**

691.    PwC has been Dell's independent auditor for over twenty years, going back to 1986, and has certified every single one of Dell's financial reports filed with the SEC during that time period.  By virtue of its longstanding relationship with Dell and the nature of the auditing and consulting services rendered to the Company, PwC's personnel were regularly present at Dell's corporate headquarters throughout the year.  As such, they had continuous access to, and knowledge of, Dell's internal accounting records and confidential corporate financial and business information through conversations with employees of Dell and through review of Dell's non-public documents.

692.    Based on this access, PwC knew, should have known, or recklessly disregarded facts concerning the Company's improper financial reporting during the Class Period, including the statements contained in the Company's 2003, 2004, 2005 and 2006 year-end financial statements and PwC's unqualified audit opinions thereon.  Nonetheless, PwC knowingly or recklessly issued unqualified audit opinions during the Class Period that falsely assured investors that Dell's financial reports, "fairly, in all material respects, [reflected] the financial position of Dell Inc. and its subsidiaries." Dell 2005 10-K.

**C.  PwC Failed To Render Accurate Audit Reports**

693.    PwC issued its audit opinions, dated February 13, 2003, February 12, 2004, March 3, 2005, and March 15, 2006 on Dell's financial statements as of and for the 2003 to 2006 fiscal years. *See supra* ¶¶ 241-42, 336, 458, 574.  Each of PwC's opinions was filed with Dell's annual reports on Form 10-K.  In these audit opinions, PwC falsely stated that the disclosures in Dell financial statements were presented in conformity with GAAP and that PwC's audit was performed in accordance with GAAS. *Id.*

267

694.     Despite PwC's certifications attesting to Dell's compliance with GAAP and its own compliance with GAAS, in Dell's Form 8-K filed on August 16, 2007, Dell disclosed that its previously issued financial statements for fiscal 2003, 2004, 2005 and 2006 (including the interim periods within those years), and the first quarter of fiscal 2007, should no longer be relied upon because of certain accounting errors and irregularities in those financial statements. As a result, Dell was forced to restate the previously issued financial statements for those periods.

695.     In each of the audits that required restating, PwC violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP.  AU § 508.04.  As admitted by Dell's restatement, PwC's opinions falsely represented that Dell's 2003, 2004, 2005 and 2006 financial statements were presented in conformity with GAAP when, in fact, they were not, for the myriad of reasons herein alleged.

696.     Pursuant to AU § 508.04, the auditor's report must express an opinion on the audited financial statements taken as a whole and must contain a clear indication of the character of the auditor's work.  The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS.  AU § 508.07.

697.     PwC did not render an accurate audit report and thus did not exercise due professional care.  Since, as is now admitted by the Company, Dell's financial statements were not in conformity with GAAP, PwC obviously failed to perform sufficient procedures to audit Dell's financial statements for fiscal years ended 2003, 2004, 2005 and 2006, in accordance with GAAS.

698.     In issuing such audit opinions, PwC turned a blind eye to Dell's improper accounting practices and control deficiencies, as described herein.  Moreover, PwC issued

unqualified audit opinions on Dell's 2003, 2004, 2005 and 2006 financial statements, even though PwC knew, or recklessly disregarded, that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Dell and its subsidiaries as of 2003, 2004, 2005 and 2006, and the results of their operations and cash flow for the fiscal years ended 2003, 2004, 2005 and 2006; and (b) PwC had not audited Dell's 2003, 2004, 2005 and 2006 financial statements in accordance with GAAS.  As set forth in detail in Section VII above, Dell's violations of GAAP during the Class Period include, among other things:

> a.    the improper acceleration of revenue on high volume software products in violation of SOP 97-2;
>
> b.    the improper premature recognition of deferred revenue from the sale of extended warranties in violation of FTB 90-1;
>
> c.    the improper premature recognition of revenue prior to the meeting the required criteria under SAB 101;
>
> d.    the improper classification of certain sales transactions in the income statement, such as software sales where Dell acted as agent and the sale of certain component commodities, in violation of EITF 99-19;
>
> e.    the improper development and manipulation of accounting accruals and reserves, such as accrued bonuses and vendor funding arrangements, for the purpose of enhancing the Company's reported operating results in violation of SFAS 5 and EITF 02-16.

**D.    PwC Improperly Issued Unqualified Opinions On The Effectiveness Of The Company's Internal Controls Over Financial Reporting During The Class Period**

699.    Under Section 404(b) of the Sarbanes-Oxley Act of 2002, PwC was required to opine on Dell's management's assessment of the effectiveness of internal controls over financial reporting beginning with Dell's fiscal year 2005 audit.  As Dell now admits, there were material weaknesses in the Company's controls during the periods PwC issued certifications declaring Dell's controls to be effective.

700.    In 2005 and 2006, PwC knowingly or recklessly issued unqualified opinions on the effectiveness of Dell's internal controls over financial reporting.  *See supra* ¶¶ 241-42, 336, 458 and 574.  In so doing, PwC violated PCAOB Standard No. 2: An Audit of Internal Control over Financial Reporting Performed in Conjunction with an Audit of Financial Statements.  This standard defines internal controls over financial reporting as a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

701.    The concept of reasonable assurance is built into the definition of internal controls over financial reporting and also is integral to the auditor's opinion.  Reasonable assurance includes the understanding that there is a remote likelihood that material misstatements will not be prevented or detected on a timely basis. Although not absolute assurance, reasonable assurance is, nevertheless, a high level of assurance.

702.    PCAOB acknowledges how important this audit of internal controls over financial reporting is to investors.  PCAOB Auditing Standard No. 2 states:

> The auditor should be aware that persons who rely on the information concerning internal control over financial reporting include investors, creditors, the board of directors and audit committee, and regulators in specialized industries, such as banking or insurance. The auditor should be aware that *external users of financial statements are interested in information on internal control over financial reporting because it enhances the quality of financial reporting and increases their confidence in financial information*, including financial information issued between annual reports, such as quarterly information. Information on internal control over financial reporting is also intended to provide an early warning to those inside and outside the company who are in a position to insist on improvements in internal control over financial reporting, such as the audit committee and regulators in specialized industries.

(emphasis added).

703.   In Dell's Form 8-K filed on August 16, 2007, the Company disclosed that its investigation identified control deficiencies during the Class Period that constituted material weaknesses in its internal controls over financial reporting.  A material weakness is defined under the PCAOB standards as "a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."

704.   In its Form 10-K dated October 30, 2007, Dell identified the following deficiencies in their accounting and financial reporting controls:

> As a result of our review of the accounting issues identified in the investigation, as well as the other issues identified by management in its internal reviews, we have identified the following deficiencies in our accounting and financial reporting controls:
>
> • Control environment — we did not maintain an effective control environment. Specifically:
>
>> • We did not maintain a tone and control consciousness that consistently emphasized strict adherence to GAAP. This control deficiency resulted in an environment in which accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls, which in certain instances led to inappropriate accounting decisions and entries that appear to have been largely motivated to achieve desired accounting results and, in some instances, involved management override of controls. In a number of instances, information critical to an effective review of transactions and accounting entries was not disclosed to internal and external auditors.
>>
>> • We did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with our financial reporting requirements and business environment.
>
> The control environment, which is the responsibility of senior management, sets the tone of the organization, influences the control consciousness of its people, and is the foundation for all other components of internal control over financial reporting. The inadequate control environment contributed to the deficiencies in our period-end financial reporting process described below.

- Period-end financial reporting process — we did not maintain effective controls over the period-end reporting process, including controls with respect to the review, supervision, and monitoring of accounting operations. Specifically:

  - Journal entries, both recurring and nonrecurring, were not always accompanied by sufficient supporting documentation and were not adequately reviewed and approved for validity, completeness and accuracy;

  - Account reconciliations over balance sheet accounts were not always properly and timely performed, and the reconciliations and their supporting documentation were not consistently reviewed for completeness, accuracy and timely resolution of reconciling items; and

  - We did not design and maintain effective controls to ensure the completeness, accuracy and timeliness of the recording of accrued liabilities, reserves and operating expenses, primarily related to our accrued warranty obligations, goods and services received but not invoiced, customer rebates and nonproduction operating expenses.

Dell FY 2007 Form 10-K at 112-113.

705.   At the same time, the Company further stated:

These material weaknesses resulted in the restatement of our annual and interim financial statements for Fiscal 2003, 2004, 2005, and 2006 and the first quarter of Fiscal 2007, and resulted in adjustments, including audit adjustments, to our annual and other interim financial statements for Fiscal 2007. Additionally, these material weaknesses could result in misstatements of substantially all of our financial statement accounts that would result in a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.

Based on management's evaluation, because of the material weaknesses described above, management has concluded that our internal control over financial reporting was not effective as of February 2, 2007. Our independent registered public accounting firm, PricewaterhouseCoopers LLP, has audited management's assessment of the effectiveness of our internal control over financial reporting as of February 2, 2007, and that report appears in this Report.

*Id.*

706.   PwC's knowing or reckless failure to identify the material internal control weaknesses referenced above is not simply a violation of PCAOB Auditing Standard No. 2 in fiscal years 2005 and 2006. In an audit of internal control over financial reporting, the auditor's

evaluation of controls is interrelated with the auditor's evaluation of controls in a financial statement audit, as required by AU § 316, Consideration of Fraud in a Financial Statement Audit. Controls identified and evaluated by the auditor during the audit of internal controls over financial reporting also addresses or mitigates fraud risks, which the auditor is required to consider in a financial statement audit. PwC knowingly or recklessly failed to adequately test and identify, or respond to, deficiencies in controls designed to prevent and detect fraud during the audit of internal controls over financial reporting. Under AU § 316, PwC should have additionally altered the nature, timing, or extent of procedures to be performed during the financial statement audit in consideration of these deficiencies.

707.    PwC knowingly or recklessly violated PCAOB Auditing Standard No. 2 and AU § 326.25, which requires that the auditor obtain sufficient competent evidence about the design and operating effectiveness of controls over all relevant financial statement assertions related to all significant accounts and disclosures in the financial statements. The auditor must plan and perform the audit to obtain reasonable assurance that deficiencies that, individually or in the aggregate, would represent material weaknesses are identified.   Based on the material weaknesses identified in the periods of restatement and the related restatement adjustments, it is clear PwC failed to obtain sufficient competent evidential matter on the design and effectiveness of the internal controls as required by Sarbanes-Oxley beginning in FY2005. Corroborating evidentiary matter under GAAS includes both documentation obtained during the field work, such as invoices, contracts, and independent confirmations, and information obtained from inquiry, observation, inspection and physical examination. Thus, although Dell admitted that, "[i]n a number of instances, information critical to an effective review of transactions and accounting entries was not disclosed to internal and external auditors," as the Company's

auditor, PwC had an obligation under GAAS to gather evidence supporting its attestation on management's assessment of the effectiveness of Dell's controls.

708.    The same GAAS general standards of fieldwork and reporting that are required in the auditing of the financial statements are required by PCAOB.  As such, PwC's violations of the general and fieldwork standards, as outlined herein, also pertain to its performance of the audit of internal controls over financial reporting.  Had PwC properly understood and evaluated management's process and its inherent shortfalls, as well as performed the basic audit procedures, it would have identified the material weaknesses that led to the restatement.

709.    PwC knowingly or recklessly violated ¶ 129 of PCAOB Auditing Standard No. 2, which provides that an auditor may issue an unqualified opinion only when there are no identified material weaknesses.  PwC's audit failed to acknowledge or to report material weaknesses that had been in existence throughout the Class Period and which were later identified in, *inter alia*, Dell's Form 10-K filed dated October 30, 2007, as follows:

a.    PwC violated PCAOB Auditing Standard No. 2, ¶40, which requires the auditor obtain an understanding of, and evaluate, management's process for assessing the effectiveness of the company's internal controls over financial reporting.

b.    PwC violated PCAOB Auditing Standard No. 2, ¶47 which requires the auditor obtain an understanding of the design of specific controls over financial reporting by applying procedures that included making inquiries of appropriate management, supervisory, and staff personnel, inspecting company documents, observing the application of specific controls, and tracing transactions through the information system relevant to financial reporting.

c.    GAAS required PwC, when auditing Dell to, among other things:

i.    "maintain independence in mental attitude in all matters relating to the audit";

ii.    "exercise due professional care in the performance of the audit and the preparation of the report";

iii.     "obtain a sufficient understanding of [Dell] . . . and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures";

iv.     "adequately plan the work and must properly supervise any assistants";

v.     "obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit";

vi.     state in its audit report whether Dell's financial statements were presented in accordance with GAAP;

vii.     identify in its audit report "those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period"; and

vii.     state in its audit report "that informative disclosures are not reasonably adequate" when it so determined.

710.    None of the foregoing provisions were followed prior to PwC issuing "clean audit" opinions for Dell's financial statements during the Class Period.

## E.     PwC Failed To Adequately Plan Its Audit

711.    Under GAAS, it is inherent in the planning process (AU § 311) that an auditor have sufficient knowledge of the company being audited, the industry, the environment, areas of audit exposure, weaknesses in internal controls and various other important matters in order to properly plan the audit.  GAAS (AU § 311) states that:

The auditor should obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with generally accepted auditing standards.  That level of knowledge should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements. . . .  Knowledge of the entity's business helps the auditor in:

a.     Identifying areas that may need special consideration;

b.     Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization;

c.    Evaluating the reasonableness of estimates;

d.    Evaluating the reasonableness of management representations; and

e.    Making judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures.

712.    Moreover, the auditor is required to design the audit with professional skepticism (AU § 230) in order to provide reasonable assurance of detecting errors, material misstatements (AU § 312) or fraud (AU § 316).

713.    PwC failed to comply with GAAS because it failed to design its audit plan to provide reasonable assurance of detecting material errors as required by AU § 312. PwC was required under GAAS to obtain knowledge of the Company's business, apply analytical procedures, and assess the risk of material misstatement in planning for its audit.

714.    AU § 316.36 emphasizes that the risk of material misstatement of the financial statements is generally greater when account balances and classes of transactions include accounting estimates rather than essentially factual data because of the inherent subjectivity in estimating future events. The guidance specifically names warranty obligations as a type of estimate subject not only to the unpredictability of future events, but also to misstatements that may arise from using inadequate or inappropriate data or misapplying appropriate data. PwC violated GAAS by failing to adequately consider the risk of material misstatement related to warranty obligations and Dell's use of other reserves and accruals, both of which were used by Dell to manipulate earnings resulting in significant restatement adjustments throughout the Class Period.

715.    PwC failed to consider, or overlooked the existence of, the red flags identified herein, as well as other risk factors. PwC also failed to properly design or modify its planned audit procedures to mitigate those risks. Furthermore, PwC failed to develop an adequate

276

strategy for the conduct and scope of the audit of the Company's revenue recognition, warranty liabilities, and other reserves and accruals.

716.    PwC audited Dell's financial statements and provided significant additional services to the Company during the Class Period.  Given PwC's extensive involvement with the Company, it possessed a thorough knowledge of Dell's financial history, accounting practices, internal controls, and business operations.  Despite this intimate familiarity with Dell's business practices, in auditing Dell's financial statements, PwC either knowingly or recklessly:

    a.    Failed to identify areas that needed special consideration (such as software and deferred revenue recognition, warranty liabilities and other reserves or accruals) or identified such areas and audited them in a manner which was so deficient that it amounted to no audit at all, while making audit judgments that no reasonable auditor would have made if confronted with the same facts;

    b.    Failed to assess the conditions under which accounting data (such as for "period-end adjusting journal entries") was produced, processed, reviewed, and accumulated within the organization or assessed such conditions and made audit judgments based upon said assessment that no reasonable auditor would have made if confronted with the same facts;

    c.    Failed to evaluate the reasonableness of estimates and management's representations (such as its estimates of warranty obligations and the establishment and use of other accruals and reserves) or evaluated them in a manner which was so deficient that it amounted to no evaluation at all; and

    d.    Failed to judge the appropriateness of the accounting principles applied (such as revenue recognition under SOP 97-2, FTB 90-1, SAB 101, SAB 104 and EITF 99-19 and the establishment and use of accrued liabilities under SFAS 5 and EITF 02-16), or did so and arrived at judgments that no reasonable auditor would have arrived at if confronted with the same facts.

717.    GAAS (AU § 311) states that audit planning involves developing an overall strategy for the expected conduct and scope of the audit.  Accordingly, GAAS recognizes that the nature, extent, and timing of audit planning may vary with the size and complexity of the company, experience with the company, and knowledge of the company's business.  In this regard, GAAS (AU § 311) provides that in planning the audit, the auditor should prepare a

written audit program (or set of written audit programs) for every audit and that this audit program should set forth in reasonable detail the audit procedures that the auditor believes are necessary to accomplish the objectives of the audit. GAAS further states that, in developing the program, the auditor should be guided by the results of the planning considerations and procedures and recognize that, as the audit progresses, changed conditions may make it necessary to modify planned audit procedures.

718. In preparing this audit program, GAAS provides that the auditor should consider, among other things (AU § 311):

a. Matters relating to the entity's business and the industry in which it operates;

b. The entity's accounting policies and procedures;

c. The methods used by the entity to process significant accounting information;

d. Planned assessed level of control risk;

e. Preliminary judgment about materiality levels for audit purposes;

f. Financial statement items likely to require adjustment; and

g. Conditions that may require extension or modification of audit tests.

719. PwC failed to comply with the foregoing provisions of GAAS in that PwC knew, or was reckless in not knowing, that Dell's earnings manipulations and the internal control weaknesses were a material part of the Company's business operations. Further, PwC failed to utilize this information in planning and performing its audit, or utilized this information in a manner that no reasonable auditor would have used if confronted with the same facts. Given that PwC had unrestricted access to all of the Company's books and records, counseled the Company on a wide variety of tax, accounting and other business matters, and attended meetings of the Audit Committee of the Company's Board of Directors to discuss the planning and staffing of its

278

audit and the Company's internal controls, and the management letters which PwC issued on a regular basis, it is apparent that PwC should have been thoroughly familiar with all aspects of the Company's financial history, accounting practices, system of internal controls, and business operations.

**F.      PwC Failed To Exercise Due Professional Care**

720.    Auditors must exercise due professional care in performing the audit and preparing the audit report.  AU § 230.01.  Due professional care concerns what the auditor does and how well he does it.  AU § 230.04.

721.    PwC did not exercise due professional care because it failed to obtain sufficient competent evidential matter to support the assertions in the financial statements, maintain an attitude of professional skepticism, and render an accurate audit report on behalf of Dell.

722.    In auditing Dell's financial statements for fiscal years 2003, 2004, 2005 and 2006, PwC repeatedly violated each of these GAAS requirements.  Given the systemic and substantial nature of the Dell Defendants' accounting fraud throughout the Class Period, including but not limited to Defendants' manipulation of Dell's accruals and reserves, PwC was aware of Defendants' accounting fraud but nevertheless deliberately turned a blind eye to it, thereby destroying any pretense of PwC's due professional care.

**G.      Numerous "Red Flags" Should Have Alerted PwC To Dell's Materially False And Misleading Financial Statements**

723.    During the course of PwC's audits of Dell, the existence of certain "red flags" should have raised questions in the auditors' minds and led them to alter the nature, timing, or extent of procedures to be performed during a financial statement audit.

724.    One of the most egregious red flags deliberately ignored by PwC was the numerous adjustments made to Dell's books at the end of quarters.  PwC also ignored the suspicious timing of Dell's accounting adjustments.  As admitted in Dell's restatement:

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that certain adjustments appear to have been motivated by the objective of attaining financial targets.  ***According to the investigation, these activities typically occurred in the days immediately following the end of a quarter, when the accounting books were being closed and the results of the quarter were being compiled***.

(emphasis added).

725.    PwC knowingly or recklessly ignored the suspicious timing of adjustments to Dell's books – which occurred at the end of quarters – when issuing clean opinions to Dell's annual reports.

726.    In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU § 326.01.

727.    Had PwC conducted its audits in accordance with GAAS, it would have discovered that Dell's financial statements were materially false and misleading and failed to comply with GAAP.

728.    In October 2002, the AICPA's Auditing Standards Board issued SAS No. 99, Consideration of Fraud in a Financial Statement Audit, which requires auditors to plan and perform audits to obtain reasonable assurance that the financial statements are free of material misstatement whether caused by error or fraud.  The auditor's consideration of fraudulent acts under AU § 317 establishes that, for those fraudulent acts that have a direct and material effect on the determination of financial statement amounts, the auditor's responsibility to detect misstatement resulting from such fraudulent acts is the same as that for errors.  AU § 312.

729.     SAS No. 99 served as an update to AU § 316 that provided auditors with a significant level of detail in order to enhance the auditor's understanding of the nature and characteristics of fraud.  This pronouncement provided numerous examples of risk factors or red flags that the auditor must consider in assessing the risk of material misstatements due to fraudulent financial reporting.

730.     Even prior to the issuance of SAS No. 99, GAAS had identified various red flags that auditors need to consider in determining audit risk relating to misstatements arising from fraudulent financial reporting (AU § 316).  SAS No. 99 served to expand the factors to consider and also emphasized the need for increased auditor professional judgment and skepticism in assessing the risks of fraud or misstatement.

731.     There were numerous red flags that should have alerted PwC to fraudulent accounting practices that were rampant at Dell and endemic in the Company's corporate culture. PwC knew or should have known of the significant risk of misstatement in Dell's financial reporting as a result of these risks.  Many of these red flags present at Dell, as described in Dell's own Form 8-K and Form 10-K disclosures as well as by numerous confidential witnesses, are strikingly similar to the examples cited as "risk factors" in SAS No. 99 (AU § 316).  Some of the red flags present during the Class Period at Dell include:

    a.     Profitability threatened by a high degree of competition, vulnerability to rapid changes and declining margins;

    b.     Declines in customer demand;

    c.     Excessive pressure exists for management to meet the requirements or expectations of third parties due to the profitability or trend level expectations of investment analysts and unduly aggressive or unrealistic expectations created by management in overly optimistic press releases;

    d.     Indications that management's personal financial situation is threatened by the entity's financial performance arising from financial interests in the Company and that significant portions of their compensation are contingent upon achieving

aggressive targets for stock price, operating results, financial position, or cash flow;

e.      Excessive pressure on management or operating personnel to meet financial targets set up by those charged with governance or management, including sales or profitability incentive goals;

f.      Assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate.

g.      Domination of management by a single person or small group without compensating controls, allowing management override of controls such as in the preparation of improper period-end adjustments;

h.      Ineffective oversight over the financial reporting process and internal controls by those charged with governance;

i.      Inadequate monitoring of controls, including automated controls and controls over interim financial reporting;

j.      Employment of ineffective accounting, internal audit, or information technology staff;

k.      Ineffective accounting and information systems, including situations involving significant deficiencies or material weaknesses in internal control;

l.      Ineffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards;

m.      Management failing to correct known significant deficiencies and material weaknesses in internal controls on a timely basis;

n.      Recurring attempts by management to justify marginal or inappropriate accounting on the basis of materiality;

o.      Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend; and

p.      Practice by management of committing to analysts, creditors, and other third parties to achieve aggressive or unrealistic forecasts.

AU § 316.85.

732.    Many of theses red flags individually, including the suspicious timing of the adjustments, should have alerted PwC to Dell's fraudulent accounting practices and control

deficiencies. The accumulation of all these red flags shows just how widespread the risks of fraudulent financial reporting were at Dell and that it was endemic to Dell's corporate culture. The foregoing pattern of red flags provided notice to PwC about Dell management's character and lack of integrity, *i.e.*, the "tone at the top," which, in turn, should have caused PwC to re-evaluate its risk assessments. GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. AU § 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25.

733. PwC violated SAS No. 99 because it failed to adequately plan and perform the audits to obtain reasonable assurance about whether the financial statements were free of material misstatement, whether caused by error or fraud. PwC knew or recklessly ignored the numerous "risk factors" relevant to financial reporting, including events and circumstances that occurred or existed at Dell during the Class Period, which adversely affected Dell's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

734. Throughout the Class Period, PwC knew that the control deficiencies set forth above contributed to material fraud in Dell's period-end financial reporting statements, yet PwC still failed to adequately plan and perform the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement, whether caused by error or fraud, and PwC thereby knowingly and intentionally deceived the investing public.

735. As one of the largest audit firms in the world, PwC was well aware of the strategies, methods, and procedures required by GAAS to conduct a proper audit. Also, PwC knew of the audit risks inherent at Dell and the industry in which Dell operated because of the

283

comprehensive services it had provided to Dell for many years.  PwC's intentional failure to comply with GAAS and PwC's performance on the Dell audits rose to the level of recklessness and/or was knowingly fraudulent.

**H.     PwC Failed To Properly Consider And Test For Management Override Of Controls**

736.    In its Form 10-K filed on October 30, 2007, Dell disclosed the background and results of the special investigation that began in August 2006.  As part of those disclosures, Dell stated:

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that certain adjustments appear to have been motivated by the objective of attaining financial targets. According to the investigation, these activities typically occurred in the days immediately following the end of a quarter, when the accounting books were being closed and the results of the quarter were being compiled. The investigation found evidence that, in that timeframe, account balances were reviewed, sometimes at the request or with the knowledge of senior executives, with the goal of seeking adjustments so that quarterly performance objectives could be met.

737.    According to AU § 316, management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls through recording fictitious journal entries, particularly those recorded close to the end of an accounting period, to manipulate operating results and intentionally biasing assumptions and judgments used to estimate account balances.

738.    It is clear, based on Dell's own disclosures of and restatement for improper period-end journal entries to meet financial objectives, that PwC failed to follow the requirements of AU § 316.58 to mitigate the risk of the override of controls on period-end journal entries by:

> a.      Failing to obtain an understanding of the entity's financial reporting process and the controls over journal entries and other adjustments;

b.      Failing to identify and select journal entries and other adjustments for testing;

c.      Failing to determine the timing of the testing; and

d.      Failing to inquire of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

## I.     PwC Failed To Obtain Sufficient Competent Evidential Matter Regarding Revenue Recognition On High Volume Software Products

739.    PwC knowingly or recklessly failed to exercise due professional care and obtain sufficient evidential matter for its audit procedures concerning whether Dell had properly established Vendor Specific Objective Evidence ("VSOE") of fair value, as required under SOP 97-2, to immediately recognize revenue on multiple element sales transactions.  AU § 330. Despite the fact PwC knew that Dell's high volume software product revenues were material to the Company's financial results during the Class Period, PwC simply relied on management representations and allowed Dell to improperly accelerate the revenue recognized on these sales. As such, PwC knew, or recklessly disregarded, the consequences of Dell recording the revenue from these transactions incorrectly.

740.    Moreover, PwC knowingly or recklessly ignored the guidance in the AICPA Audit Guide: Auditing Revenue in Certain Industries ("AAG-REV"), which states that "[a]uditors should gather evidential matter to support VSOE for each element in a multiple-element arrangement."  AAG-REV ¶ 2.61.  Therefore, in obtaining VSOE for each element, PwC needed to:

a.      Examine documentation to support the price charged for the element when it is sold separately; and

b.      Review the company's procedures to establish pricing policies for elements that have not yet been sold separately, and determine that management does not change prices once established.

285

AAG-REV ¶ 2.61.

741.    PwC could not have fulfilled, and in fact did not fulfill, the foregoing auditing duties, however, because VSOE had not been appropriately established.  To be sure, there was no supportable VSOE since, as shown by the restatement, the revenues were deferred and recognized "over the post-contract support period."

## J.    The Manipulation Of Accounting Accruals And Reserves For The Purpose Of Enhancing The Company's Reported Operating Results

742.    PwC knowingly or recklessly disregarded Dell's use of the creation and release of accruals and reserves that were made for the purpose of enhancing reported operating results throughout Dell's fiscal years 2003 through 2006.  According to the Form 10-K dated October 30, 2007:

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that certain adjustments appear to have been motivated by the objective of attaining financial targets. . . .  The investigation concluded that a number of these adjustments were improper, including the creation and release of accruals and reserves that appear to have been made for the purpose of enhancing internal performance measures or reported results, as well as the transfer of excess accruals from one liability account to another and the use of the excess balances to offset unrelated expenses in later periods. The investigation found that sometimes business unit personnel did not provide complete information to corporate headquarters and, in a number of instances, purposefully incorrect or incomplete information about these activities was provided to internal or external auditors.

> The investigation identified evidence that accounting adjustments were viewed at times as an acceptable device to compensate for earnings shortfalls that could not be closed through operational means.

Dell FY 2007 Form 10-K at 37.

743.    PwC's knowledge is evidenced by the fact that Dell's improper creation and release of accruals and reserves was not an isolated incident, but rather was pervasive throughout the Class Period, as shown by the 2007 10-K.  Additionally, the fraud related to the improper

286

creation and release of accruals and reserves involved virtually every current liability account, such as warranty liabilities, employee benefits, accounts payable, litigation, sales commissions, payroll, employee bonuses, and supplier rebates.

### K.      The Restatements Were Material To Dell's Reported Results

744.    Dell clearly has attempted to disparage the effects of the misstatements through its subsequent disclosures.  In its Form 8-K filed on August 16, 2007, Dell stated:

> The investigation identified evidence that accounting adjustments were viewed at times as an acceptable device to compensate for earnings shortfalls that could not be closed through operational means. Often, these adjustments were several hundred thousand or several million dollars, in the context of a company with annual revenue of between $35 billion and $56 billion and annual net income of between $2.1 billion and $3.6 billion for the periods in question. . . .

745.    In fact, the misstatements were material to Dell's financial statements.  Similar to the auditor's assessment of materiality when conducting an audit, Dell's restatements must be viewed from more than simply a quantitative view.  AU § 310.10 states that the auditor's consideration of the materiality is a matter of professional judgment and is influenced by his or her perception of the needs of a reasonable person.  Specifically, AU § 312.11 states:

> As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements. . . .

746.    In assessing materiality, AU § 9312.17 requires the auditor to consider relevant qualitative factors.  Some of these factors, along with the considerations as they relate to Dell, include:

> a.      The potential effect of the misstatement on trends, especially trends in profitability.  **Dell repeatedly touted the number of quarters that revenue or earnings had increased or exceeded the previous year.  Many of these disclosures were false and misleading as a result of the misstatements in the financial statements;**
>
> b.      The sensitiv**ity of the circumstances surrounding the misstatement, for example, th***e* **implications** of misstatements involving fraud and possible illegal

acts, violations of contractual provisions, and conflicts of interest. *Dell's own disclosures repeatedly reference improper adjustments motivated by attaining financial targets, improper period-end journal entries and the creation and release of reserves/accruals for the purpose of enhancing reported results;*

c.   The *significance* of the misstatement relative to known user needs, such as:

      i.   The significance of earnings and earnings per share to public-company investors. *Dell's restatements served to change EPS by at least $0.01 per share in 10 of the 17 quarters included in the Class Period*; and

      ii.   The effect of misstatements of earnings when contrasted with expectations. *In 5 of 6 quarters in which Dell's restatements served to decrease EPS from what was originally reported, the restatement reduced EPS below Company guidance that was originally shown to have been met.*

747.   As a result of the consideration of the qualitative factors of materiality, Dell's restatements were material to its investors and readers of its financial statements.

## L.   PwC Has A History Of Violating GAAS And Engaging In Questionable Conduct

748.   PwC's inept auditing of Dell was not unique. In fact, PwC has a long history of shabby work and questionable conduct. For example, in 2004 the PCAOB performed a review of PwC's auditing work and found deficiencies at nine of its clients. The report was issued in 2006. The PCAOB performed work at PwC's national office and sixteen of its other practice offices. Not surprisingly, the deficiencies included some of the very issues Dell identified in its Form 10-K dated October 30, 2007, such as:

- *failure to identify GAAP violations;*

- *failure to obtain sufficient competent evidential matter to support its audit opinions;*

- *failure to consider deficiencies in controls and how that affected risk assessment, and the nature, timing, and extent of some of its procedures; and*

- *failure to properly test consolidated revenues, and whether revenue was recognized in the proper period.*

288

749.    Apart from the foregoing, PwC's suspect accounting and auditing practices have

been called into question by public shareholders and the SEC.  By way of example:

•    PwC was sued in connection with the collapse of Hibernia Foods PLLC, in which the plaintiffs alleged that PwC ignored signs that Hibernia did not have a promising financial outlook.  The Judge in that case denied PwC's motion to dismiss and PwC later settled the case for $2.8 million;

•    A federal New Jersey jury found PwC jointly liable for gross mismanagement and fraudulent financial reports that bankrupted Ambassador Insurance Co;

•    In 2003, the SEC initiated and settled an enforcement action against PwC for improper accounting connected with SmarTalk TeleServices, Inc.  The SEC found through its investigation that PwC had improperly conducted its audit and intentionally manipulated its working papers with knowledge of deficiencies in its client's financial statements to the SEC; and

•    In 2003, a PwC partner, Richard P. Scalzo, was permanently barred from auditing public companies as part of a settlement with the SEC after Tyco executives claimed that Scalzo and PwC had approved the hidden bonuses and forgiven loans that led to charges of embezzlement against former Tyco executives.  In July 2007, PwC reached a $225 million settlement with the class in the *Tyco* securities litigation.

750.    Given PwC's history and the magnitude of the repeated, systemic and obvious

fraudulent conduct permeating Dell's accounting and reporting, PwC clearly was aware of, or

recklessly disregarded, the accounting fraud at the Company during the Class Period.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

751.    At all relevant times, the market for Dell's securities was an efficient market for

the following reasons, among others:

•    Dell's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

•    As a regulated issuer, Dell filed periodic public reports with the SEC;

•    Dell regularly communicated with public investors by established market communication mechanisms, including through regular disseminations of press releases on national circuits of major news wire services and through other wide-

289

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Dell was followed by numerous securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

752.     As a result of the foregoing, the market for Dell's securities promptly digested current information regarding Dell from all publicly available sources and reflected such information in Dell's stock price. Under these circumstances, all purchasers of Dell's securities during the Class Period suffered similar injury through their purchase of Dell's securities at artificially inflated prices and a presumption of reliance applies.

## XII.   NO SAFE HARBOR EXISTS FOR DEFENDANTS' FALSE STATEMENTS

753.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and/or misleading statements pleaded in this Complaint. The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants still are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Dell who knew that those statements were false when made.

## XIII.  LOSS CAUSATION

754.     Throughout the Class Period, the Defendants' false and misleading statements and omissions concerning Dell's financial performance inflated Dell's stock price. But for the

Defendants' misrepresentations and omissions, which concealed Dell's improper revenue recognition practices, its improper accounting for warranty liabilities, its accelerated recognition of deferred revenue from extended warranties, the misstatement of shareholder equity, Dell's practice of using "accounting adjustments . . . to compensate for earnings shortfalls that could not be closed through operational means," and the accuracy of Dell's SEC filings, thereby misstating Dell's reported revenue, operating income, net income, earnings per share, gross margin, shareholder equity and liability figures, Lead Plaintiff and the Class would not have purchased Dell's securities, or would not have purchased them at the artificially inflated prices at which they were offered.

755.    As a direct result of the Defendants' scheme, misrepresentations, and omissions of material facts, the price of Dell's common stock was artificially inflated throughout the Class Period.   Because of the Defendants' false and misleading statements, Dell's common stock closed at an average price of $32.11 per share during the Class Period, reaching a Class Period high of $42.57 on December 9, 2004.

756.    The Defendants' false statements and omissions were gradually revealed to the market beginning in August 2005, after the SEC commenced an investigation into Dell that was not publicly disclosed for more than one year.   Each individual disclosure after August 11, 2005 partially corrected misstatements and omissions relating to Dell's financial performance, its purported adherence to GAAP, and PwC's compliance with GAAS in the audit of Dell's filings.

757.    The declines in the Company's stock price between August 2005 and September 2006, including, but not limited to, the declines summarized below are directly attributable to the market's absorption of information correcting the Defendants' fraudulent misrepresentations and omissions.

A.      **The August 11, 2005 Announcement**

758.    On August 11, 2005, Dell issued an earnings release announcing its financial results for the quarter ended July 29, 2005 (the "Q2 2006 Earnings Release"). The Q2 2006 Earnings Release reported that Dell earned $13.4 billion in revenue, $1.17 billion in operating income, and $1.02 billion in net income. The Q2 2006 Earnings Release also reported liabilities of $17 billion and EPS of $0.41 (diluted). The Q2 2006 Earnings Release, although not ostensibly disclosing fraud, began Dell's deceptive attempt to unwind its fraudulent scheme and thus partially corrected the Defendants' misrepresentations that Dell was based on a sound business model, which did not improperly recognize revenue and did not include the manipulation of the Company's warranty and other reserves. As the market absorbed the information contained in the Q2 2006 Earnings Release, the Company's shares declined in value, falling from $39.58 per share on August 11, 2005, to close at $35.38 on August 24, 2005, a decline of 10.6%.

B.      **The February 16, 2006 Fourth Quarter FY 2006 Announcement**

759.    After trading closed on February 16, 2006, Dell announced that, after two consecutive disappointing quarters, its fourth quarter FY 2006 results had actually *exceeded* analysts' expectations. Despite the superficially positive nature of this news on earnings (43 cents per share, versus a consensus analyst estimate of 41 cents), sales ($15.2 billion versus a consensus analyst estimate of $14.8 billion) and revenue, Company officials noted that Dell only achieved these results because of an unusually long first quarter – 14 weeks versus the normal 13 week quarter. Indeed, Defendant Rollins explained that the additional week added two to three percentage points to Dell's growth rate. Thus, instead of an actual growth rate of 13 percent from the significantly shorter fourth quarter in the prior fiscal year, Dell's normalized growth rate – an apples to apples comparison, adjusting for the extra week in 2005 – was only 10 to 11

percent, significantly *lower* than expected, projected, and historically achieved. Additionally, Dell's all-important earnings per share received significant one-time boosts from a tax adjustment and from $2 billion in share buy backs in the quarter that significantly reduced the amount of publicly traded shares outstanding. Specifically, Dell announced that during the quarter, it spent $2 billion to repurchase 66 million shares of common stock, *reducing weighted average shares outstanding by seven percent year-over-year.* For the full year, Dell spent $7.2 billion to repurchase almost 205 million shares, *which helped artificially add three cents to its earnings per share.* Without these extraneous factors, Dell would have vastly missed its marks for this quarter. Additionally, Dell's guidance for the first quarter of FY 2007 was disappointing and far below pre-correction expectations. Specifically, Dell predicted revenue of $14.2 to $14.6 billion, representing only a six to nine percent growth rate over the prior year. This fell far short of the 16 and 21 percent year-over-year growth that Dell posted in the two immediately preceding first quarters, respectively.

760. The February 16, 2006 Press Release, although not ostensibly disclosing fraud, continued Dell's attempt to unwind its fraudulent scheme and thus partially corrected the Defendants' misrepresentations that Dell was based on a sound business model, which did not improperly recognize revenue and did not include the manipulation of the Company's warranty and other reserves. As the market absorbed the information contained in the February 16, 2006 press release, the Company's shares declined in value, falling from a closing price of $31.96 per share on February 16, 2006, to a closing price of $30.38 the following day. By the end of February 2006, Dell's share price was only $29.00 per share.

C.      **The May 8, 2006 Announcement**

761. On May 8, 2006, after the close of trading, Dell updated its earnings guidance by announcing that it would miss the street's earnings expectations for the quarter by five cents per

share.  Dell stated that the miss was the result of a decision to cut prices in hopes of accelerating future revenue growth.

762.  The May 8, 2006 Press Release, although not ostensibly disclosing fraud, continued Dell's attempt to unwind its fraudulent scheme and thus partially corrected the Defendants' misrepresentations that Dell was based on a sound business model, which did not improperly recognize revenue and did not include the manipulation of the Company's warranty and other reserves.  As the market absorbed the information contained in the May 8, 2006 press release, the Company's shares declined in value, falling from their close on May 8, 2006 of $26.43 per share to $23.78 by May 16, 2006, a decline of 10%.  Dell's shares continued to lose value, by June 23, 2006, they had declined to $23.72 per share, and to $21.68 by the end of July, erasing more of the share price inflation that was achieved through the inflated results of prior years.

**D.     The August 17, 2006 Announcement**

763.  On August 17, 2006, Dell issued an earnings release announcing its financial results for the second quarter of fiscal year 2007 (the "Q2 2007 Earnings Release").  The Q2 2007 Earnings Release reported that Dell earned $14.09 billion in revenue, $605 million in operating income, and $502 million in net income.  The Q2 2007 Earnings Release also reported EPS as $0.22.

764.  The Q2 2007 Earnings Release, although not ostensibly disclosing fraud, continued Dell's attempt to unwind its fraudulent scheme and thus partially corrected the Defendants' misrepresentations that Dell was based on a sound business model, which did not improperly recognize revenue and did not include the manipulation of the Company's warranty and other reserves.  As the market absorbed the information contained in the Q2 2007 Earnings

294

Release, the Company's shares declined in value, falling from $22.80 per share on August 17,

2006, to close at $21.64 on August 23, 2006, a decline of 5.1%.

**E.      The September 11, 2006 Announcement**

765.    On September 11, 2006, Dell issued a press release stating:

The company said it is unable to file because of questions raised in connection
with the previously announced informal investigation by the U.S. Securities and
Exchange Commission (SEC) into certain accounting and financial reporting
matters and the subsequently initiated independent investigation by the Audit
Committee of its board of directors. The company said it plans to file the report as
soon as possible.

The investigations have indicated the possibility of misstatements in prior period
financial reports, including issues relating to accruals, reserves and other balance
sheet items that may affect the company's previously reported financial results.
The company is working with the Audit Committee and with the company's
independent auditors to determine if any restatements of prior period financial
reports will be necessary.

*   *   *

The SEC requests for information have been joined by a similar request from the
United States Attorney for the Southern District of New York, who has
subpoenaed documents related to the company's financial reporting from 2002 to
the present.

*   *   *

In light of these developments, the company has suspended its ongoing share
repurchase program until further notice. In addition, given the delay in its 10-Q
filing, the company has postponed the meeting with analysts that was to be held
on Wednesday, September 13 and will reschedule it to a later date. Dell will be
holding its Technology Day on Tuesday, September 12, in New York showcasing
its latest products and services.

766.    The September 11, 2006 disclosure partially corrected the Defendants' prior false

statements that Dell was based on a sound business model that did not improperly recognize

revenue and did not include the manipulation of the Company's warranty and other reserves.

767.    In total, between August 11, 2005 and September 8, 2006, Dell's share price declined from $39.58 per share to $21.65 (a decline of 45.3%), returning stock prices back to at or about the pre-fraud level.

768.    This drop represented, at least in part, the unwinding of Dell's fraudulent scheme and represents a loss in market capitalization – *i.e.*, a total loss to Dell shareholders – of $45.7 billion.

769.    Because Lead Plaintiff and other putative class members purchased shares at inflated prices based on Defendants' fraud and still held shares after the price was deflated, *i.e.*, corrected, as truthful information entered the market place, Lead Plaintiff's and the Class' losses were caused directly by the Defendants' fraud.

## XIV.   CLASS ACTION ALLEGATIONS

770.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Dell during the period May 16, 2002 through and including September 8, 2006, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company and PwC at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendants have or had a controlling interest.

771.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class contains at least thousands of members.  Record owners and other members of the Class may be identified from records maintained by Dell or its transfer agent and may be

notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

772.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

773.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and it has retained counsel competent and experienced in class and securities litigation.

774.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants violated the federal securities law by their acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations, management and the accuracy of the financial reports and SEC filings filed by Dell;

- whether these misstatements and omissions caused Dell's share price to be inflated; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

775.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

XV.    **CLAIMS FOR RELIEF**

<u>COUNT ONE</u>
**Violation Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder
Against Defendants Dell, Michael Dell, Rollins, Schneider and PwC
(collectively, the "Section 10(b) Defendants")**

776.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

777.    This count is asserted against the Section 10(b) Defendants by Lead Plaintiff on behalf of itself and all members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

778.    During the Class Period, the Section 10(b) Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Dell common stock at artificially inflated prices.  In response to the unwinding and disclosure of the Section 10(b) Defendants' fraud, the price of the Company's common stock declined precipitously, damaging Lead Plaintiff and the Class.  In furtherance of this unlawful scheme, plan and course of conduct, the Section 10(b) Defendants took the actions set forth above.

779.    The Section 10(b) Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or concealed material facts necessary to make the statements complete, accurate and not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Dell common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

780.    The Section 10(b) Defendants were primary participants in the wrongful and illegal conduct charged herein.

781.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Dell.

782.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive investors into buying Dell common stock at inflated prices. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Dell in the light of the circumstances under which they were made, complete, accurate and not misleading, as set forth more particularly above, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Dell common stock during the Class Period.

783.    The Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with intent or with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Section 10(b) Defendants' material misrepresentations and/or omissions were done intentionally, knowingly, or recklessly and for the purpose and effect of concealing Dell's operating condition and future business prospects from the investing public and thereby deceiving investors into buying Dell common stock at artificially inflated prices. In view of the repeated and pervasive misstatements made during the Class Period regarding the Company's