IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2008 OCT -7  AM 8: 53

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

*In re*

Case No.  A-06-CA-726-SS

DELL INC., SECURITIES LITIGATION

_____

# O R D E R

BE IT REMEMBERED on the ___6th___ day of October 2008 the Court reviewed the file in the above-styled cause, and specifically Defendant PricewaterhouseCoopers LLP's ("PwC") Motion to Dismiss ("PwC's Mot. to Dismiss") [#174], Plaintiffs' Memorandum of Law in Opposition to Defendant PwC's Motion to Dismiss ("Pls.' Resp. to PwC's Mot. to Dismiss") [#186], Defendant PwC's Reply thereto ("PwC's Reply") [#190], Defendants Dell Inc., Michael Dell, Kevin Rollins, and James Schneider's (collectively "Dell Defendants") Motion to Dismiss ("Dell Defs.' Mot. to Dismiss") [#175], Plaintiffs' Memorandum of Law in Opposition to the Dell Defendants' Motion to Dismiss ("Pls.' Resp. to Dell Defs.' Mot. to Dismiss") [#185], Dell Defendants' Reply thereto ("Dell Defs.' Reply") [#191], and Defendants' Unopposed Motion for Leave to File Supplemental Authority in Further Support of Defendants' Motion to Dismiss [#193].  Being unopposed, the Court GRANTS Defendants' Unopposed Motion for Leave to File Supplemental Authority in Further Support of Defendants' Motion to Dismiss [#193].  After considering the motions, the responses, the replies, the relevant law, and the case file as a whole, the Court enters the following opinion and orders.

## Background

This case is a securities fraud class action brought on behalf of all investors (collectively, "Plaintiffs") who purchased common stock in Dell, Inc. ("Dell") between May 16, 2002 and September 8, 2006 (the "Class Period"). Plaintiffs allege violations under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.SC. §§ 78u-4, and Rule 10b-5 promulgated thereunder. This Court consolidated various similar actions on February 28, 2007, and chose Union Asset Management Holding AG as the lead plaintiff of the consolidated action on April 9, 2007. Plaintiffs filed their Consolidated Amended Complaint ("Pls.' Am. Compl.") [#164] on January 11, 2008 against Dell, Michael S. Dell ("Michael Dell"), Dell's founder and Chairman, Kevin B. Rollins ("Rollins"), Dell's former President and Chief Executive Officer, James M. Schneider ("Schneider"), Dell's former Chief Financial Officer (collectively, Michael Dell, Rollins, and Schneider are hereinafter referred to as the "Individual Defendants"), and PricewaterhouseCoopers ("PwC"), Dell's outside auditor.

Dell is a Delaware corporation with its principal place of business in Round Rock, Texas. According to the Company's 2006 Form 10-K filed with the SEC, Dell is a provider of "information technology products and service." Pls.' Am. Compl. at ¶ 24. Dell is a multi-billion dollar company. Dell Defs.' Mot. to Dismiss at 2. Defendant Michael Dell served as Dell's Chief Executive Officer and its Chairman during the Class Period, and thus was a signatory to Form 10-Ks submitted from 2003 to 2005, and certified Dell's financial condition and controls over financial reporting in Form 10-Ks and 10-Qs for those years in accordance with SEC regulations. Pls.' Am. Compl. at ¶ 28.

Defendant Rollins served as Dell's President and Chief Operating Officer, Chief Executive Officer, and as a director during the Class Period. Thus, Rollins was a signatory to Dell's Form 10-

Ks in 2005 and 2006, and certified Dell's financial condition and controls over financial reporting in Form 10-Ks and 10-Qs from 2004 to 2006, in accordance with SEC regulations. *Id.* at ¶ 29.

Defendant Schneider served as Dell's Senior Vice President and Chief Financial Officer during the Class Period. He was thus a signatory to Dell's Form 10-Ks from 2003 to 2006, and certified Dell's financial condition and controls over financial reporting in Form 10-Ks and 10-Qs from 2003 to 2006, in accordance with SEC regulations. *Id.* at ¶ 30.

It is undisputed that from 2002 to early 2005, Dell met or exceeded investor expectations, and earnings grew—the stock price rose from $27.85 at the start of the Class Period to a high of $42.57 on December 9, 2004. *Id.* at ¶¶ 75, 339. But, according to Plaintiffs, there are plenty of reasons the rising stock price did not reflect what was really going on at Dell: they allege Dell's competitive advantage over its rivals began to wither in late 2001, and by 2002, Dell had been surpassed as the global leader in PC sales and "exhausted its market" after the dot-com boom. *Id.* at ¶¶ 3, 62, 67. Plaintiffs claim this decline in growth threatened devastation to Dell, and thus Dell began at the start of the Class Period to "cook the books" to return to its earlier dominance. *Id.* at ¶ 4.

Although Dell's stock price remained steady or rose throughout 2003 and into late 2004 in accordance with the "fraudulent scheme" allegedly implemented by the Individual Defendants, Plaintiffs allege that in reality Dell's business model deteriorated, its profit margin declined, its growth was hamstrung by a limited consumer market, and its competitors surpassed it in sales of personal computers. *Id.* at ¶¶ 17, 61, 61, 75, 76. Plaintiffs allege the Individual Defendants managed to hide Dell's "deteriorating business model" and "artificially inflate the Company's stock price" by knowingly or extremely recklessly disseminating false and misleading information to the

-3-

public from 2002 to December 2004.  *Id.* at ¶¶ 10, 71.  Plaintiffs refer to this as a "campaign of misinformation."  *Id.* at ¶ 71.

Specifically, Plaintiffs take issue with the Individual Defendants' statements during this period that "(1) Dell's market share, sales revenue, and earnings were expanding in a predictable and stable manner; (2) the Company's gross profit margins were not diminishing; and (3) Dell's 'unique' business model continued to be robust in that its product quality and customer service were industry leaders."  *Id.*  Plaintiffs cite numerous specific examples of such statements made during the Class Period.  For instance, an earnings release announcing Dell's financial results for the quarter ending May 2, 2003 stated Dell had just had "its best-ever fiscal first-quarter opening results, recording exceptional growth and profitability in all product and regional markets" and informed investors Dell's "second-quarter increases should also be strong."  *Id.* at ¶ 244.  Michael Dell stated in the same report, "Dell's unique ability is innovating, integrating, and delivering technology with the best possible value, and our execution in those areas has never been better."  *Id.* at ¶ 247.  The Plaintiffs highlight countless examples of similar statements, made by each of the Individual Defendants in earnings reports, proxy statements and conference calls throughout the fiscal periods from 2002 through the first quarter of 2005.  *See* ¶¶ 160-616.  Plaintiffs claim these statements were false and misleading, were made with knowledge or reckless disregard of the facts, and were designed to, and did, artificially inflate Dell's stock price during the Class Period.

Plaintiffs claim the Individual Defendants were motivated to make the allegedly false and misleading statements, in part, because, "[Dell] incentivized its managers through enormous bonuses, which were tied to meeting financial benchmarks, and then engaged in massive accounting fraud scheme to meet its revenue growth numbers."  *Id.* at ¶ 5.  The crux of Plaintiff's "bonus"

allegations is Dell's 2002 Long Term Incentive Program (the "Long Term Program"). Dell changed the structure of the Long Term Program in 2002 to directly link bonuses to the performance measures of revenue, operating income, operating margin, and return on investment capital. *Id.* at ¶ 6. Plaintiffs allege these are precisely the numbers Dell subsequently began to manipulate. *Id.* at ¶ 644. In 2003, Dell introduced the Long Term Cash Incentive Bonus Program (the "Cash Incentive Program"), which linked bonuses for top executives—although not Dell or Rollins—directly to "certain revenue growth and profitability metrics." *Id.* at ¶ 6 (citing Dell 2003 Proxy Statement at 22). Finally, the Executive Annual Incentive Plan (the "Short Term Plan") was in place both before and after the Class Period, and was tied to revenue growth and operating margin. *Id.* at ¶ 640. Plaintiffs allege the Individual Defendants made "tremendous bonuses" under these plans over the course of the Class Period, and further, used them to encourage employees to manipulate financials. *Id.* at ¶¶ 648, 654.

Plaintiffs cite as further proof of the Individual Defendants' states of mind "numerous confidential sources" who state the Individual Defendants were "intimately involved in everything that was going on at Dell," and thus could not have avoided knowing their statements were incorrect or misleading based on the actual facts. *Id.* at ¶ 10. To otherwise support the claim the Individual Defendants made these "false and misleading statements" with scienter, Plaintiffs point out the Individual Defendants signed and certified SEC filings during this period, allegedly had "unfettered access" to all financial information, had oversight of and directly managed accounting functions, "reaped the benefit of their fraud [in the form of bonuses]," and (with regard to Rollins and Schneider) "left the Company at suspicious times." *Id.* at ¶ 617. Plaintiffs also allege the Individual Defendants "cashed in on their Dell stock and stock option grants" at inflated prices during this

period because they were aware the "reported numbers were being fabricated." *Id.* at ¶ 12. Specifically, Plaintiffs claim the Individual Defendants engaged in insider trading throughout the Class Period, with Michael Dell selling 29.61% of his holdings in Dell, Rollins selling 13.65% of his holdings, and Schneider selling 49.33% of his holdings. *Id.* at ¶ 666.

In 2005, according to Plaintiffs, the truth finally started to be "unwound," as public speculation about the health of Dell began when Dell missed revenue and earnings projections for the first time since 2002. *Id.* at ¶ 13. Plaintiffs attribute this to "deficiencies in Dell's business model" which were becoming apparent: "poor product quality was widespread, customer sales were down, and customer support was experiencing major problems." *Id.* at ¶ 76. In August 2005, the SEC began an informal investigation of accounting irregularities at Dell, although this was not disclosed until the following year. *Id.* at ¶ 76.

On August 17, 2006, Dell announced another quarter of "disappointing financial results." *Id.* at ¶ 77. Dell also announced at that time it was under informal investigation by the SEC for accounting irregularities relating to "revenue recognition and other accounting and financial reporting matters for certain past fiscal years." *Id.* at ¶ 13. After the announcement, Dell's stock price dropped 9%, to a low of $20.65 on August 18, 2006. *Id.* at ¶ 77.

Finally, on September 11, 2006 Dell issued a press release stating the SEC (and a subsequently initiated independent investigation) had raised serious questions about the accuracy of the company's reported financial results in prior fiscal quarters. *Id.* at ¶ 13. Dell announced on November 15, 2006 the SEC had upgraded the status of the investigation to "formal," and Dell would delay disclosure of financial results for the third fiscal quarter of 2006 due to the complexity arising from the investigation. *Id.* at ¶ 79.

Schneider, Dell's CFO, retired effective January 1, 2007.  Soon after, Rollins resigned as CEO and a board member effective January 31, 2007.  *Id.* at ¶ 13.  Other senior executives also left: Joe Marengi, Dell's Senior Vice President, Americas; John Medica, Dell's Senior Vice President, Consumer Products; Senior Vice President John Hamlin, head of Dell's online operations worldwide; and Senior Vice President Paul McKinnon, head of Dell's human resources department. *Id.* at ¶ 13.  Plaintiffs make much of these retirements because of a statement made on August 16, 2007 in an investor conference call to discuss the results of the independent investigation.  When asked whether "the ones who knew about it are the ones that are gone," (referring to the executives in senior management who knew about the misstated financials), Dell CFO Don Carty responded "we have...absolutely taken the necessary remedial action."  Dell Defs.' Mot. to Dismiss at Ex. 3.

On August 16, 2007, Dell announced it had completed its internal investigation, which had revealed a variety of accounting errors and irregularities, and that it would restate results for fiscal years 2003, 2004, 2005, 2006, and the first quarter of 2007.  Pls.' Am. Compl. at ¶ 86.  Interestingly, Dell's stock price actually rose the day following the announcement.  Dell Defs.' Mot. to Dismiss at Ex. 2.  On October 30, 2007, Dell filed the restated financials (the "Restatement").  Pls.' Am. Compl. at ¶¶ 14, 89.  The Restatement cited "certain accounting errors and irregularities in those financial statements" as the reasons the previously issued statements should no longer be relied upon. Earnings were restated upwards for some quarters and downwards for others, with the cumulative change being a reduction of $106 million in net income.  *See* Dell Defs.' Mot. to Dismiss at Ex. 1; Pls.' Am. Compl. at ¶ 14.  Plaintiffs rely heavily upon the following portion of the Restatement:

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that ***certain adjustments appear to have been motivated by***

*the objective of attaining financial targets.* According to the investigation, these activities typically occurred in the days immediately following the end of a quarter, when the accounting books were being closed and the results of the quarter were being compiled. *The investigation found evidence that, in that time frame, account balances were reviewed, sometimes at the request or with the knowledge of senior executives, with the goal of seeking adjustments so that quarterly performance objectives could be met.* The investigation concluded that a number of these adjustments were improper, including the creation and release of accruals and reserves that appear to have been made for the purpose of enhancing internal performance measures or reported results, as well as the transfer of excess accruals from one liability account to another and the use of the excess balances to offset unrelated expenses in later periods.

*Id.* at ¶ 14 (emphasis in original).  In "Management's Report on Internal Control Over Financial Reporting," Dell admitted to not maintaining an effective control environment that consistently emphasized strict adherence to Generally Accepted Accounting Practices ("GAAP") during the period in question. *Id* at ¶¶ 14, 91 (citing Dell FY 2007 Form 1O-K at 112-113).  Dell also admitted it had lacked sufficient personnel with an appropriate level of accounting knowledge and experience, and sufficient controls over the period-end reporting process with respect to the review, supervision, and monitoring of accounting operations.  *Id.*

The impact of the Restatement was to reduce Dell's net income for the entire period by less than 1% of the amount previously reported (of a reported $12 billion in net income for the entire period). *Id.* at ¶ 92; Dell Defs.' Mot. to Dismiss at Ex. 1, pg. 21.  Plaintiffs allege, however, that although Dell "has sought to paint its admissions as nothing more than minor adjustments with little effect...the reality is that Defendants' fraud was much grander and more calculated than simple accounting manipulations." Pls.' Am. Compl. at ¶ 18.

In sum, Plaintiffs allege the Defendants fraudulently and materially inflated reported revenues during the Class Period by $463 million, and engaged in erroneous accounting by accelerating and

overstating revenue, mismanaging various accruals and reserves, and manipulating warranty liabilities. *Id.* at ¶¶ 96, 101, 103-42. Secondly, Plaintiffs allege Defendants disseminated false and misleading information to the public attributing Dell's success to its unique business model and other things, but never to accounting fraud. Because of the fraud—which Plaintiffs allege was "unwound" beginning in 2005 with the announcement of disappointing earnings statements—Dell's share price dropped from $39.85 per share to $21.65 (a decrease of 45.3%) between August 11, 2005 and September 8, 2006 (the end of the Class Period). Plaintiffs allege this drop represented "the unwinding of Dell's fraudulent scheme" and represented a total loss to shareholders of $45.7 billion. *Id.* at ¶ 767. For support, Plaintiffs cite portions of Dell 10-Ks which were originally submitted to the SEC between 2003 and early 2007 and point to statements made and certified therein by the Individual Defendants that were "materially false and misleading when made" (according to Dell's own admissions in the Restatement). *See, e.g, id.* at ¶¶ 234-39. Finally, Plaintiffs allege the Individual Defendants took advantage of the inflated stock prices during the Class Period to cash in some of their stock and stock option grants, and earn tremendous bonuses. *See, e.g. id.* at ¶ 666.

Plaintiffs also allege PwC, Dell's longtime auditor, had consistently approved the now-restated financial statements as prepared in accordance with GAAP, and their audits as prepared in according with GAAS, although they were not. *Id.* at ¶¶ 19, 267. Plaintiffs point out Dell's 10-Ks during this period—parts of which were later admitted to be inaccurate—included "clean audit" opinions from PwC saying the forms fairly represented the financial position of Dell. *Id.* at ¶ 241. These opinions from PwC, Plaintiffs allege, were materially false and misleading as well. *Id.* at ¶ 243.

**Analysis**

## I.      Section 10(b) Standard

To state a claim under § 10(b) and Rule 10b-5 of the Securities Exchange Act, a plaintiff must show "(1) a misstatement or omission, (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).  A § 10(b) claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled "with particularity" and the requirements of the PSLRA.  *Id.*

The PSLRA "was enacted in response to an increase in securities fraud lawsuits perceived as frivolous." *Newby v. Enron Corp.*, 338 F.3d 467, 471 (5th Cir. 2003).  The PSLRA requires a complaint to specify each allegedly misleading statement and the reason why it is misleading; if an allegation is made on information and belief, the complaint must also state with particularity all facts on which the belief is formed. 15 U.S.C. § 78u-4(b)(1).  The Fifth Circuit has found the requirements of the PSLRA comport with those of Fed. R. Civ. P. 9(b), which "requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  In short, "the who, what, when, and where must be laid out before access to the discovery process is granted." *Id.*  A district court must dismiss a securities fraud claim failing to satisfy either the PSLRA's pleading requirements or those of Rule 9(b). *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (internal quotes omitted).

## II.  Scienter

As discussed, Section 10(b) and Rule 10b-5 require proof the defendant acted with "scienter"—i.e., an intention to deceive, manipulate, or defraud.  *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, — U.S. — , 127 S.Ct. 2499, 2504-2505 (2007).   The Plaintiff must show either intent

or severe recklessness.  *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407  (5th Cir. 2001).   "Severe

recklessness" is not mere negligence, but is

> limited to those highly unreasonable omissions or misrepresentations that involve not
> merely simple or even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and that present a danger of misleading buyers or sellers
> which is either known to the defendant or is so obvious that the defendant must have
> been aware of it.

*Id.* at 408.   Under the PSLRA, a complaint must state particular facts giving rise to a ***strong***

***inference*** the defendant acted with the required state of mind to avoid dismissal.   15 U.S.C. §

78u04(b)(2) (emphasis added).

### a.   Scienter of Dell and the Individual Defendants

Congress, when it enacted the PSLRA, left little guidance as to what exactly constituted a

"strong inference" of scienter, and interpretations differed among the circuit courts until the Supreme

Court addressed the issue in *Tellabs Inc. v. Makor Issues & Rights, Ltd.*  "To qualify as 'strong'...

we hold, an inference of scienter must be more than merely plausible or reasonable—it must be

cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 127

S.Ct. at 2504-2505.  The Court noted the inference of scienter need not be irrefutable, but it must be

strong in light of other explanations.  *Id.* at 2510.

Further, the Supreme Court detailed a three step process for use by courts reviewing

allegations of scienter on a motion to dismiss pursuant to the PSLRA.  *Indiana Elec. Workers'*

*Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).  First, as is

generally the case in federal pleadings, the facts alleged in the complaint are to be taken as true.  *Id.*

Second, those facts must be considered holistically rather than in isolation to determine whether

scienter has been properly pleaded. *Id.* Finally, a court must assess plausible inferences opposing

as well as supporting an inference of scienter. *Id.*

### i.    Accounting Irregularities, Public Statements, and Restatement of Financials

The vast majority of the Plaintiffs' complaint relates to Dell's alleged violations of Generally

Accepted Accounting Principles ("GAAP"). The complaint specifically alleges Dell accelerated and

overstated revenue, mismanaged various accruals and reserves, and manipulated warranty liabilities.

*See* Pls.' Am. Compl. at ¶¶ 101, 103-142. As evidence of these accounting violations, Dell was

forced to restate its income for sixteen consecutive quarters beginning in 2003 and running through

the first quarter of 2007. Pls.' Am. Compl. at ¶ 14. In its restatement, Dell adjusted income upward

in some quarters and downward in others, resulting in an overall reduction of $106 million.

The Plaintiffs contend that, through these accounting irregularities, the Individual Defendants

(Michael Dell, Mr. Rollins, and Mr. Schneider) were able to create a false picture of continued,

steady growth during the class period. This picture was then disseminated to the investing public

by release and filing of erroneous financial documents and false public statements made by the

Individual Defendants.

Generally, "the mere publication of inaccurate accounting figures, or failure to follow GAAP,

without more, does not establish scienter." *Indiana Elec.*, 537 F.3d at 534 (quoting *Barrie v.*

*Intervoice-Brite, Inc.*, 397 F.3d 249, 264 (5th Cir. 2005)); *Abrams v. Baker Hughes, Inc.*, 292 F.3d

424, 432 (5th Cir. 2002). "To plead scienter adequately, plaintiffs must state with particularity facts

giving rise to a strong inference that the party knew that it was publishing materially false

information, or that the party was severely reckless in publishing such information." *Indiana Elec.*,

537 F.3d at 534 (internal quotations omitted).  No direct allegations of fraudulent intent on the part of the Individual Defendants are alleged; instead, Plaintiffs rely on circumstantial allegations—as they are permitted to do—to establish the Individual Defendants knew of, or were severely reckless in not knowing of, the falsity of their financial documents and public statements because of their executive positions, their management styles, and the nature and duration of the accounting violations.

### A.    Circumstantial Evidence

Plaintiffs contend generally that, due to their positions within the firm, the Individual Defendants had "unfettered access" to Dell's financial information, had "direct oversight of and actively managed accounting functions," and were "ultimately responsible for making and/or approving all high-level financial decisions." Pls.' Am. Compl. at ¶¶ 617, 622.  Therefore, Plaintiffs assert, they ***must have known*** or were reckless in not knowing that various financial documents they signed and statements they made contained erroneous information.  But the law of the Fifth Circuit is clear: "pleadings of scienter may not rest on the inference that defendants must have been aware of a misstatement based on their positions with the company." *Abrams*, 292 F.3d at 432.  Likewise, "corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  Without specific allegations the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem, the pleadings are simply too vague to support a strong inference of scienter. *See Indiana Elec.*, 537 F.3d at 540-41.  Accounting violations can "easily arise from negligence, oversight, or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action." *Abrams*, 292 F.3d at 433.  In this

case, the Plaintiffs state generally that the Individual Defendants oversaw accounting functions, had unfettered access to information, and approved high-level decisions, but allege nothing specific about what the Individual Defendants knew or intended, or even what "fraudulent" decisions they approved.

In an attempt to distinguish the facts in this case, Plaintiffs point to proclamations by the Individual Defendants themselves concerning their intimate knowledge with the details of Dell's operations. However, even this distinction will not support a strong inference of scienter, as the Fifth Circuit has rejected very similar statements. *See Indiana Elec.*, 537 F.3d at 535. In *Indiana Electric*, the Fifth Circuit held a CEO's boasting "there is nothing in this company I don't know" was insufficient to support a strong inference of scienter on his part. *Id.* Likewise, broad statements such as Michael Dell's assertion that he and Rollins "are intimately involved in running every aspect of the company together," Pls.' Am. Compl. at ¶ 625, lack specificity about what he or Rollins knew or were reckless not to have known about the details of the company's accounting practices. In none of the statements cited by the Plaintiffs do the Individuals Defendants make any claims concerning knowledge or involvement with *specific* accounting practices or internal controls. Pls.' Am. Compl. at ¶¶ 625-631.

Plaintiffs also allege the nature and duration of the GAAP violations, and therefore of the subsequent Restatement, provide a basis on which to infer scienter. Even though GAAP violations are not, in themselves, sufficient to establish scienter, "when the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor or scienter." *In re Triton Energy Ltd. Securities Lit.*, 2001 WL 872019, *11 (E.D. Tex. 2001).

Dell's restatement of financials covered a four year period, and it brought to light numerous accounting irregularities. These facts would tend to weigh in favor of inferring scienter. However, the magnitude of the errors was quite small. Ultimately Dell's net income was restated downward by less than 1% of the total net income for the period. This is in stark contrast to other cases where the court has found sufficient evidence of scienter based on the magnitude and extent of the restatement. *See e.g. In re MicroStrategy, Inc. Sec. Lit.*, 115 F. Supp. 2d. 620 (E.D. Va. 2000) (income was restated downward by approximately 290%); *In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) (income was restated downward by approximately 152% over a two year period). Therefore, any weight given to an inference of scienter because of the duration of the accounting irregularities must be tempered by their relatively small magnitude.

### B.   Confidential Sources

Plaintiff also uses information gathered from confidential sources ("CS") to attempt to establish the required scienter of the Individual Defendants. According to the complaint, CS2, CS4, and CS12 identified the Individual Defendants as being present and/or participating in meetings and conversations that dealt with areas in which accounting violations took place. Specifically, the Individual Defendants were alleged to have been involved with Dell's policies regarding the handling of reserves and warranty accruals.

The fact that these accusations came from confidential sources detracts from their weight in the scienter analysis. "Following *Tellabs*, courts must discount allegations from confidential sources." *Indiana Elec.*, 537 F.3d at 535. To be given any weight, confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source ... would possess the information pleaded." *ABC Arbitrage Plaintiffs Group*

*v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).  The complaint should give details such as the

person's job description, individual responsibilities, and specific employment dates. *Cent. Laborers'*

*Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007).  Furthermore,

plaintiffs must allege with particularity *when* a comment was made to a confidential source, or, if

the source alleges a conversation took place, when and where the conversation occurred. *Indiana*

*Elec.*, 537 F.3d at 538; *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 382

(5th Cir. 2004).  If an ambiguous statement is susceptible to many interpretations, including innocent

ones, it will not contribute to an inference of scienter. *Indiana Elec.*, 537 F.3d at 538.

Plaintiffs' complaint relies heavily on confidential sources to support their claims, but fails

to provide sufficient detail to give the sources' allegations credibility.  Although the complaint does

give some specific information as to the jobs and employment dates of the confidential sources, the

information they provide is ambiguous, to say the least.  The sources merely provide general details

about the involvement of the senior executives, which has already been rejected as an indicator of

scienter in and of itself, and about company practices.  For example, CS2 reported "there was always

a scramble at the end of the quarter to make their sales," and CS3 stated Dell "sometimes...fail[ed]

to make any profits on sales."  Pls.' Am. Compl. at ¶¶ 33, 34.  These comments reveal nothing

fraudulent on their face, and, furthermore, fail to prove any scienter on the part of the Individual

Defendants.  Also troubling are the sources' work dates and positions—for instance, CS12 did not

even work for Dell during the class period, and CS2 and CS4 worked for only one of the four years

at issue.  Information from these confidential sources could hardly be probative of the Individual

Defendants' scienter concerning matters that happened when they were not employed at Dell.  In

short, the information provided by the confidential sources is so general and ambiguous as to be useless, and does not contribute to an inference of scienter.

## C.   Sarbanes-Oxley Act Certifications

Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports. *See* 15 U.S.C. § 7241(a).   Each officer must certify, *inter alia*, that he and other officers are responsible for establishing and maintaining internal controls.   15 U.S.C. § 7241(a)(4)(A).   According to the Plaintiffs, the certifications were false because the Defendants knew Dell's internal accounting controls were defective and its financial statements misleading.

Sarbanes-Oxley certifications, standing alone, are not indicative of scienter. *Indiana Elec.*, 537 F.3d at 545.   Under the Plaintiffs' interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company. *Cent. Laborers' Pension Fund v. Integrated Elec. Serv. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). Instead, to infer scienter from Sarbanes-Oxley certifications there must be "facts establishing that the officer who signed the certification had a 'reason to know, or should have suspected, ***due to the presence of glaring accounting irregularities or other "red flags*,**" that the financial statements contained material misstatements or omissions.'" *Indiana Elec.*, 537 F.3d at 545 (quoting *Garfield*, 466 F.3d at 1266) (emphasis added).

In relation to Dell's financial publications and public statements, the Plaintiffs have put forth no allegations of specific "glaring" accounting irregularities or other red flags.   In fact, the accounting errors had a relatively small cumulative impact on Dell's net income for the Restatement

period—there is simply no reason to believe they were so egregious in the scope of Dell's entire business that not to notice them would give rise to an inference of scienter on the part of the Individual Defendants.  Given that the facts provide weak support for this proposition, the Sarbanes-Oxley certifications do not add much, if anything, to an inference of scienter.

### ii.    Motive and Opportunity Allegations

A showing that a defendant stood to gain financially from one or more of the false statements or wrongful nondisclosures alleged may buttress whatever other inferences of scienter are drawn from the substantive allegations.  *Indiana Elec.*, 537 F.3d at 543.  However, a plaintiff cannot rely on allegations of a defendant's motive and opportunity to commit fraud alone—rather, a plaintiff must plead specific facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness," and motive and opportunity may be considered one factor in determining whether a strong inference has been raised.  *Abrams*, 292 F.3d at 429.  Plaintiffs in this case contend the Defendants' holdings of Dell stock and the bonus plan structure at Dell both provided motive and opportunity to commit fraud.

### A.    Insider Trading

"Insider stock sales may be probative of scienter if they occur in ***suspicious amounts*** or at ***suspicious times***."  *Abrams*, 292 F.3d at 435 (emphasis added).  In order for sales to be suspicious in this context, they must be "out of line with prior trading practices or at times calculated to maximize personal profit."  *Id.*  Because corporate executives are often paid in stock and stock options, and often trade those securities, a court will not infer fraudulent intent from the mere fact that the officers have sold some of their holdings.  *Indiana Elec.*, 537 F.3d at 543.

During the four year Class Period the Individual Defendants sold many shares of their Dell stock. Specifically, as a portion of their entire holdings, Michael Dell sold 29.61%, Rollins sold 13.65%, and Schneider sold 49.33%. However, the complaint provides no basis on which to compare these sales with the Individual Defendants' past trading practices. According to the Fifth Circuit, previous trading history, while an important factor, need not be pleaded as a per se matter; "instead, the court looks at the information that is pled and determines whether the timing or scope is unusual." *Cent. Laborers' Pension Fund*, 497 F.3d at 553.

The timing of the stock sales in this case does not appear unusual on its face. All three Individual Defendants sold shares of Dell stock at a consistent rate throughout the class period. In fact, they sold nearly identical amounts of stock following periods where Dell's income was understated as they did following periods where its income was overstated, and many of the sales occurred at a price substantially lower than the "peak." Additionally, courts have found the length of the class period impacts the inference that can be drawn from securities trading. *See e.g. Teachers' Retirement System of Louisana v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007); *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079 (9th Cir. 2002). The Fourth Circuit labeled a class period of 46 months as "exceedingly long" and declared "such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades." *Teachers'*, 477 F.3d at 185. The class period alleged in this case is even longer than that described by the Fourth Circuit. Therefore, the Court finds the timing of the Individual Defendants' trades fails to enhance any inference of scienter.

Plaintiffs assert the sheer number of shares "dumped" on the public make these sales suspicious. Altogether the Individual Defendants sold nearly 99 million shares of Dell stock during

the class period.  Despite this large number of shares, it is hard to determine if the sales in this case

are unusual in scope.  First, neither the Plaintiffs nor the Defendants aid the Court by giving any

context to these activities.  It is not clear if this magnitude of trading is out of the ordinary for these

Individual Defendants, and the Court will not infer that it is simply based on the volume of sales.

The length of the class period complicates the matter as well.  Over a four year period, the percentage

of holdings sold by the Individual Defendants may not be as large as it seems, and the total number

of shares sold was significantly less than half of the total number of shares held by the three

Individual Defendants.

### B.    Bonus Plan

The complaint also alleges the Individual Defendants had motive to commit fraud because

the bonus plans at Dell were tied to the revenue numbers that were being fraudulently adjusted.  The

Fifth Circuit has held that in most cases "incentive compensation can hardly be the basis on which

an allegation of fraud is predicated." *Tuchman v. DSC Communications Corp.*, 14 F.3d. 1061, 1068

(5th Cir. 1994).  If it were, nearly all corporations and their executives would be subject to securities

fraud allegations.  *Id.*  These kinds of bonus plans may be considered in conjunction with other

scienter allegations, but are probative only in extraordinary cases.  *Indiana Elec.*, 537 F.3d 544.

According to the Plaintiffs' complaint, the Individual Defendants' compensation at Dell was

made up of three components: base salary, short-term bonuses and long-term bonuses.  Pls.' Amend.

Compl. at ¶ 639.  Bonuses awarded through the Short Term Plan were linked to revenue related

figures even prior to the alleged fraud.  The Defendants did not alter this plan during or immediately

prior to the class period.  However, the Plaintiffs point out that before the alleged fraud the

Defendants' bonuses had suffered because Dell had not hit its projected numbers, but during the class period these bonuses skyrocketed.

Next, the complaint states the Long Term Plan was altered by the Individual Defendants in 2002 to focus its payouts on revenue based numbers as well. *Id.* at ¶¶ 643-44.  However, the complaint does not allege any specific impact of this alteration on the compensation of Michael Dell and Rollins.  There are no figures comparing the long-term bonuses they received during the class period with those they received previously.

As a subpart of this newly altered long-term bonus structure, other executives, including Schneider, were eligible for substantial bonuses for reaching "certain revenue growth and profitability metrics.  The Plaintiffs allege this system turned the focus of other executives toward making revenue-related targets.

Overall, the allegations relating to the various bonus plans at Dell provide slight weight in favor of inferring scienter.  The fact executives at corporations base their compensation on the performance of the company (as measured partly by revenue-related numbers), is not surprising or suspicious, and does not lead to an inference of fraudulent intent.  On the other hand, the fact the Individual Defendants chose to alter these plans to focus almost all of their compensation on hitting revenue-related targets does allow for some slight  inference of scienter.

### iii.    Personnel Reshuffling

Finally, Plaintiffs contend the departure of Defendants Schneider and Rollins from Dell should enhance an inference of scienter on the part of these defendants.  Multiple Fifth Circuit decisions suggest resignations have little implication on scienter analysis.  *See Abrams*, 292 F.3d at 434; *Southland Securities Corp.*, 365 F.3d at 382-383.   The resignation of officials is, in and of

itself, unavailing as proof of the commission of fraud when no specific evidence indicates the resigning officials or their replacements knew of any accounting irregularities or that such irregularities were the reason for their resignations. *Southland Securities Corp.*, 365 F.3d at 383.

In this case, the complaint alleges two executives—Schneider and Rollins—resigned almost a year after the end of the Class Period. Aside from conclusory allegations, the complaint does not connect their resignations to any specific fraud they intended or recklessly ignored. There are other plausible inferences as to why these defendants left Dell which are more likely than their alleged knowledge of fraudulent activity. According to Dell's press release of December 19, 2006, Schneider left to pursue other business opportunities. No reason is explicitly given for Mr. Rollins departure, but even had he left for "personal reasons" scienter could not be inferred. *Branca v. Paymentech, Inc.* [2000 Transfer Binder] Fed.Sec. L. Rep. (CCH) ¶ 90,911 at 93, 855-856 (N.D. Tex. Feb. 8, 2000). Plaintiffs' sole attempt to tie Rollins' and Schneider's resignations to the alleged fraud is Dell CFO Don Carty's statement in August 2007 that Dell had taken remedial action against "the ones who knew about" the financial misstatements. But other senior officials also left at the same time—Rollins and Schneider were by no means the only ones, and there is no indication Carty's statement was in reference to Rollins or Schneider. Because the statement is ambiguous, does not mention Rollins or Schneider, and especially does not mention they personally knew of or recklessly ignored accounting fraud, the single statement coupled with their retirements does not add to an inference of scienter.

### iv.   Collective Impact - Individual Defendants

The Plaintiffs' allegations read *in toto* are insufficient to permit a strong inference of scienter as to the named Individual Defendants. Plaintiffs' pleading concerning the Individual Defendants'

knowledge of fraudulent accounting practices only allows, at the most, a very small inference of scienter. This inference cannot be enhanced enough by the surrounding circumstances to warrant being labeled "strong," as defined in *Tellabs*.

### v.     Corporate Scienter

Scienter is usually only attributed to a defendant corporation when the requisite scienter is found for the individual officer of that corporation who made the false or misleading statements. *Southland Securities Corp,* 365 F.3d at 366. However, the Seventh Circuit held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs II*"). The situation envisioned by the court was one where the false or misleading announcement was so dramatic "[it] would have been approved by corporate officials sufficiently knowledgeable about the company to *know* that the announcement was false." *Id.* (emphasis added) (giving as an example a hypothetical announcement by General Motors that it had sold a million SUVs in 2006, when in fact it had sold none). That is not this case. The accounting irregularities, while they lasted for approximately four years, were relatively small when viewed quantitatively. Therefore, none of Dell's announcements nor its release of financial documents were dramatic enough to assume corporate officials who were knowledgeable about the company generally would have known of their falsity at the time they were made.

### b.     Scienter of PwC

Because Plaintiffs' claims against PwC also arise under Section 10(b) and Rule 10b-5, Plaintiffs must also satisfy the heightened pleading requirements imposed by Fed. R. Civ. P. 9(b) and the PSLRA to avoid dismissal of these claims. As stated previously, this requires a plaintiff to "state

with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required

state of mind [i.e., scienter]." 15 U.S.C. § 78u-4(b)(2) (emphasis added).  The inference must be

more than merely plausible or reasonable; it must be "cogent and compelling, thus strong in light of

other explanations." *Tellabs*, 127 S. Ct at 2510.  Also discussed previously were the three

requirements for a motion to dismiss a Section 10(b) claim: the court must accept all factual

allegations in the complaint as true, the court must take the facts collectively when making its

determination—in other words, consider the complaint "in its entirety," and the court must take into

account opposing inferences. *Id.* at 2509.[1]

Many circuit courts have concluded the meaning of recklessness in securities fraud cases is

"especially stringent" when the claim is made, as it is here, against an outside auditor. *See, e.g., PR*

*Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004).  Specifically, courts have held

"[r]ecklessness on the part of an independent auditor entails a mental state so culpable that it

'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Id.*

(*quoting Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir.1982)); *Rothman v. Gregor*,

220 F.3d 81, 98 (2nd Cir. 2000).  It must be proven not merely that there was a deviation from

accounting principles, but

> that the accounting practices were ***so deficient that the audit***
> ***amounted to no audit at all, or an egregious refusal to see the***
> ***obvious, or to investigate the doubtful***, or that the accounting
> judgments which were made were such that no reasonable accountant
> would have made the same decisions if confronted with the same
> facts.

---

[1]For more discussion of the general principles surrounding the establishment of a "strong
inference" of scienter, see *supra* sec. II, pp. 10-12.

*PR Diamonds*, 364 F.3d at 693-94 (emphasis added) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994)). Thus, "to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud." *Id.* at 694; *In re SmarTalk Teleservices, Inc. Secs. Litig.*, 124 F. Supp. 2d 505, 514 (S.D.Ohio 2000); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1570 (9th Cir. 1990).

In this case, Plaintiffs allege the audit opinions PwC issued each year during the Class Period were false and misleading in that they stated Dell's fiscal year-end financial statements, later admitted to be false in some respects, were correct. To give rise to a strong inference of scienter on the part of PwC with respect to the allegedly false audit opinions, Plaintiffs plead the following particularized facts: (i) PwC was not truly independent from Dell; (ii) PwC had full and complete access to Dell's internal accounting records and information; (iii) PwC violated basic GAAP and GAAS principles over several fiscal years, which resulted in a significant Restatement; (iv) PwC ignored multiple red flags, such as accounting violations and end-of-quarter adjustments by Dell; and (v) PwC has been accused of fraudulent audits in the past. Although the Court will take all of Plaintiffs' allegations collectively and consider them as a whole to determine whether Plaintiffs have pled a strong inference of scienter, for the purpose of clarity the factual allegations are broken down allegation by allegation.

### i.    PwC was Independent

Plaintiffs claim PwC was not independent for various reasons: the company has served as Dell's auditor for over twenty years, was paid by Dell for "non-audit" functions, and received more than $50 million in payment from Dell during the period from 2003 to 2007. Pls.' Resp. to PwC's

Mot. to Dismiss at 6; Pls.' Am. Compl. at ¶ 686.  Specifically, Plaintiffs allege PwC earned $36.4 million for auditing Dell's annual financial statements, and $14.6 million in "other fees" for non-audit services.  Pls.' Am. Compl. at ¶ 686.  Furthermore, Plaintiffs point out Schneider, a "key decision maker" at Dell, had a past relationship with PwC because he worked for PwC for nineteen years before starting at Dell.  *Id.* at ¶ 689.

Motive and opportunity to commit fraud may well add to an inference of scienter. *Nathenson*, 267 F.3d at 412.  However, mere general allegations auditors gained financially by participating in or recklessly disregarding a client company's fraud are not sufficient under the PSLRA's heightened pleading standard.  *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994).  In *Melder*, the Fifth Circuit found a plaintiff's allegations the defendant auditing firm sought to protect and enhance their "substantial auditing and other fees" received, increase their income, and retain their client, were all insufficient to support an inference of fraud.  *Id.*  "A contrary conclusion," the court found, "would universally eliminate the state of mind requirement in securities fraud actions against accounting firms. This follows from the indisputable proposition that accounting firms—as with all rational economic actors—seek to maximize their profits."  *Id.*  Other courts have agreed. *See, e.g., Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000) (stating a "large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud" because an "accountant's success depends on maintaining a reputation for honesty and integrity").

However, courts have also sometimes found that when outside auditing firms are paid exorbitant "consulting fees"—so they earn more for consulting than for auditing the client—or otherwise gain some sort of "dual role" with respect to the company, it may add to an inference of

scienter. *See In re Global Crossing, Ltd. Sec. Litig.*, 2004 WL 763890, at *20-21 (S.D.N.Y. Mar. 23, 2004) (finding motive allegations sufficient where the auditor was paid consulting fees of six times its auditing fees); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 655-56 (E.D. Va. 2000) (the fact that an auditor "clearly would have received concrete benefits through its partnership with [the client], from certifying and maintaining [the client]'s allegedly false and misleading financial reports, lends more weight to a stronger inference of scienter"). One Texas district court found the plaintiff had pled sufficient facts to show motive where the plaintiff showed the auditor had received consulting fees twice that of its auditing fees, and thus had a "dual role" with respect to the client. *In re Fleming Comps., Inc. Sec. Litig.*, 2004 WL 5278716, at *40 (E.D. Tex. 2004). In another example, *In re MicroStrategy*, the auditor had become a "channel partner" and reseller of its client's products, such that the court found it had acquired a "vested stake in [the client]'s fortunes." 115 F. Supp. 2d at 654-56.

In the present case, PwC reaped less than 30% of its total fees from "non-audit" services performed for Dell. Futhermore, PwC claims (and Plaintiffs do not deny) the "other" services were also audit-related and tax services, not consulting services—the services included tax planning and compliance, audits of employee benefit plans, contract compliance reviews, and accounting research—nothing of the sort that would have given PwC the "direct stake" in Dell courts have found may contribute to an inference of scienter. PwC's Mot. to Dismiss at 11-12, n. 4. Plaintiffs likewise do not allege PwC performed any services that gave the firm a direct stake in Dell or a vested interest in the performance and profitability of Dell. Thus, because the services PwC performed did not give it a "direct stake" in Dell or a "dual role" at the company, the conclusory allegations made by the

Plaintiffs that PwC profited from their auditing work at Dell does not add to an inference of scienter of the part of PwC.

Likewise, the fact Schneider previously worked at PwC is irrelevant. Plaintiffs allege no facts suggesting Schneider in any way influenced PwC to participate in or deliberately ignore fraudulent accounting at Dell. The assertion he worked at PwC previously, without anything more, does not add to an inference of scienter on the part of PwC.

### ii.   Full and Complete Access

It is well established merely pleading access to a company's private records, without more, does not adequately allege scienter. *See Fin. Acquisition Partners, LP v. Blackwell*, 2004 WL 2203253, at * 23 (N.D. Tex. 2004) (citing *Arnlund v. Deloitte & Touche*, 199 F. Supp. 2d 461, 477 (E.D. Va. 2002)). Although Plaintiffs cite *In re Worldcom* for the opposite proposition, that case involved a plethora of other factors in the determination of whether the plaintiff had adequately pled scienter on the part of the outside auditor. 2003 WL 21488087 (S.D.N.Y. June 25, 2003). The court in *In re Worldcom* did note the auditor had unlimited access to the company's books and records, and an obligation to review and evaluate those records in order to form an opinion regarding the company's financial statements. But the problem in that case arose because evidence was presented the outside auditor "did not obtain direct evidence regarding Worldcom's [financial information]...Instead, it relied on management's representations." *Id.* at *4. The court went on to explain that had the auditor sought supporting documentation for Worldcom's financial statements, the auditor would have quickly discovered "the lack of documentation [for the financial information] and the fraudulent accounting treatment." *Id.* at *7.

-28-

In this case, the Plaintiffs do not identify any specific records or information PwC failed to obtain or inspect which would have alerted them to the alleged fraud at Dell if they had inspected it. There is also no allegation PwC relied on "statements from management" or anything else improper in making their opinions.  In short, there is simply no allegation connected with the auditors' unlimited access to Dell's books and records that contributes to an inference of scienter.

### iii.    Violations of GAAP and GAAS Principles

The Fifth Circuit has concluded "the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter;" instead, as in other areas, a plaintiff must show the accounting firm deliberately misrepresented material facts or acted with severe recklessness as to the accuracy of its audits or reports. *Abrams*, 292 F.3d at 432; *Melder*, 27 F.3d at 1103 ("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud").  Such violations, on their own, do not represent the extreme departure from the standards of ordinary care the recklessness standard requires.  In the absence of additional facts specifying fraudulent intent or the defendant's state of mind,  GAAP errors "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." *In re Baker Hughes Sec.  Lit.*, 136 F. Supp. 2d 630, 649 (S.D. Tex. 2001).  Likewise, courts have recognized an auditor's failure to detect weaknesses in a company's internal controls alone is insufficient to determine the auditor acted with scienter, even when a restatement later acknowledges deficiencies. *See P.R. Diamonds Inc.*, 364 F.3d at 694.

Similarly, the existence of a restatement does not by itself satisfy the scienter requirement, although it can tip the scales in favor of finding scienter when it is viewed with the totality of the

circumstances surrounding the restatement. *In re Fleming*, 2004 WL 5278716 at *37; *In re Triton*, 2001 WL 872019 at *11. A restatement may add significant weight to the scienter calculus based on the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the violated accounting principles. *In re Fleming*, 2004 WL 5278716 at *37. "[C]ourts appear willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of wrongdoing." *Id.* at *38; *P.R. Diamonds, Inc.*, 364 F.3d at 694.

In the present case, Plaintiffs contend PwC issued four annual audit opinions from 2003 to 2007 in which it falsely stated the disclosures in the Dell financial statements conformed with GAAP, and PwC's audit was performed in accordance with GAAS. Pls.' Am. Compl. at ¶ 693. As for the GAAP violations, Plaintiffs assert PwC did not render accurate audit reports for Dell, and either knew or recklessly disregarded that the financial statements had not been prepared in conformity with GAAP. *Id.* at ¶¶ 693-98. As for the GAAS violations, Plaintiffs make numerous contentions. Principally among them are allegations PwC gave inadequate attention to material risk factors, such as the unpredictability of warranty obligations and other areas requiring special consideration, in violation of AU § 311, and PwC failed to design an audit plan to provide reasonable assurance of detecting material errors as required by AU § 312. *Id.* at ¶¶ 711-19.

The Plaintiffs, however, do not allege any specific facts to support their assertions. They allege no facts about PwC's audit, what it entailed, or how it was deficient. Plaintiffs simply make the bare assertion PwC violated GAAS rules, but without a shred of evidence about what PwC's

-30-

procedures or audits actually entailed, how the procedures specifically violated the standards, or that the alleged violations were purposeful or negligent.  The GAAS standards cited by Plaintiffs acknowledge "even a properly planned...audit may not detect a material misstatement," AU § 230.12, so the mere fact the audits apparently did not catch the later-revised accounting errors in Dell's financial statements is not conclusive.  Furthermore, the fact the Restatement recognized there were weaknesses in Dell's internal controls during the Class Period does not give rise to an inference PwC did not conduct a GAAS audit.  Plaintiffs present no specific allegations to support an inference PwC was aware of or recklessly disregarded any deficiencies in Dell's internal controls.  Plaintiffs' bare assertion that PwC failed to detect weaknesses in Dell's internal controls, without more, is not sufficient to support an inference of scienter.

Neither have the Plaintiffs adequately pled the GAAP violations corrected by the Restatement were such that the scope and magnitude of the Restatement tips the scales in favor of finding scienter on the part of PwC.  Plaintiffs properly recognize violations of GAAP, such as were recognized in Dell's Restatement, may give rise to an inference of fraudulent intent when they are particularly egregious or are coupled with other specific and properly pled allegations of fraud.  *See S.E.C. v. Casarta*, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999).  Plaintiffs claim the Restatement in the present case is adequate evidence of "egregious violations of the most basic accounting principles," and thus establishes a strong inference of scienter on the part of PwC.  Pls.' Resp. to PwC's Mot. to Dismiss at 19.  The Court does not agree.  The cases cited by Plaintiffs in support of this assertion deal with GAAP violations on an entirely different scale—in one, revenue had been overstated by 48%, and in another the auditor had completely failed to audit the financial statements at all.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1019 (9th Cir. 2005); *Casarta*, 75 F. Supp. 2d at 86.

Plaintiffs contend, however, the Restatement itself recognizes the accounting errors and irregularities PwC overlooked were "significant" to Dell's shareholders. Pls.' Am. Compl. at ¶ 93. But Plaintiffs fail to recognize that to support an inference of scienter, GAAP and GAAS violations must extend in nature and magnitude beyond merely the materiality threshold. *P.R. Diamonds, Inc.*, 364 F.3d at 695. Instead, they must be so grievous as to suggest "no audit at all." *Id.* (internal citations omitted). In all, accounting errors and irregularities recognized by the Restatement affected less than one percent of Dell's net income. They simply were not egregious or obvious enough to add to an inference of scienter on the part of PwC.

### iv.    Ignoring Multiple Red Flags

Plaintiffs also allege PwC deliberately ignored obvious red flags which should have alerted them to the existence of accounting fraud at Dell. Pls.' Am. Compl. at ¶¶ 723-25. In certain circumstances, courts have held allegations of GAAP or GAAS violations, coupled with allegations of deliberately ignoring "red flags," can be sufficient to state a claim of securities fraud. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1209-10 (11th Cir. 2001); *In re Enron*, 235 F. Supp. 2d at 677-79, 706-07. "Red flags are those facts which come to the attention of the auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sunterra Corp. Sec. Lit.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002). A red flag creating a strong inference of scienter generally consists of "[a]n egregious refusal to see the obvious, or to investigate the doubtful." *P.R. Diamonds, Inc.*, 364 F.3d at 695.

Plaintiffs allege one of the "most egregious red flags" deliberately ignored by PwC was Dell's manipulation of accounting accruals and reserves at the end of the various quarters during the Class Period. Pls.' Am. Compl. at ¶ 724. But Plaintiffs set forth no specific facts concerning these

transactions and whether they were out of the ordinary for Dell. The Plaintiffs put forth no specific

facts indicating PwC knew or had reason to think the adjustments were being made fraudulently,

which is generally required for a red flag to contribute to a strong inference of scienter. *See In re*

*Sunbeam Securities Litigation,* 89 F. Supp. 2d 1326, 1344 (S.D. Fla.1999) (a red flag existed where,

among other things, an employee had "tipped off" the auditor that the client company had

fraudulently overstated its restructuring reserves by $20 million). Although the Restatement did state

adjustments to various reserve and accrued liability accounts "typically occurred in the days

immediately following the end of the quarter," the improper adjustments could well have been made

in the midst of large numbers of legitimate post-closing entries, as PwC alleges. There is simply no

reason alleged that these adjustments should have been considered suspicious on their face. As has

been discussed, in light of Dell's total net income, the manipulations recognized by the Restatement

were comparatively small ones. In short, the end-of-quarter adjustments were neither egregious nor

obvious such that they can be considered "red flags" which contribute to an inference of scienter on

the part of PwC simply by their existence.

Plaintiffs also allege PwC deliberately ignored an additional host of "risk factors" at Dell

which should have alerted PwC to accounting fraud. Among the risk factors Plantiffs identify are

concerns about profitability and competition, declines in consumer demand, excessive pressure for

management to meet the requirements or expectations of third parties, "[i]ndications that

management's personal financial situation [wa]s threatened by the entity's financial performance,"

"excessive pressure on management or operating personnel to meet financial targets," management

override of controls, etc. *See* Pls.' Am. Compl. at ¶ 731. Although the list of risk factors is lengthy,

they are not linked to any particularized facts concerning what PwC knew and disregarded. Plaintiffs

simply rely on boilerplate "red flags" present in almost every securities fraud action.  In short, the litany of risk factors provided by the Plaintiffs, which is neither particularized nor supported by any specific details, does not meet the particularity and strong inference requirements of the PSLRA and does not warrant further comment.

v.      <strong>Accusations of Fraudulent Audits in Other Cases</strong>

Plaintiffs also refer to other cases in which PwC's audit work has allegedly been fraudulent and violated GAAS. Pls.' Am. Compl. at ¶¶ 748-50.  But the four matters Plaintiffs reference involve entirely different companies and, according to PwC, different individual auditors with no connection to the present case.  It is undisputed none of allegations are in any way related to PwC's auditing of Dell, and accordingly they are not probative of whether or not PwC acted knowingly or recklessly with regard to its audit reports of Dell. *See Fidel*, 392 F.3d at 232.

For the above reasons, the Court finds Plaintiffs have failed to adequately plead scienter under the heightened pleading standards of the PSLRA and Rule 9(b), and thus have failed to state a claim for which relief may be granted.  As a result, the Court GRANTS the Dell Defendants' and PwC's motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

## III.    Loss Causation

The PSLRA requires plaintiffs to plead loss causation, "*i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages"). *Dura* made clear there must be sufficient allegations the misrepresentations caused the plaintiffs' loss; it is insufficient to simply allege the misrepresentation "'touches upon' a later

economic loss." *Dura*, 544 U.S. at 343.  Loss causation cannot be satisfied simply by alleging in the complaint and subsequently establishing the price of the security on the date of purchase was inflated because of the misrepresentation. *Id.* at 338.

The Supreme Court has held "[a]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* at 342.  This is because at the moment of the purchase, the plaintiff has suffered no loss. *Id.*  Nor is there ***necessarily*** a link between an inflated purchase price and a later economic loss; the subsequent lower price may reflect changed economic circumstances exclusive of the inflated purchase price. *Id.* at 342-43.  For example, the lower price may reflect changed investor expectations, new industry- or firm-specific facts, changed conditions, or other events unrelated to the inflated purchase price. *Id.*

a.      **Pleading Standard**

Because a plaintiff must prove proximate causation and economic loss in order to establish loss causation, a plaintiff must also adequately allege these requirements in the complaint. *Id.* at 346. The Supreme Court has stated, in reference to an allegation of loss causation, the plaintiff's "short and plain statement" required by Rule 8(a)(2) of the Federal Rules of Civil Procedure "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*  Defendants argue, however, the more stringent requirements of Rule 9(b) should apply to loss causation allegations.  Dell Defs.' Mot. to Dismiss at 8-9.  The Dell Defendants assert courts which have held Rule 9(b) does not apply to loss causation have "overread" *Dura*. *Id.* at n. 2.  In *Dura*, the plaintiffs' complaint failed to claim Dura Pharmaceuticals' share price fell after defendants revealed their asthmatic spray device would be approved by the FDA.  544 U.S. at 346-47.  Rather, the plaintiffs only stated, "In reliance on the integrity of the market, the plaintiffs paid artificially

inflated prices for Dura securities and the plaintiffs suffered damages thereby." *Id.* at 340 (internal quotation marks omitted). The Supreme Court held this was insufficient to satisfy the loss causation pleading standard and overcome a motion to dismiss, since it did not provide the defendant with notice of the relevant economic loss and the causal connection between that loss and the misrepresentation concerning Dura's spray device. *Id.* at 347. The Supreme Court applied the more lenient standard of Rule 8(a)(2) and "assume[d], at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." *Id.* at 346.

The Dell Defendants admit district courts are divided over whether to apply Rule 8(a)(2) or Rule 9(b). Dell Defs.' Mot. to Dismiss n. 2. The Dell Defendants cite only one Fifth Circuit opinion released since the *Dura* decision that states, in dicta, that loss causation is subject to a heightened pleading standard as one of the "substantive elements" of a 10b-5 case. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). But, *Plotkin* is less than persuasive. *Plotkin* was decided only 2 days after *Dura*, makes no reference or citation to the Supreme Court decision, and mentions the standard for proving loss causation only in dicta. *Id.* The Court finds *Dura*'s reference to and application of Rule 8(a)(2), even if only "for argument's sake," indicates Rule 8(a)(2) is the proper standard to apply for determining whether a party has adequately plead loss causation. Furthermore, since the Court finds Plaintiffs have failed to meet even the more lenient Rule 8(a)(2) standard, for the reasons discussed below, Plaintiffs would also fail to meet the more stringent requirements of Rule 9(b).

Loss causation requires disclosure; defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed. *Akerman v. Oryx Communications,*

*Inc.*, 810 F.2d 336, 342 (2d Cir. 1987). The two methods of disclosure generally recognized by courts are "corrective disclosure" and "materialization of the risk."

### b.     Corrective Disclosure

Plaintiffs can withstand dismissal by adequately alleging a "corrective disclosure" of a previously concealed truth caused a decline in the stock's price. *Huddleston v. Herman & Maclean*, 460 F.2d 534, 549 (5th Cir. 1981). However, plaintiffs must differentiate between fraud factors and any intervening or other causes in order to establish loss causation. *Oscar Private Equity Investments v. Allegiance Telecom*, 487 F.3d 261, 270 (5th Cir. 2007). As stated above, *Dura* made clear there must be sufficient allegations the misrepresentations caused plaintiffs' loss; it is insufficient to simply allege the misrepresentation "'touches upon' a later economic loss." *Dura*, 544 U.S. at 343. Plaintiffs must allege, therefore, the market reacted negatively to a corrective disclosure, which revealed the falsity of Dell's previous representations. *Id.* at 347 ("The complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient."); *see also Glaser v. Enzo Biochem, Inc.*, 646 F.3d 474, 477 (4th Cir. 2006) ("*Dura* requires plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed"); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005); *Catogas v. Cyberonics, Inc.*, No. 07-20787, 2008 WL 4158923, *3 (5th Cir. Sept. 8, 2008) (unpublished opinion). "When unrelated negative statements are announced contemporaneous of a corrective disclosure, the plaintiff must prove 'that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the

decline.'" *Dura*, 544 U.S. at 343 (quoting *Greenburg v. Crossroads Systems, Inc.* 364 F.3d 657, 666 (5th Cir. 2004)).

Courts have differed over what constitutes a corrective disclosure. Some courts have interpreted the term strictly, finding a corrective disclosure must "at a minimum...identify which prior representation is called into question." *In re Odyssey Health Care Inc. Sec. Litig.*, 424 F. Supp. 2d 880, n. 4 (N.D. Tex. 2005); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 167 (N.D. Tex 2007) ("To allege loss causation adequately, Plaintiffs must explicitly allege a corrective disclosure – i.e., a statement that corrects a previous misrepresentation or discloses a prior omission – that, when disclosed, negatively affected the value of the security."). Other courts interpret *Dura* more generally, treating "the loss causation requirement as more functional than facial: a disclosure is sufficiently 'corrective' if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 543 (N.D. Ill. 2007); *see also In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006).

The Court finds the stricter interpretation of corrective disclosure to be more consistent with the Supreme Court's decision in *Dura*. The Supreme Court specifically recognized there is not necessarily a link between an inflated purchase price and a later economic loss; the subsequent lower price may reflect changed economic circumstances exclusive of the inflated purchase price. *Dura*, 544 U.S. at 342-43. A prior misrepresentation my "touch upon" a loss without causing the loss due to the "tangle of factors affecting price." *Id.* at 343. In *Dura*, the plaintiffs plead misrepresentations which artificially inflated the stock price, a lower than expected earnings statement and subsequent stock price drop, and an announcement the FDA would not approve it's product, also followed by

a stock price drop. *Id.* at 339. The Supreme Court found these facts insufficient allegations of loss

causation. *Id.* at 346-47. Rather, a plaintiff must allege facts demonstrating loss "after the truth

became known." *Id.* at 347. Adopting the more lenient standard for a corrective disclosure, as

advocated by the Plaintiff, would violate the principles articulated by *Dura* by essentially allowing

a plaintiff to claim any announcement followed by a stock price drop which occurs after some

alleged misrepresentation as a corrective disclosure. *See Catogas v. Cyberonics, Inc.*, 2008 WL

4158923, *3 (5th Cir. Sept. 8, 2008) (unpublished opinion) ("Plaintiffs must allege, therefore, that

the market reacted negatively to a corrective disclosure, which revealed the falsity of [defendant's]

previous representations regarding the accounting for its stock options.").

     Here, Plaintiffs have failed to sufficiently allege a corrective disclosure. Plaintiffs address

loss causation at length in the consolidated amended complaint. Pls.' Am. Compl. at ¶¶ 754-69.

Plaintiffs allege, "but for the Defendants' misrepresentations and omissions...Lead Plaintiff and the

Class would not have purchased Dell's securities or would not have purchased them at the artificially

inflated prices at which they were offered." *Id.* at ¶ 754. Plaintiffs further allege Defendants'

misrepresentations were "gradually revealed to the market beginning in August 2005." *Id.* at ¶ 756.

Plaintiffs argue disappointing earnings statements and statements disclosing the SEC investigation,

issued by Dell, caused an "immediate decline in the Company's stock" and qualify as corrective

disclosures. Pls.' Resp. to Dell Defs.' Mot. to Dismiss at 20.

     The first earnings statement, issued on August 11, 2005, announced Dell's financial results

for the quarter ending July 29, 2005. Pls.' Am. Compl. at ¶ 758. According to the Plaintiffs, "[a]s

the market absorbed the information" Dell's stock fell after the announcement from $39.58 per share

on August 11, 2005 to $35.38 on August 24, 2005. *Id.* Plaintiffs admit the August 11, 2005

earnings statement did not specifically disclose fraud. *Id.* However, Plaintiffs argue it was part of Dell's "attempt to unwind its fraudulent scheme and thus partially corrected the Defendants' misrepresentations." *Id.*

The second earnings announcement, issued February 16, 2006, stated that, after two consecutive disappointing quarters, Dell's fourth quarter fiscal year 2006 results actually exceeded expectations. *Id.* at ¶ 759. Plaintiff, however, points out this result was somewhat skewed by a longer than normal quarter and other factors, and Dell's "guidance for the first quarter of FY 2007 was disappointing and far below pre-correction expectations." *Id.* According to the Plaintiffs, "[a]s the market absorbed the information" Dell stock declined from $31.96 per share on February 16, 2006 to $30.38 the next day. *Id.* at ¶ 760. Once again, Plaintiffs recognize the press release does not specifically disclose any fraud or wrongdoing, but they argue it continues Dell's efforts to "unwind its fraudulent scheme" and "partially corrected" the prior misrepresentations. *Id.*

The third earnings announcement, issued May 8, 2006, updated Dell's earnings guidance and announced Dell "would miss the street's earnings expectations for the quarter by five cents per share." *Id.* at ¶ 761. According to the Plaintiffs, "[a]s the market absorbed the information" Dell stock declined from $26.43 per share on May 8, 2006 to $23.78 on May 16, 2006. *Id.* at ¶ 762. Plaintiffs again recognize the third earnings announcement does not specifically disclose any fraud or wrongdoing, but they argue it continues Dell's efforts to "unwind its fraudulent scheme" and "partially corrected" the prior misrepresentations. *Id.*

The fourth earnings announcement, issued August 17, 2006, announced Dell's financial results for the second quarter of fiscal year 2007. *Id.* at ¶ 763. For the second quarter of fiscal year 2007, Dell reported earning "$14.09 billion in revenue, $605 million in operating income, and $502

-40-

million in net income." *Id.* The August 17, 2006 announcement also revealed the U.S. Securities

and Exchange Commission ("SEC") "was conducting an informal investigation of the company."

*Id.* at ¶ 77; Pls.' Resp. to Dell Defs.' Mot. to Dismiss Ex. 1 at 4. The announcement further stated:

> [T]he investigation is not an indication that any violations of law have occurred. The SEC has requested information relating to revenue recognition and other accounting and financial reporting matters for certain past fiscal years, and Dell has been cooperating. In the course of responding to the requests, the company recently discovered information that raises potential issues relating to certain periods prior to fiscal 2006. While the company does not believe that these issues have had or will have any material impact on its financial position or the reported results of operations for the relevant years, the company's audit committee, upon the recommendation of management, has initiated an independent investigation. Management is committed to addressing any questions, concerns or October 3, 2008issues the SEC or the audit committee may have.

Pls.' Resp. to Dell Defs.' Mot. to Dismiss Ex. 1 at 4. According to the Plaintiffs, "[a]s the market

absorbed the information" Dell stock declined from $22.80 per share on August 17, 2006 to $21.64

on August 23, 2006. Pls.' Am. Compl. at ¶ 764. Plaintiffs again recognize the press release does

not specifically disclose any fraud or wrongdoing, but they argue it continues Dell's efforts to

"unwind its fraudulent scheme" and "partially corrected" the prior misrepresentations. *Id.*

The fifth announcement, a press release issued September 11, 2006, again disclosed the

existence of the SEC investigation and "the possibility of misstatements in prior period financial

reports, including issues relating to accruals, reserves and other balance sheet items that may affect

the company's previously reported financial results." *Id.* at ¶ 765. Plaintiffs allege this "disclosure

partially corrected the Defendants' prior false statements." *Id.* at ¶ 766. However, Plaintiffs do not

allege the price of Dell stock dropped immediately following this announcement. Furthermore, the

September 11, 200 announcement falls outside the purported class period, which closed September

8, 2006.

The first three disclosures, issued August 11, 2005, February 16, 2006, and May 8, 2006, do

no more than announce Dell's earnings or expected earnings. By the Plaintiffs' own admission, none

of these disclosures reveals or specifically corrects any prior fraud or misrepresentation. Nor do the

Plaintiffs allege these statements are in themselves misleading or anything other than a true reflection

of the company's earnings or expected earnings. Rather, Plaintiffs contend these disclosures qualify

as "corrective" merely because they reduce the value of Dell stock and thereby "unwind" the

fraudulent scheme. "Disclosure of financial losses generally–even if those financial losses are a

result of the specific concealed fact–is not sufficient" to establish–or allege–loss causation. *In re

Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007). "Mere failure to meet earnings

forecasts is insufficient to establish loss causation." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F.

Supp. 2d 666, 678-78 (S.D.N.Y. 2007). The disappointing earnings or expected earnings statements

identified by the Plaintiffs fail to reveal the falsity of any of Dell's prior representations, and

therefore do not qualify as a corrective disclosure. *Catogas v. Cyberonics, Inc.*, 2008 WL 4158923

at *3.

The fourth disclosure identified, issued August 17, 2006, both reports Dell's financial

earnings and discloses the existence of the SEC investigation. Plaintiffs do not even allege the

financial results released in the August 11, 2006 announcement were disappointing or below

expectations. Pls.' Am. Compl. at ¶¶ 763-64. Assuming the announcement was below

expectations, as discussed above a disclosure of financial loss without a revelation of prior fraud or

misrepresentation fails to qualify as a corrective disclosure. *Catogas v. Cyberonics, Inc.*, 2008 WL

4158923 at *3. Nor does the disclosure of an investigation, whether conducted internally or by the

SEC, absent a revelation of prior misrepresentations, constitute a corrective disclosure for purposes

of loss causation. *See Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 888 (N.D. Cal. 2008) ("[T]he announcement of an internal investigation cannot support an allegation of loss causation."); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (disclosure of initiation of SEC investigation and Board Special Committee investigation insufficient for loss causation purposes). The August 17, 2006 announcement of the SEC investigation did not disclose the existence of any wrongdoing, thus it did not constitute a corrective disclosure.

Unlike the August 17, 2006 disclosure, the September 11, 2006 announcement revealed "the possibility of misstatements in prior period financial reports, including issues relating to accruals, reserves and other balance sheet items that may affect the company's previously reported financial results." Pls.' Am. Compl. at ¶ 765. However, this disclosure occurred after the close of the alleged class period, September 8, 2006, and consequently could not have caused the Plaintiffs any loss. Furthermore, Plaintiffs do not allege the price of Dell stock dropped immediately following this announcement. As a result, the September 11, 2006 announcement cannot qualify as a corrective disclosure for loss causation purposes.

Based on the above analysis, the Court finds Plaintiffs have failed to adequately allege a corrective disclosure with respect to either the Dell Defendants or PwC.[2]

c.      **Materialization of the Risk**

Some courts have recognized a second method of pleading loss causation known as "materialization of the risk." Under this approach, a plaintiff must show the concealed risk somehow "materialized," other than by public disclosure, "in the form of unfavorable developments that

_____

[2]Plaintiffs allege the same announcements constitute corrective disclosures with respect to the Dell Defendants and PwC. Pls.' Resp. to PwC's Mot. to Dismiss at 28-31.

caused the market to drive the share price down." *In re Williams Sec. Litig.*, 496 F. Supp.2d 1195, 1265 (N.D. Okla. 2007). However, "*Dura*'s causation requirement would be entirely undermined if, in the context of an overall implosion of shareholders' equity in the relevant industry, a plaintiff could exempt himself from the obligation to separate the effects of fraud-related inflation from the effects of non-fraud risks by asserting simply that he is the victim of materialization of a fraudulently-concealed risk." *Id.* at 1266. The Southern District of New York explained the difference between materialization of the risk and corrective disclosure: "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed, i.e, a corrective disclosure." *In re Initial Public Offering Securities Litig.*, 399 F.Supp.2d 298, 307 (S.D.N.Y. 2005); *In re Enron Corp. Securities, Derivative & "Erisa" Litig.*, 2005 WL 3504860, *18 (S.D. Tex. Dec. 22, 2005).

Plaintiffs argue PwC's "clean audit" opinions and the Dell Defendants' deceptive practices concealed the fact that Dell's financial reports contained misrepresentations and the company lacked adequate internal controls. Pls.' Resp. to PwC's Mot. to Dismiss at 26; Pls.' Resp to Dell Defs.' Mot. to Dismiss n. 17. Plaintiffs argue these risks materialized when Dell disclosed the existence of the SEC investigation and when Dell issued disappointing earnings results and expectations. Pls.' Resp. to PwC's Mot. to Dismiss at 28; Pls.' Resp to Dell Defs.' Mot. to Dismiss n. 17.

Assuming a properly plead "materialization of the risk" can satisfy the *Dura* loss causation requirement,[3] the Court finds the "events" identified by the Plaintiffs insufficient to establish the requisite materialization. To support loss causation, allegations of materialization of the risk must identify some event or condition which causes a loss and which was concealed by the defendant's actions. *In re Initial Public Offering Securities Litig.*, 399 F. Supp. 2d at 307. For example, in *In re Parmalat Sec. Litig.*, the defendant was unable to pay bonds as they came due as a result of "massive undisclosed debt" it was unable to service, the risk of which was concealed by two fraudulent audit reports. 375 F. Supp. 2d 278, 306-307 (S.D.N.Y. 2005). The failure to pay the bonds led to a sharp drop in the price of Parmalat stock, and satisfied the materialization of the risk requirement. *Id.* In contrast, the only "risk" Plaintiffs have identified is the risk of a misstatement itself. Adopting the Plaintiffs' theory of materialization of risk would eviscerate *Dura*'s loss causation requirement, as any negative earnings news following a misrepresentation could, arguably, "materialize" the risk of a prior misrepresentation. *See In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1265; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (if the "risk could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement."). The Court thus finds the Plaintiffs have failed to allege a

---

[3]The Court notes the Fifth Circuit has yet to comment on the validity of "materialization of the risk" as a method of showing loss causation. However, *Catogas v. Cyberonics, Inc.* suggests a plaintiff must allege a corrective disclosure. 2008 WL 4158923, *3 (5th Cir. Sept. 8, 2008) (unpublished opinion) ("Plaintiffs must allege, therefore, that the market reacted negatively to a **corrective disclosure**, which revealed the falsity of [defendant's] previous representations regarding the accounting for its stock options.") (emphasis added).

"materialization of the risk" which would satisfy the loss causation element of § 10(b) liability as to either the Dell Defendants or PwC.

For the above reasons, the Court finds Plaintiffs have failed to adequately plead loss causation and thus failed to state a claim for which relief may be granted.  As a result, the Court GRANTS the Dell Defendants' and PwC's motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

## IV.    PSLRA Safe Harbor Provision

Under Rule 10-b5, Plaintiffs present a list of statements made by Dell and the Individual Defendants which Plaintiffs claim were false and misleading when made.[4]  Defendants claim many of the statements alleged as fraudulent in the complaint are not actionable because they are "forward-looking" statements protected by the PSLRA's safe harbor provision.  *See* 15 U.S.C. § 78u-5(c)(1)(A); *see also* Dell Defs.' Reply at Ex. 4 (chart detailing statements in the complaint which would allegedly be protected by the PSLRA safe harbor).  The PSLRA's safe harbor for forward-looking statements has two independent prongs, one focusing on the defendant's cautionary statements and the other on the defendant's state of mind.  15 U.S.C. §§ 77z-2(c)(1)(A)-(B), 78u-5(c)(1)(A)(B).  Under the first prong, there is no liability to the extent a forward-looking statement is: (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those

---

[4]Additionally, Plaintiffs allege actionable omissions occurred; principally, that between August 2005 and August 17, 2006, Defendants failed to disclose the SEC was investigating Dell's accounting practices. Pls.' Am. Compl. at ¶ 160.  But absent a duty to disclose, the failure to disclose information, even if that information is material, is not actionable. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").  Plaintiffs make no allegation Dell had a duty under the law to disclose the SEC investigation immediately, or anytime before August 17, 2006.

in the forward-looking statement," or (ii) "immaterial." *Id.* at §§ 77z-2(c)(1)(A), 78u-5(c)(1)(A).

Under the second prong, there is no liability for a forward-looking statement if the plaintiff fails to

prove the statement: (i) if made by a natural person, was made with actual knowledge that the

statement was false or misleading or (ii) if made by a business entity, was made by or with the

approval of an executive officer of that entity with actual knowledge by the officer that the statement

was false or misleading. *Id.* at §§ 77z-2(c)(1)(B), 78u-5(c)(1)(B).

Consequently, if a statement is forward-looking, Defendants may invoke the first prong of

the safe harbor by showing the statement was identified as forward-looking and accompanied by

meaningful cautionary language, or that the statement was immaterial, or nonactionable "puffery."

*Southland*, 365 F.3d at 371-72. To avoid the second prong of the safe harbor, Plaintiffs must plead

facts demonstrating the statement was made with actual knowledge of its falsity. *Id.* at § 78u-

5(c)(1)(B); *Nathenson*, 267 F.3d at 409.

In this case, the plethora of statements which Plaintiffs claim were false and misleading spans

49 pages of the complaint. *See* Pls.' Am. Compl. at ¶¶ 160-616. Because the Court has already

found Plaintiffs have not adequately alleged scienter as to *any* of the allegedly false or misleading

statements, it is not necessary to examine each statement piecemeal to determine whether it fits into

the PSLRA safe harbor.

## V.     Section 20(a) "Control Person" Claims

The complaint also alleges the Individual Defendants are liable as "controlling persons"

under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). "Control person"

liability is, however, derivative—it is predicated on the existence of an independent violation of the

securities laws. *Rubinstein v. Collins*, 20 F.3d 160, 166 n. 15 (5th Cir. 1994); *Lovelace v. Software*

*Spectrum Inc.*, 78 F.3d 1015, 1021 n. 8 (5th Cir.1996). Because Plaintiffs have failed to state a claim under section 10(b), a "predicate " claim, they have necessarily failed to state a Section 20(a) claim.

## VI.    Section 20A Insider Trading Claims

Plaintiffs' "insider trading" claims against Michael Dell, Rollins, and Schneider also fail as a matter of law because Section 20A mandates an independent, predicate violation of the 1934 Act or of its rules and regulations. *See, e.g., In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 n. 17 (S.D. Tex. 2003). Plaintiffs have failed to state an Exchange Act violation as to any of the Individual Defendants.

## VII.   Amendment Would be Futile

Although leave to amend is generally freely given, in this case leave to amend is DENIED. Plaintiffs have had more than ample time to set forth sufficient allegations as to all defendants and has failed to do so. Plaintiffs have made no effort to indicate what additional facts they would assert to adequately plead its case under Fed. R. Civ. P. 12(b)(6), nor have Plaintiffs claimed to need or be missing any information necessary to properly state a claim for which relief may be granted. *See Internet Corporativo S.A. de C.V. v. Bus. Software Alliance, Inc.*, No. Civ.A. H-04-2322, 2004 WL 3331843, *15 (S.D. Tex. Nov. 15, 2004) ("The failure to identify new facts or to connect them to a legal claim...leads this court to conclude that leave to amend should be denied as futile."); *Hughes v. Mays*, No. Civ.A.3:04-CV-0480-L, 2004 WL 1638020, *1 (N.D. Tex. June 30, 2004) (same).

### Conclusion

In accordance with the foregoing:

IT IS ORDERED that Defendants' Unopposed Motion for Leave to File Supplemental Authority in Further Support of Defendants' Motion to Dismiss [#193] is GRANTED.

IT IS FURTHER ORDERED that Defendant PricewaterhouseCoopers LLP's ("PwC") Motion to Dismiss [#174] and Defendants Dell Inc., Michael Dell, Kevin Rollins, and James Schneider's (collectively "Dell Defendants") Motion to Dismiss [#175] are GRANTED and all claims against all defendants in the above styled and numbered cause are DISMISSED WITH PREJUDICE for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

IT IS FINALLY ORDERED that any pending motions are DISMISSED AS MOOT.

SIGNED this the _6th_ day of October 2008.

SAM SPARKS
UNITED STATES DISTRICT JUDGE